

Richard E. Levine (SB #88729)
LEVINE & BAKER LLP
One Maritime Plaza, Suite 400
San Francisco, CA 94111
Telephone: (415) 391-8177
Facsimile: (415) 391-8488
rlevine@levinebakerlaw.com

Joseph V. Norvell
NORVELL IP LLC
1776 Ash Street
Northfield, IL 60093
Telephone: (847) 809-2212
Facsimile: (312) 268-5063

Attorneys for Plaintiffs
ROBERT TRENT JONES II, INC.
ROBERT TRENT JONES LICENSING GROUP, LLC

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ROBERT TRENT JONES II, INC. and ROBERT TRENT JONES LICENSING GROUP, LLC | Civil Action No. |
| | **COMPLAINT FOR FRAUD, NEGLIGENT MISREPRESENTATION, BREACH OF CONTRACT, WILLFUL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION AND DILUTION** |
| Plaintiffs, | |
| v. | |
| GFSI, INC. d/b/a GEAR FOR SPORTS, INC. | EQUITABLE RELIEF SOUGHT |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

For its Complaint against defendant GFSI, Inc. d/b/a Gear For Sports, Inc. (hereinafter "GFSI"), plaintiffs Robert Trent Jones II, Inc. and Robert Trent Jones Licensing Group, LLC states as follows:

**NATURE OF ACTION**

1.     This is an action for fraudulent and negligent misrepresentation in violation of the California Civil Code §§ 1572, 1574, 1709 and 1710, breach of contract, and willful federal trademark infringement, unfair competition and dilution in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and 1125(c).

2.     This action results from GFSI's fraudulent and negligent misrepresentations leading to the execution of the May 1, 2005 ROBERT TRENT JONES II LICENSING GROUP, LLC Intellectual Property License Agreement ("License Agreement"), and GFSI's unauthorized use of the ROBERT TRENT JONES trademarks in violation of the License Agreement.

**PARTIES**

3.     The Plaintiffs are Robert Trent Jones II, Inc., a California Corporation with its principal place of business at 705 Forest Avenue, Palo Alto, California 94301 ("RTJ2, Inc.") and Robert Trent Jones Licensing Group, LLC, a Delaware limited liability corporation with its principal place of business also at 705 Forest Avenue, Palo Alto, California 94301 ("RTJ Licensing"), hereinafter collectively referred to as "Plaintiffs."

4.     RTJ2, Inc. owns and is using the ROBERT TRENT JONES trademarks and service marks as well as the rights of publicity of the famous golf course architect Robert Trent Jones, Jr. Through his companies, Robert Trent Jones, Jr. has designed over 240 golf courses on six continents in 40 different countries. These courses have received numerous awards and recognition. RTJ2, Inc. has built up considerable goodwill in the ROBERT TRENT JONES trademarks and services and they have come to signify the source of high quality golf course design services and products.

5.    RTJ2, Inc. granted the right to license certain ROBERT TRENT JONES trademarks and services marks as well as the rights of publicity of Robert Trent Jones, Jr. to RTJ Licensing pursuant to a May 1, 2005 License Agreement.

6.    RTJ Licensing licenses the ROBERT TRENT JONES trademarks and service marks as well as the rights of publicity of the famous golf course architect Robert Trent Jones, Jr.

7.    Defendant, GFSI, Inc. d/b/a Gear For Sports, Inc. is a Delaware corporation with its principal place of business at 9700 Commerce Parkway, Lenexa, Kansas ("GFSI"). GFSI conducts business in this Judicial District, including in San Francisco, California.

## JURISDICTION

8.    This Court has jurisdiction because: (a) this is a civil action arising under the trademark laws of the United States, Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, jurisdiction being conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 and 1338(a); and (b) the Plaintiffs' state and common law claims are joined and related pursuant to 28 U.S.C. §§ 1367(a) and 1338(b). Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because the defendant is doing business in this District and Plaintiffs' principal place of business is in this District.

## INTRADISTRICT ASSIGNMENT

9.    Plaintiff's principal place of business is in the County of Santa Clara; however, this action concerns intellectual property rights and, thus falls within an exception to the general rule of intradistrict assignment pursuant to Local Rule 3-2(c).

**GFSI'S SOLICITATION OF ROBERT TRENT JONES, JR.**

10. In 2004, GFSI solicited RTJ Licensing to license Robert Trent Jones, Jr.'s rights of publicity and the name and mark ROBERT TRENT JONES for use in connection with a line of high quality golf apparel.

11. As part of these solicitations, on July 13, 2004, GFSI presented RTJ Licensing with a comprehensive ROBERT TRENT JONES Golf Apparel Business Plan ("2004 Proposed Plan"). A copy of this plan is attached as Exhibit A.

12. The opening sentence of GFSI's 2004 Proposed Plan states, "Our goal is to create a stand-alone apparel company..."

13. GFSI's 2004 Proposed Plan also contained the following representations verbatim:

- The Robert Trent Jones Golf Apparel Company (RTJA) would be established and based in Lenexa, Kansas. It would be a stand-alone company wholly owned by GFSI, Inc. The entity's only activity would be to design, develop and market tasteful, high quality, golf apparel with wholesale distribution into the Green Grass golf pro shops; Green Grass golf tournaments with national recognition; specialty retailers the likes of In Celebration of Golf, and Mark Shale; high end specialty department stores the caliber of Nordstrom, Saks 5th Ave., and Neiman Marcus; high end destination resorts, hotels like the Ritz Carlton, The Breakers, or the Boca Raton Hotel; high end cruise ship retail shops on cruise lines comparable to Seaborne, or the World; and the corporate identity market for use in golf tournaments and customer or employee gifts.

- We will develop two line releases each year.

- We are people and a company of our word, and live by our Gear For Sports Values. We believe Robert Trent Jones, the person, and Robert Trent Jones II, the company have the same goals and values. We would like to create a licensing agreement that is most interested in the well-being of the RTJA entity, rather than the rights of either party.

- As one can imagine, the capital requirements needed to properly fund a start up business are extremely high in relationship to the revenue and income generated. That is the reason for the reduced royalty rate request in the beginning years.

- We are most interested in the long-term value of the brand than we are on the short-term gains.

1

## THE LICENSE AGREEMENT

2      14.     Based on the oral and written representations made by GFSI, including the

3 representations made in the 2004 Proposed Plan, RTJ Licensing and GFSI entered into the

4 License Agreement for the manufacture and sale of ROBERT TRENT JONES branded apparel.

5 The License Agreement commenced on May 1, 2005 and expires on April 20, 2015.  A copy of

6 the License Agreement, with confidential information redacted, is attached as Exhibit B.

7      15.     The License Agreement licenses to GFSI on an exclusive basis specific

8 intellectual property ("Licensed Rights") for use in connection with golf apparel, including the

9

10 following:

11 **United States Trademark Registrations ("RTJ Marks"):**

| Mark | Reg. No. | Status | Reg. Date | Goods |
|---|---|---|---|---|
| ROBERT TRENT JONES | 1,899,912 | Incontestable | 06/13/95 | Men's accessories, namely jackets, shirts, pants, shorts, sweaters |
| ℛ | 3,205,541 | Registered | 02/06/07 | Clothing, namely shirts, sweaters, sweater vests, trousers, shorts, jackets, headwear |
| ROBERT TRENT JONES | 3,128,905 | Registered | 08/15/06 | Pants, shorts, sweaters, jackets, sweatshirts, vests, long-sleeved and short-sleeved golf shirts |

**Rights of Publicity ("RTJ Publicity Rights"):**

The Robert Trent Jones, Jr. Name
The Robert Trent Jones, Jr. Signature
Likeness, Image and Persona of Robert Trent Jones, Jr.

16. The License Agreement grants GFSI the right to use the Licensed Rights in connection with the manufacture, display, sale, marketing, distribution and/or reproduction of specified golf apparel ("Licensed Products") in exchange for specified royalties.

17. Under the License Agreement, as amended, GFSI may only distribute, display, promote, and sell Licensed Products in the United States of America and its territories, Canada, Mexico and Japan.

18. GFSI is required under the License Agreement to pay RTJ Licensing a non-refundable, actual royalty equal to a percentage defined under the License Agreement multiplied by the Net Sales of all Licensed Products sold. GFSI is also required to pay a Minimum Royalty for each year of the License Agreement and a Royalty Advance, as defined under the Licensed Agreement.

19. Under the License Agreement, if GFSI makes any sales of Licensed Products to an associated or affiliated company, or through an agency, the price subject to royalty is the greater of the price charged to the consumer by the subsidiary, associated or affiliated company or agency, or the price charged by GFSI.

20. GFSI is required under the License Agreement to maintain Books and Records, as defined under the License Agreement. Upon written notice, GFSI shall annually provide RTJ Licensing access to such Books and Records for inspection, audit and copy. If the inspection or audit reveals a deficiency of royalties due, GFSI shall pay RTJ Licensing the deficient amount including interest. If the inspection or audit reveals a deficiency of more than two percent (2%) of royalties due, GFSI shall reimburse RTJ Licensing for the cost of services for the RTJ Licensing representatives, accountants, and for other costs incident to the inspection or audit, including attorney's fees and costs of collection.

21.    Because of GFSI's representations that it would create a stand-alone company for

the manufacture and sale of the Licensed Products, RTJ Licensing ensured that the License

Agreement, Section 12, contained provisions that GFSI shall not:

- include or permit the inclusion of its name or any other person or entity with any of the Licensed Rights in any advertising, promotional or other material or on the Licensed Products; and/or
- display, sell, market, distribute, or advertise any other product or service in conjunction or association with an Licensed Product.

22.    Section 18.2 of the License Agreement states that GFSI "shall not negotiate with

respect to, enter into agreements relating to, or participate in business transactions which are

inconsistent with the purpose of the Agreement."

23.    Section 6 of the License Agreement requires GFSI to submit to RTJ Licensing

for approval Samples of Licensed Products and promotional and packaging material prior to

distribution or sale. GFSI may only manufacture, sell, display, market or distribute Licensed

Products after approval. The number of Samples to be provided by GFSI is defined under the

License Agreement.

24.    Section 6 of the Licensed Agreement also requires GFSI to provide RTJ

Licensing with a reasonable number of samples of each Licensed Product together with labeling

and packaging upon request.

25.    Section 7 of the License Agreement requires GFSI to submit to RTJ Licensing all

advertising, display and promotional copy in advance of product for approval. GFSI shall not

use the Licensed Rights in any advertising, display or promotional material without such

approval.

26.    Section 13 of the License Agreement states that GFSI "warrants it will not use

the Licensed Products for sales to Mass Retailers, Clubs or discount stores except as permitted

by Sections (2.10) and (6)" of the License Agreement. Section 6.3 permits GFSI to sell substandard Licensed Products to Secondary Markets only if all Licensed Rights identification is first removed. Section 2.10 defines Secondary Markets as "a LICENSEE customer that LICENSEE customarily sells defective, irregular, seconds or overstocks of products, such as The Paradies Shops (d/b/a PGA Tour Stop Stores), Burlington Coat Factory, Bermo Enterprises, Gabriel Brothers or the like." These provisions were material to RTJ Licensing. The Licensed Rights are, and were, prior to the License Agreement, associated with certain luxury products and were intended by RTJ Licensing to be used only in connection with full priced, high quality products marketed to consumers interested in and attracted to luxury products. RTJ Licensing was careful to protect, contractually, against ROBERT TRENT JONES branded product being sold in discount stores or defective product bearing the licensed rights being sold at all. It was RTJ Licensing's view (a correct view, in fact), that such sales would detract from the value of the mark.

27.     Under the License Agreement, GFSI shall not manufacture, display, sell, market, distribute and/or reproduce, or at GFSI's direction, any product under a different brand that is identical to a Licensed Product.

28.     Section 6.4 of the License Agreement requires GFSI to make an Investment, as defined under the License Agreement, over the first four years of the License Agreement. At the request of RTJ Licensing, GFSI shall provide detailed documentation showing the dollar amount of this Investment.

29.     Under the License Agreement, GFSI is required to dedicate and utilize adequate staffing and resources to develop the business contemplated by the License Agreement in a commercially reasonable fashion.

30.    Section 6.5 of the License Agreement requires GFSI to annually submit its proposed Marketing, Distribution, Financial and Quality Plan to RTJ Licensing for approval.

31.    Under the License Agreement, GFSI is required to establish a toll free customer service telephone number or public e-mail address and is required to keep a detailed log or e-mail printed history of all communications. Semi-annually, GFSI must submit copies of the customer communications to RTJ Licensing.

32.    Under the License Agreement, GFSI shall reimburse RTJ Licensing for all reasonable expenses, legal fees and costs required to enforce GFSI's obligations under the License Agreement.

## GFSI'S SURPRISE DECISION TO DISCONTINUE ROBERT TRENT JONES BRANDED APPAREL

33.    In early 2007, RTJ Licensing requested a meeting with GFSI to review performance to date and to further develop the long-term relationship between RTJ Licensing and GFSI. GFSI agreed to meet with RTJ Licensing at GFSI's offices on June 5, 2007.

34.    The June 5, 2007 meeting began as RTJ Licensing expected, including a presentation by GFSI employees on the proposed Spring 2008 product line. However, at the end of the June 5th meeting, GFSI "bombarded" RTJ Licensing with news that it did not intend to produce a new Spring 2008 product line, notwithstanding the fact that the production of such a line is an obligation of GFSI under the License Agreement. Instead, GFSI proposed several vague options that GFSI admitted were either not viable or involved changing product quality and/or distribution channels beyond the scope of the License Agreement.

35.    After the June 5, 2007 meeting, RTJ Licensing encouraged GFSI to continue with the development and production of a new 2008 product line. RTJ Licensing suggested that even if GFSI did not intend on honoring the License Agreement on a continuing basis, the

production of a Spring 2008 line might create time in which RTJ Licensing could find a new

licensee and/or mitigate the damages RTJ Licensing would suffer as a result of GFSI's apparent

decision to abandon its obligations to RTJ Licensing under the License Agreement. GFSI,

however, refused to agree to produce a new 2008 product line, and made no new proposals

within the terms of the License Agreement. Indeed, GFSI even uninvited Robert Trent Jones, Jr.

and other RTJ Licensing representatives from GFSI's annual sales meeting (to which they had

previously been invited) after RTJ Licensing had already begun travel to Lenexa, Kansas.

## GFSI'S BREACH OF THE LICENSE AGREEMENT

36.     GFSI has breached, and is continuing to breach, the License Agreement in at

least the following ways:

- GFSI's decision not to produce a new 2008 product line is inconsistent with the purpose of the License Agreement and violates Section 18.2.

- GFSI's sale of Licensed Products that are not approved by RTJ Licensing violates Section 6.

- GFSI's use of advertising and marketing materials for Licensed Products that are not approved by RTJ Licensing violates Section 7.

- GFSI's sale of "private label" apparel that is identical to Licensed Products violates Section 18.3 and GFSI's failure to pay royalties on said sales violates Section 4.

- GFSI's sale of Licensed Products with the Licensed Rights on them to discount stores violates Section 13.

- GFSI's sale of defective and irregular Licensed Products with the Licensed Rights on them violates Section 6.

- Subsequent to entering in to the License Agreement, GFSI entered into a license agreement with Under Armour, an entity that licenses its mark on items of clothing directly competing with the Licensed Products, which is inconsistent with the purpose of the License Agreement and violates Section 18.2.

- GFSI's salesmen are currently selling five competitive golf apparel brands, including the Licensed Products. Such transactions are inconsistent with the purpose of the License Agreement and violate Section 18.2.

- GFSI's failure to submit a Marketing, Distribution, Financial and Quality Plan for 2006, and GFSI's failure to provide such a plan that can be approved by RTJ Licensing for 2007 violates GFSI's obligation under Section 6.5.

- GFSI is calculating royalties based on numbers lower than Net Sales, as defined under the License Agreement, in breach of its obligations under Sections 2.8 and 4.

- GFSI's sale, or coordinating or arranging for, of Licensed Products beyond the granted Licensed Territory violates Section 3.1.

- GFSI is including and permitting the inclusion of the names of other entities with the Licensed Rights in advertising, promotional and other material and is displaying, selling, marketing, distributing, and advertising other products in conjunction and association with Licensed Products in breach of its obligations under Section 12.8(b) and 12.8(c).

- GFSI's refusal to produce a new Spring 2008 product line in contradiction to the reasonable expectations and intent of the parties breaches GFSI's duty to exert best efforts to comply with the License Agreement.

- GFSI acted in bad faith by abandoning its support of the Robert Trent Jones apparel line in favor of the subsequently acquired, competing license agreement with Under Armour and thereby destroyed RTJ Licensing's rights and expectation interests under the License Agreement. By at least these actions, GFSI breached and continues to breach its duty of good faith and fair dealing under the License Agreement.

- GFSI's failure to provide RTJ Licensing with detailed documentation substantiating the dollar amounts of GFSI's Investment in the ROBERT TRENT JONES brand after repeated requests by RTJ Licensing violates Section 6.4.

- GFSI's failure, after reasonable requests by RTJ Licensing, to provide RTJ Licensing with any samples, labeling or packaging for 2007 for RTJ Licensing's quality review and approval violates Section 6.

- After RTJ Licensing gave timely notice of an audit on GFSI to take place at GFSI's facilities, and made reasonable requests prior to, during and following the audit for certain Books and Records, as defined under the License Agreement, GFSI failed to provide such Books and Records violating Section 9.

- GFSI's failure to submit to RTJ Licensing copies of customer communications received through GFSI's toll free customer service telephone number or public e-mail address violates Section 6.6.

37.     The stand-alone apparel company that GFSI proposed in its 2004 Proposed Plan was never created.  GFSI never intended to create a stand-alone company and intentionally misrepresented to RTJ Licensing that a stand-alone apparel company would be created.  In fact, and in stark contradiction to its representations to RTJ Licensing (see, e.g., GFSI's 2004 Proposed Plan, Exhibit A hereto), GFSI has promoted, and continues to promote, its apparel brands as "One Company, Five Brands" in breach of Section 12.8 of the License Agreement.

38.     RTJ Licensing's attempt to address its differences with GFSI amicably has been rebuffed by GFSI.

## **FIRST CLAIM FOR RELIEF**

### **FRAUDULENT MISREPRESENTATION**

39.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 38 as though fully set forth herein.

40.     GFSI's material representation that it would create a stand-alone company directed to the Licensed Products line was made by GFSI with the knowledge that it was false and with the intent to induce reliance on the part of RTJ Licensing.  RTJ Licensing was justified in relying on the material representation when entering in to the License Agreement and damages have resulted to Plaintiffs as result of the reliance.

**COMPLAINT**

13

## SECOND CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION

41.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 40 as though fully set forth herein.

42.    GFSI's material representation that it would create a stand-alone company directed to the Licensed Products line was untrue and was made by GFSI without any reasonable grounds for believing it was true and with the intent to induce reliance on the part of RTJ Licensing. RTJ Licensing was justified in relying on the material representation when entering in to the License Agreement and damages have resulted to Plaintiffs as result of the reliance.

## THIRD CLAIM FOR RELIEF

### BREACH OF CONTRACT

43.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 42 as though fully set forth herein.

44.    The License Agreement between RTJ Licensing and GFSI is a valid contract entered into with consideration.

45.    RTJ Licensing has performed and continues to perform all of its obligations under the License Agreement.

46.    GFSI has materially breached the License Agreement as set forth in detail above.

47.    As a result of GFSI's material breaches, Plaintiffs suffer and continue to suffer irreparable harm.

48.    As a result of GFSI's material breaches, Plaintiffs have and will continue to be damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

1

**TRADEMARK INFRINGEMENT**

2

49.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 48 as though

3

fully set forth herein.

4

50.     GFSI's unauthorized use of the RTJ Marks outside the terms of the License

5

Agreement is likely to cause consumer confusion, mistake, or deception as to the nature,

6

characteristics, qualities and geographic origin of the Licensed Products.  The public is likely to

7

believe that GFSI's use of the RTJ Marks is licensed, approved or sponsored by, connected with,

8

or related to Plaintiffs in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),

9

California Business and Professions Code, § 17200, et seq., and the common laws of California.

10

11

51.     GFSI's conduct was at all times intentional and with knowledge that its use is

12

likely to cause consumer confusion, mistake, or deception as to the nature, characteristics,

13

qualities and geographic origin of the Licensed Products, such that GFSI's conduct was willful.

14

52.     Plaintiffs have been irreparably harmed as a result of GFSI's infringement and will

15

continue to suffer irreparable harm unless GFSI is retrained from infringing the RTJ Marks.

16

Without preliminary and permanent injunctive relief, Plaintiffs have no means by which to

17

prevent GFSI's infringement.  No amount of money damages can adequately compensate

18

Plaintiffs if they lose the ability to control the use, reputation and goodwill of the RTJ Marks.

19

Plaintiffs are therefore entitled to preliminary and permanent injunctive relief.

20

21

**FIFTH CLAIM FOR RELIEF**

**UNFAIR COMPETITION**

22

23

53.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 52 as though

24

fully set forth herein.

25

53.    GFSI's unauthorized use of the RTJ Marks in connection with the Licensed Products outside the terms of the License Agreement constitutes use of a false designation of origin or false or misleading representation in interstate commerce, that wrongfully and falsely designates, describes and represents the nature, characteristics, qualities, or geographic origin of the RTJ Marks, and is likely to cause confusion as to GFSI's affiliation, connection, or association with Plaintiffs, or as to the origin, sponsorship, or approval of the Licensed Rights in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), California Business and Professions Code, § 17200, et seq., and the common laws of California.

54.    Plaintiffs have been irreparably harmed as a result of GFSI's false designations of origin, false descriptions or misrepresentations regarding the RTJ marks and will continue to suffer irreparable harm unless GFSI is restrained from this infringing conduct. Without preliminary and permanent injunctive relief, Plaintiffs have no means by which to prevent GFSI's infringing conduct.  No amount of money damages can adequately compensate Plaintiffs if they lose the ability to control the use, reputation and goodwill of the RTJ Marks. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief.

## SIXTH CLAIM FOR RELIEF

### TRADEMARK DILUTION

55.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 54 as though fully set forth herein.

56.    The aforementioned actions by GFSI began recently, long after the RTJ Marks became distinctive and famous.

57.    GFSI's actions constitute a commercial use in commerce and dilute the distinctive quality of Plaintiffs' famous RTJ Marks through tarnishment and blurring.  GFSI

willfully intended to trade on Plaintiffs' reputation and to cause dilution of Plaintiffs' famous

RTJ Marks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), California

Business and Professions Code, § 14330, et seq., and the common laws of California.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand the following relief:

(1)        That the Court issue a Preliminary Injunction:

  a.  enjoining GFSI, its officers, directors, shareholders, agents,

    employees, subcontractors, partners, licensees, subsidiaries,

    affiliates and related companies or entities, and all others acting in

    concert or participation with it from using the Licensed Rights and

    distributing or selling apparel bearing the Licensed Rights in light

    of GFSI's fraudulent and negligent misrepresentations and its

    intentional and willful breach of the License Agreement;

  b.  ordering GFSI to cease all manufacture of Licensed Products; and

  c.  ordering GFSI to turn over its entire inventory of Licensed

    Products, advertising, promotional and packaging material related

    to the Licensed Products to RTJ Licensing.

That said injunction be made permanent with the entry of judgment.

(2)        That the Court enter judgment in favor of Plaintiffs that GFSI has

made fraudulent and negligent misrepresentations and willfully breached the License Agreement.

(3)        That the Court enter judgment in favor of Plaintiffs declaring that

RTJ2, Inc. is the owner of all right, title and interest in and to the RTJ Marks and Robert Trent

Jones Publicity Rights and that GFSI has willfully infringed and diluted said rights.

1    (4)              That GFSI be ordered to pay Plaintiffs all damages suffered by reason

2    of GFSI's trademark infringement, unfair competition, trademark dilution, breach of contract and

3    fraudulent misrepresentation as set forth in this Complaint, including but not limited to:

4              a.  At least one millions seven hundred thirty-nine thousand, two

5                  hundred fifty-eight United States dollars and forty five cents

6                  ($1,739,258.45), which is the reasonable present value of future

7                  guaranteed royalty payments under the License Agreement,

8                  discounted for inflation;

9

10             b.  GFSI's profits from the sale of Licensed Products to discount

11                 stores;

12             c.  GFSI's profits from the sale of defective and irregular Licensed

13                 Products;

14             d.  GFSI's profits from the sale of "private label" products identical to

15                 Licensed Products;

16             e.  The dollar value of the damage to the goodwill associated with the

17                 famous RTJ Marks from:

18                     1.  the sudden exit of new Licensed Products from the

19                         marketplace without an opportunity for RTJ Licensing

20                         to mitigate damages;

21

22                     2.  the sale of defective and irregular Licensed Products;

23                     3.  the sale of private label products identical to the

24                         Licensed Products;

25                     4.  the sale of Licensed Products to discount stores; and

f. All royalty deficiencies unpaid to date including interest pursuant

to Section 9.2 of the License Agreement;

g. The cost of services for RTJ Licensing's representatives,

accountants, and any other costs incident to the audit initiated on

GFSI on August 28 and 29, 2007, including attorney's fees and

cost of collection; and

h. The present value of a stand-alone Robert Trent Jones apparel

company at the end of the ten-year License Agreement.

(5) That the Court award Plaintiffs three times the damages suffered by reason

of the intentional, unlawful acts of GFSI as set forth in this Complaint pursuant to 15

U.S.C. Section 1117(b).

(6) That GFSI be ordered to pay Plaintiffs punitive or exemplary damages as

provided by law.

(7) That GFSI be ordered to pay Plaintiffs its expenses, costs and reasonable

attorneys' fees pursuant to 15 U.S.C. Sections 1117(a) and (b) and License

Agreement Section 18.8.

(8) That GFSI be ordered to reimburse Plaintiffs for its out of pocket expenses

and attorneys fees in seeking GFSI's compliance with the License Agreement,

including but not limited to travel to Lenexa, Kansas for the annual sales meeting to

which Robert Trent Jones, Jr. and RTJ Licensing representatives were uninvited at the

last minute and after travel had begun to Lenexa, Kansas.

(9) That GFSI be required to file with this Court and serve on the undersigned

counsel for RTJ Licensing within thirty (30) days after the entry of judgment a

written report under oath setting forth in detail the manner in which GFSI has

complied with the injunction ordered by this Court.

(10)    That Plaintiffs shall have such other relief as this Court may deem

just and proper.

(11)

Dated: September 21, 2007

Respectfully submitted,

Richard Levine
Levine & Baker LLP
One Maritime Plaza, Suite 400
San Francisco, CA 94111
United States of America
Telephone:    (415) 391-8177
Facsimile:    (415) 391-8848

Joseph V. Norvell
Joseph T. Kucala
Jay M. Burgett
Norvell IP llc
1776 Ash Street
Northfield, Illinois 60093
Telephone:    (847) 809-2212
Facsimile:    (312) 268-5063

Attorneys for Plaintiffs
ROBERT TRENT JONES II, INC.
ROBERT TRENT JONES LICENSING GROUP, LLC

**JURY TRIAL DEMANDED**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues properly triable of right by a jury.

Dated: September 21, 2007

Respectfully submitted,

Richard Levine
Levine & Baker LLP
One Maritime Plaza, Suite 400
San Francisco, CA 94111
United States of America
Telephone:    (415) 391-8177
Facsimile:     (415) 391-8848

Joseph V. Norvell
Joseph T. Kucala
Jay M. Burgett
Norvell IP llc
1776 Ash Street
Northfield, Illinois 60093
Telephone:    (847) 809-2212
Facsimile:     (312) 268-5063

Attorneys for Plaintiff
ROBERT TRENT JONES II, INC.
ROBERT TRENT JONES LICENSING GROUP, LLC



**EXHIBIT A**

Our goal is to create a stand alone apparel company, established to meet the following Vision, Mission, and Value goals and to do so whereby we launch this new apparel brand at the PGA SHOW in January 2005.

## *VISION*

TO EXPAND THE **ROBERT TRENT JONES** GOLF IMAGE BEYOND GOLF COURSE ARCHITECTURE BY INTERPRETING YOUR VISION AND VALUES INTO IMAGINATIVE, WELL-CRAFTED GOLF APPAREL

## *MISSION*

CREATE TASTEFUL COLLECTIONS OF HIGH QUALITY GOLF APPAREL, BLENDING CLASSIC DESIGN WITH INNOVATION, AND DISTRIBUTE THIS COLLECTION TO THE FINEST DESTINATION GOLF RESORTS, HIGH END GREEN GRASS PRO SHOPS, AND A LIMITED NUMBER OF HIGH END SPECIALTY RETAILERS.

## *VALUES*

- THE PROCESS WILL ENHANCE AND EXTEND THE **ROBERT TRENT JONES** NAME
- HIGH QUALITY APPAREL PRODUCTS MADE IN FORTHRIGHT FACTORIES
- BE A WORLD CLASS SERVICE PROVIDER
- PROVIDE THE GOLF CONSUMER PRODUCTS THAT HAVE ENDURING VALUE

The Robert Trent Jones Golf Apparel Company (RTJA) would be established and based in Lenexa, Kansas. It would be a stand-alone company wholly owned by GFSI, Inc. The entity's only activity would be to design, develop and market tasteful, high quality, golf apparel with wholesale distribution into the Green Grass golf pro shops; Green Grass golf tournaments with national recognition; specialty retailers the likes of In Celebration of Golf, and Mark Shale; high end specialty department stores the caliber of Nordstrom, Saks 5th Ave., and Neiman Marcus; high end destination resorts, hotels like the Ritz Carlton, The Breakers, or the Boca Raton Hotel; high end cruise ship retail shops on cruise lines comparable to Seaborne, or the World; and the corporate identity market for use in golf tournaments and customer or employee gifts.

## PRODUCT FOCUS

RTJ products will be designed and manufactured specifically for the male golfer. The product specifications will be created to insure freedom of movement, performance and comfort. We understand the consumer and we will offer a limited number of silhouettes in a broad range of colors and patterns. The product offering will include:

## PRODUCT DESCRIPTION

RETAIL PRICEPOINTS
Men's 60 doubles, mercerized 100% cotton *jersey* golf shirts in solids, stripes, and patterns                                    $65.00 - $100.00

Men's 60 doubles, mercerized 100% cotton *pique* golf shirts in solids, stripes, and patterns                                    $65.00 - $100.00

Men's basic golf sweaters, and sweater vests, in mercerized cottons, merino wools, and cashmere fabrications             $125.00- $300.00

Men's traditional trousers made of wool, wool blend, or microfiber fabrications
                             $100.00-$225.00

Men's traditional golf shorts made of microfiber and cotton fabrications
                             $75.00

Men's windshirts made of water-resistant, breathable synthetic fabrications
                             $100.00- $150.00

Men's light-weight golf jacket made of a water-resistant, breathable synthetic fabrication
                             $150.00

## SEASONAL PRODUCT RELEASES

We will develop two line releases each year.

SPRING, with product delivery to the customer from November 1st through April 30th;
and,
FALL, with product delivery to the customer from May 1st through October 31st.

## PRODUCT MANUFACTURING

RTJA would design, develop and manufacture the products to the highest commercial standards and would use only forthright factories monitored by the GFSI global sourcing organization who would control all aspects of manufacturing from yarn forward through packaging and shipping to the Kansas U.S.A. warehouse.

## LEAD TIME SERVICE STANDARDS

The golf customer will buy a large percentage of their apparel needs in advance of the season. We will offer specific apparel collections by shipping periods for initial orders and sell them to the golf pro shops 90 to 120 days prior to the beginning of each season.

The success of the golf pro shop is predicated on their ability to reorder fashion and basic products and to place special orders for local tournaments. We have had an excellent reputation for industry leading service for many years. Our new 300,000 volume distribution center will enable us to provide even faster reorder service to our customers. Since Robert Trent Jones will be our premier brand we envision a 24-hour service standard on shipping reorder RTJ products to our Green Grass golf customers. The combination of high quality apparel and one day service will set new standards in the golf business. We are one of very few, if not the only golf apparel company who has the ability to provide this level of customer service. To insure the highest quality cresting in the industry we will only decorate RTJ products in our own embroidery facilities.

## CUSTOMER PROFILE

GREEN GRASS GOLF
The Green Grass golf business is comprised of 17,500 golf courses in the United States. Of those courses, 800 are Destination golf resorts, 4,500 are private country club, and 12,100 are daily fee.

It is our desire to sell the following:

600 of the most prestigious destination golf resorts
2,500 of the best country club golf pro shops,
1,500 of the daily fee courses that will most benefit from carrying the RTJ brand in their pro shops

We will also target the following golf tournaments as RTJ apparel customers for sale of our product in their merchandise tents.

PGA Tour Events;
and,
National Events like the PGA Championship, Sr. PGA Championship, Ryder Cup, and U.S. Sr. Open

## CORPORATE IDENTITY MARKET

Corporations are huge supporters of the golf industry. Major U.S. corporations are responsible for a significant number of rounds of golf each year. They are the number one source of revenue for the destination golf and destination resort industry.  These firms use travel and golf as incentives, rewards, and recognition for their employees and customers alike. They also sponsor almost all of the national golf tournaments throughout North America.

There are a large number of these corporate customers who can offer the RTJ brand the opportunity to co-brand with theirs.  Companies like BMW, Lexus, Porsche, Mercedes Benz, American Express, IBM, Goldman Sachs, Rolex, Net Jets, Sony, AT&T, Bell South, and Bank of America all represent sales opportunities for the brand and these clients can distribute our apparel products to men of great influence and stature.

## SALES AND MARKETING STRATEGY

Selling Strategy
Products would be sold through Robert Trent Jones sales representatives who specialize in calling on each of the specific markets listed above. These representatives will be trained in selling Robert Trent Jones apparel as well as any applicable custom decoration processes appropriate to the garment and the customer. We envision having a sales organization of 35 to 40 sales people covering the United States Green Grass golf business and destination resorts, 20 sales people throughout the country selling to the corporate identity market, and three key account sales people selling to the specialty store retailers and cruise lines.  We will leverage the combined strength of our good (Gear for Sports), better (Sun Ice Technical Outerwear), best (Robert Trent Jones) branding strategy to attract the best sales representatives in each territory. The potential sales volume of this combination will put us in the top five suppliers in the Green Grass golf business.

Brand Image And Marketing Strategy
We will focus our marketing efforts on the Green Grass golf market through consumer and trade advertising.

We plan to market directly to the golf industry through direct marketing initiatives to golf pro shops, especially those designed by Robert Trent Jones Sr. or Jr., destination golf resorts and resorts.

Trade Show participation will begin with the PGA Show in Orlando, Florida in January 2005; at sometime in the future we will evaluate the need and benefit to attending the Collective trade show that caters to the men's specialty store retailers. The Robert Trent Jones apparel will have its own identity at the trade shows we attend. We will create and build a high quality trade show booth that projects the proper brand image and quality statement we plan to build into our apparel.

We would like to tie in our marketing efforts with those of RTJ II, or Robert Trent Jones, the individual, including his signature and other elements of his persona. We have already found several elements of your marketing that would be beneficial for RTJA. It would also be very helpful to use the names and images of the Robert Trent Jones golf courses in our marketing. Publications from Robert Trent Jones, including poetry would also be important marketing elements for our use.

We will create point of purchase signage and branding statements to support the golf pro shops who carry RTJ clothing in their stores. Brand enhancing shopping bags, hangers, packaging including unique shipping cartons, and other items of differentiation will also be considered.

### INITIAL LAUNCH OF THE ROBERT TRENT JONES APPAREL COMPANY

Our goal is to launch the RTJA brand at the January 2005 PGA Show in Orlando Florida. This is "THE" trade show of the golf industry and attracts 45,000 golf buyers. The timing of the launch is critical because of the power of the show and the huge impact that we can make there. If we cannot meet this deadline I would suggest that we wait until January 2006 to launch the brand. If we wait until 2006 we will miss a significant opportunity that exists in the golf apparel industry today. As you know, the market is efficient and if there is opportunity someone will take advantage of it. I cannot stress the importance of timing enough. If there is interest in the RTJA concept both entities must work together to meet this deadline. There is little time to waste, as we are already at a critical stage of time necessary to properly create, develop and build products and image for the show. For your information, we have been working on the Gear For Sports Fall 2005 line for 90 days. It is very important to rapidly complete all contract negotiations so we can fully devote our efforts to the creation of the brand. Thank you for this consideration.

### PROPOSED TERMS OF THE LICENSING AGREEMENT

Our goal is to create and develop the best golf apparel brand it the industry. We have the desire, ability, experience, and capacity to meet that goal. We are people and a company of our word, and live by our Gear For Sports Values. We believe Robert Trent Jones, the person, and Robert Trent Jones II, the company have the same goals and values. We would like to create a licensing agreement that is most interested in the well-being of the

RTJA entity, rather than the rights of either party. Robert Trent Jones Jr. said it best, "I am far more interested in getting the business fundamental correct than I am in creating an iron clad contract".

That being said, here are our proposed terms.

| | |
|---|---|
| **Contract completion date** | August 1, 2004 |
| **Start date of contract** | First ship date of merchandise to customer May 1, 2005 and that becomes the anniversary date of all annual contract details. |
| **Contract Term** | TEN YEARS, starting May 1, 2005 licensee must meet certain contract requirements at certain milestones to maintain the contact. Contract renewable after the completion of the eighth year. |

| **Royalty Rate** | | |
|---|---|---|
| | Year 1 and 2 | 3% of Net Sales |
| | Year 3 | 4% |
| | Year 4 | 5% |
| | Year 5 thru 10 | 6% |

As one can imagine, the capital requirements needed to properly fund a start up business are extremely high in relationship to the revenue and income generated. That is the reason for the reduced royalty rate request in the beginning years. We are most interested in the long-term value of the brand than we are on the short-term gains.

**Territorial rights of the contracts**

We would like to start our launch of the brand in the U.S. market and get all the details correctly in place and working smoothly.

We would then like the rights to include the following:

United States
Canada
South East Asia
Mexico

**Approval rights of Robert Trent Jones, or Robert Trent Jones II LLC**

We realize the importance of the "Robert Trent Jones" name and the desire of the family and the RTJ, II company to maintain its value and prestige. We are willing to grant approval rights to apparel product quality, apparel product design elements, catalogs, advertising and marketing materials, logos, signatures, labeling and packaging, and media packages developed by RTJA company. We are also willing to allow Mr. Jones to visit

the garment factories used to manufacture the RTJA products when he is in the area. Our goal is to enhance the Robert Trent Jones name, not detract from it in any way.

## Sales volume projections and speed of growth

As previously stated, we are most interested in the long term development of the RTJA concept and the lasting benefits it will bring to Robert Trent Jones, his family, and the Robert Trent Jones brand. Therefore, we will conservatively estimate the annual sales volume and the rate of growth we will achieve. It is our goal to build the sales volume and distribution correctly, not rapidly.

Net Sales Volume Estimates By Year

| | |
|---|---|
| Year 1, ending 6/30/06 | $2,000,000 (USD) |
| Year 2, ending 6/30/07 | $4,000,000 |
| Year 3, ending 6/30/08 | $8,000,000 |
| Year 4, ending 6/30/09 | $12,000,000 |
| Years 5 though 10 | $16,000,000 |

I hope I have addressed all the issues and elements of the development of the Robert Trent Jones Apparel Company within this business plan. Everyone in the Gear For Sports organization is excited about this opportunity and dedicated to making it a huge success in the eyes of the Robert Trent Jones group, the customers, the targeted consumers and ourselves as well. I thank you for the opportunity to make this proposal and for taking the time out of your busy lives to consider it. I am most excited about the opportunity to work with you in this development. It will be successful and a lot of fun along the way.

I have also included a copy of the **Champion** licensing agreement we presently have with Sara Lee. It may serve as a good starting point in the creation of the RTJA contract. Champion is Sara Lee's most successful apparel brand and they too share in the concern of their ability to protect its value. I hope you find this information helpful.

Thanks again for your consideration.

Respectfully,

Larry Gravee
President/ COO

# ROBERT TRENT JONES II LICENSING GROUP, LLC

## INTELLECTUAL PROPERTY LICENSE AGREEMENT

## TABLE OF CONTENTS

**Name and Address of LICENSOR:**          **Name and Address of LICENSEE:**

**ROBERT TRENT JONES II**          **GFSI, INC.**
**LICENSING GROUP, LLC**          **D/B/A GEAR FOR SPORTS**
**705 Forest Avenue**          **9700 Commerce Parkway**
**Palo Alto, California 94301**          **Lenexa, Kansas 66219**
**USA**          **USA**

*1. VARIABLE PROVISIONS*.................................................................................................. 2
*2. DEFINITIONS*............................................................................................................... 4
*3. GRANT OF LICENSE*.................................................................................................... 6
*4. ROYALTIES*................................................................................................................. 6
*5. TERM*......................................................................................................................... 7
*6. QUALITY OF LICENSED PRODUCTS AND MARKETING PLAN*...................................... 7
*7. ADVERTISING MATERIALS AND REQUIREMENTS*...................................................... 10
*8. REPORTS AND RECORDS*............................................................................................ 13
*9. VERIFICATION OF REPORTS AND RECORDS*.............................................................. 14
*10. INDEMNIFICATION AND INSURANCE*........................................................................ 15
*11. NOTICES*................................................................................................................... 16
*12.    PROTECTION OF TRADEMARKS, SERVICE MARKS, COPYRIGHTS AND*
   *PROPRIETARY INFORMATION*................................................................................. 17
*13. DISTRIBUTION*.......................................................................................................... 19
*14. REPRESENTATION AND WARRANTIES OF LICENSEE AND RTJ2*............................ 19
*15. DISCLAIMERS*............................................................................................................ 21
*16. CANCELLATION*......................................................................................................... 22
*17. NO WAIVER*............................................................................................................... 22
*18. MISCELLANEOUS*....................................................................................................... 22
*19. TERMINATION*........................................................................................................... 24

Exhibit A:      Licensed Rights
Exhibit B       Licensed Products
Exhibit C:      Royalty Report Form
Exhibit D:      Product Detail/Approval Form
Exhibit E:      Marketing, Distribution, Financial and Quality Plan

**EXHIBIT B**

**ROBERT TRENT JONES II LICENSING GROUP, LLC** (hereafter "RTJ2") and LICENSEE, in consideration of the mutual promises of this Agreement, agree as follows:

## 1. VARIABLE PROVISIONS

|  |  | **REDACTED** |
|---|---|---|
| 1.1 | Commencement Date: | |
| 1.2 | Expiration Date: | |
| 1.3 | Sales Period: | |
| 1.4 | Actual Royalty Percentage (by Contract Year): | |
| 1.5 | Minimum Royalty (by Contract Year): | |
| 1.6 | Royalty Advance: | |
| 1.7 | Royalty Advance Payable on: | |

**REDACTED**

1.8     Insurance Requirement:

1.9     Grace Period:

1.10    Sample Quantity:

1.11    LICENSEE Investment:

## 2. DEFINITIONS

2.1    "Agreement" means this ROBERT TRENT JONES II LICENSING GROUP, LLC Intellectual Property License Agreement.

2.2    "Contract Year" means each calendar year period from May 1 through April 30; and the "Last Contract Year," which shall be for the period from May 1 of the Contract Year of this Agreement's expiration through the Expiration Date or termination.

2.3    "Grace Period" means the time in which sales of any Licensed Products are permitted following the termination of the license as defined in Paragraph 1.9.

2.4    "Intellectual Property Rights" includes patents, trademarks, trade names, service marks, trade secrets, copyrights, and rights of publicity.

2.5    "Licensed Right(s)" means the trademarks, service marks, copyrights and/or rights of publicity listed and referenced on Exhibit A entitled Licensed Rights.

2.6    "Licensed Product(s)" or "Product(s)" means any article of merchandise or service listed on attached Exhibit B and having a Licensed Right used upon or in connection therewith.

2.7    "Licensed Territory" means the territory referenced in Exhibit B in the field entitled "Territory Description".

2.8    "Net Sales" means the total gross revenue for Licensed Products sold by LICENSEE, less the following items of expense to the extent to which they are paid or allowed *and* included in gross revenue: (1) trade or quantity discounts (but not cash discounts); (2) credits for refunded, returned or rejected Licensed Products (provided that amounts equal to such credits have previously been included in gross revenue); (3) sales taxes, use taxes, value added taxes , provincial taxes or turnover taxes on sales invoices; (4) freight and handling charges and (5) payments of royalties to colleges , corporation, professional golf associations, etc.

(a)    For this Agreement, Licensed Products shall be considered sold upon the earliest occurrence of:

(1)    when delivered to the purchaser or to a common carrier for delivery to purchaser; or

(2)    when paid for, if paid in advance of delivery of the good or service; or

(3)    when billed out

whichever first occurs.

(b)    Any increase in total billing or receipts resulting from the decoration, imprinting, personalization or customizing of Licensed Products shall be included in calculating Net Sales.

(c)    If LICENSEE makes any sales of Licensed Products to a associated or affiliated company, or through any agency, then the price subject to royalty shall be that charged to the consumer or customer by the LICENSEE subsidiary, associated or affiliated company or agency, or that charged by LICENSEE, whichever is higher. As an exception to the foregoing, for sales by LICENSEE to its wholly owned retail subsidiary Event1, Inc., the price subject to royalty shall equal a twenty-seven percent (27%) gross margin over the cost of goods sold.

(d)    No deductions shall be made for uncollectible accounts.

(e)    If LICENSEE receives or negotiates to receive any consideration which (a) relates in any way to the sale, display, marketing and/or distribution of any Licensed Product and (b) is not included in the total gross price at which such Licensed Product is sold by the LICENSEE, LICENSEE shall, prior to any sale, display, marketing and/or distribution of such Licensed Product: inform RTJ2 of the details and amount of such consideration; submit to RTJ2, in writing, a proposed total gross price at which the Licensed Products are to be sold by LICENSEE; and obtain RTJ2's express, written approval of such proposed total gross price. Such approved proposed total gross price shall, for purposes of this Agreement, be considered the total gross price at which such Licensed Product is sold.

2.9    "Section" means a portion of this Agreement.

2.10    "Secondary Market(s)" means a LICENSEE customer that LICENSEE customarily sells defective, irregular, seconds or overstocks of products, such as The Paradies Shops (d/b/a PGA Tour Stop Stores), Burlington Coat Factory, Bermo Enterprises, Gabriel Brothers or the like. Defective, irregular, seconds or overstocks cannot be sold to "Mass Retailers" such as Wal-Mart, K-Mart, Ames, Value City, Dollar General and Dollar Stores or "Clubs" such as Costco or Sam's or like stores.

## 3. GRANT OF LICENSE

3.1 The Licensed Rights are limited to use on or in connection with the Licensed Products listed in Exhibit B only and LICENSEE shall not, except as specifically permitted in this Agreement, use the Licensed Rights or give consent to the use of any of them in any manner.

GRANT: RTJ2 hereby grants LICENSEE: an exclusive, personal, and non-transferable license to use the Licensed Rights in connection with the manufacture, display, sale, marketing, distribution and/or reproduction of Licensed Product(s) only for LICENSEE distribution, display, promotion, and ultimate sale only within Licensed Territory; provided, however, that the exclusive grant provided herein shall not limit in any manner use of the Licensed Rights by RTJ2, Robert Trent Jones Jr. and their related companies, including the golf course design company currently known as Robert Trent Jones II, LLC.

3.2 Except to the extent LICENSEE has been granted an exclusive license(s) hereunder for Licensed Product(s), RTJ2 expressly reserves the right to grant to any other party(s) a license(s) of any scope, in any geographical area, for any use, and for any article of merchandise.

3.3 RTJ2 represents and warrants that, during the term of this Agreement, RTJ2 shall not grant to any other party(s) a license(s) to use the rights of publicity of Robert Trent Jones, Sr. for apparel.

## 4. ROYALTIES

4.1 Accounting Principles Generally Accepted in the United States (GAAP) will be consistently applied in all areas of this agreement including, but not limited to, calculation of Net Sales and royalties.

4.2 All amounts due under this Agreement shall be denominated, reported and paid in U.S. dollars.

4.3 LICENSEE shall, in accordance with the REPORTS AND RECORDS Section, pay RTJ2 a non-refundable, actual royalty equal to the Actual Royalty Percentage listed in the VARIABLE PROVISIONS Section for the applicable Contract Year, multiplied by the Net Sales of all Licensed Products sold by LICENSEE.

4.4 LICENSEE shall, in accordance with the REPORTS AND RECORDS Section and the VARIABLE PROVISIONS Section, pay to RTJ2:

(a)      the Minimum Royalty for each Contract Year in equal payments on the dates specified herein for sending reports *and*

(b)      the Royalty Advance as agreed in the VARIABLE PROVISIONS Section.

4.5 Should there be any withholding or other taxes remitted by the

LICENSEE to any government or subdivision thereof upon royalty payments by LICENSEE to RTJ2 as specified herein, LICENSEE agrees to provide to RTJ2, at the time of such payments, signed copies of the official receipts evidencing such payments for RTJ2's filing for foreign income tax credits on their Federal income tax return. The royalty on Net Sales in currencies other than U.S. Dollars shall be calculated using the appropriate foreign exchange rate for such currency quoted by the United States edition of the *Wall Street Journal*, on the close of business on the last business day of each Sales Period.

## 5. TERM

The term of this Agreement shall, respectively, commence and expire on the Commencement Date and Expiration Date indicated in the VARIABLE PROVISIONS Section, at midnight Pacific Standard Time, USA, unless terminated or extended as herein provided.

## 6. QUALITY OF LICENSED PRODUCTS AND MARKETING PLAN

6.1 LICENSEE agrees that all Licensed Products shall be of high standards and of such style, appearance, quality and consistency as shall be adequate and suitable for their intended use. RTJ2, at its sole discretion, shall render any decision and/or answer any questions regarding quality. Any and all approvals for Licensed Products given by RTJ2 to LICENSEE prior to this Agreement are hereby revoked. Any previously Licensed Products must follow the same sample approval process as new Licensed Products.

At least twice a year, LICENSEE shall conduct RTJ2 Licensed Products "line review" sessions at LICENSEE's offices. Upon at least thirty (30) days prior notice by LICENSEE, RTJ2 personnel shall be invited to attend the "line review" sessions. The "line review" sessions shall be conducted on a mutually agreed upon date and time, said date or time to be within five days (before or after) of the date noticed by LICENSEE. It is anticipated that RTJ2 personnel shall comment and advise during the final selection of the seasonal Licensed Product offerings at LICENSEE'S semi annual "line review" sessions. At or within seven (7) days subsequent to these sessions the approvals and the approval documentation contemplated by this Section 6 will be obtained from RTJ2.

(a) *Pre-distribution Sample Approval* - LICENSEE shall submit to RTJ2 at the "line review" or by post or by delivery services for approval a pre-distribution Sample of any Licensed Product and promotional and packaging material relating to the Licensed Product at least seven (7) days prior to any distribution or sale. Each pre-distribution sample submission must include a completed Product Detail/ Approval Form (Exhibit D). LICENSEE may manufacture, sell, display, market or distribute Licensed Products only after approval by RTJ2 of pre-distribution samples of

such Licensed Products, provided that, all comments and changes requested by RTJ2 in the pre-distribution sample approval process have been addressed by the LICENSEE and approved by RTJ2 .

If RTJ2 fails to approve or disapprove in writing any pre-distribution sample submitted by LICENSEE within seven (7) days after receipt of LICENSEE's submission of both the Product Detail/Approval Form (Exhibit D) and the pre-distribution sample, such failure shall constitute an *approval* of the submission. RTJ2 will provide a written explanation of the reasons for a disapproval. RTJ2 reserves the right, in its sole discretion, to disapprove a previously-approved pre-distribution sample if the commercial production quality does not meet the standards defined in the construction of the pre-distribution sample or on the Product Detail/Approval Form upon notification to the LICENSEE in writing. Should such disapproval occur subsequent to LICENSEE'S commencement of manufacture, sale, display, marketing or distribution, LICENSEE shall cease manufacture within thirty (30) days, and RTJ2 may, at its request, timely inspect LICENSEE'S inventory of disapproved product and identify items of poor quality. LICENSEE shall dispose of the identified poor quality Licensed Product within the Grace Period to Secondary Markets only, and LICENSEE shall remove any and all Licensed Rights identification from the garment prior to sales, display or distribution

   (b)     *Testing* - RTJ2 may, from time to time, require LICENSEE to submit to RTJ2 LICENSEE's testing data whether done internally by LICENSEE personnel or by an independent laboratory. Should the LICENSEE not have existing reasonably accurate independent testing data, LICENSEE will submit the Licensed Product to an independent laboratory for quality testing. LICENSEE shall pay for the cost of these testing services.

   (c)     *Random Samples* - From time to time during the term of this Agreement upon RTJ2's request, LICENSEE shall furnish to RTJ2 a reasonable number of random samples of each Licensed Product together with any labeling or packaging in which, or in conjunction with which, the Licensed Product is to be marketed.

   (d)     *Quantity of Samples/Shipping Arrangements* - The number of samples to be furnished hereunder shall be the Sample Quantity indicated in the VARIABLE PROVISIONS Section, or such other reasonable number as RTJ2 may from time to time designate. All samples furnished to RTJ2 may be excluded from Net Sales. All samples shall be provided free of charge to RTJ2 and shall be transmitted to RTJ2, shipment prepaid, via a carrier of LICENSEE's choice.

   (e)     All samples, labeling, packaging, and other materials to be submitted and/or made available to RTJ2 under this Section shall be sent to:

        Robert Trent Jones, Jr.

ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

(f)     *Changes* - If during the term of this Agreement there are any changes in the quality or significant changes in appearance of the Licensed Products or the promotional and packaging material relating to the Licensed Products after the approval of the pre-distribution samples, LICENSEE must comply with the provisions of *Pre-distribution Sample Approval, Random Samples and Quantity of Samples/Shipping Arrangements*, for such Licensed Product before its manufacture, sale, display, marketing or distribution. A change in the fabric type, i.e. leather in place of cotton, or visually significant color changes in a Licensed Product, among other things, shall constitute a change for purposes of this Agreement.

(g)     *Inspection* - LICENSEE agrees to allow RTJ2's representatives or their authorized agents at any and all times during regular business hours, to enter LICENSEE's or manufacturers' premises to inspect the Licensed Products.

(h)     *Documentation* - Evidence of RTJ2's approval of pre-distribution sample(s) is the mutual responsibility of RTJ2 and LICENSEE.

6.2  Each Licensed Product shall be of the same materials, quality and workmanship as the sample approved in *Pre-distribution Sample Approval*, and in the manufacture thereof LICENSEE shall use quality control procedures in order to ensure that the Licensed Products will consistently so comply. Under no circumstances shall LICENSEE display, sell, distribute, give away or otherwise deal in Licensed Products that bear a distortion of the Licensed Rights.

6.3  LICENSEE shall not except as provided in this Section (6.3) sell, display, market, distribute, or use for any purpose or permit any third party to sell, display, market, distribute or use for any purpose any Licensed Products or promotional and packaging material relating to the Licensed Products that are damaged, defective, seconds, or otherwise fail to meet RTJ2's specifications or quality standards or the trademark and copyright usage and notice requirements of this Agreement. Should LICENSEE elect to sell such product to Secondary Markets, LICENSEE shall remove any and all Licensed Rights identification from the garment prior to sales, display or distribution. If in RTJ2's opinion any Licensed Products fail to meet the quality standards reflected in the pre-distribution samples of the Licensed Products approved by RTJ2 or the trademark and copyright usage and notice requirements of this Agreement, then, upon RTJ2's request, LICENSEE immediately will cease all further manufacture and distribution of such Licensed Products and/or materials until the failure is corrected and RTJ2 approves the correction. LICENSEE may, however, sell  at its reasonable discretion any and all of these substandard Licensed Products to Secondary Markets upon removal of all Licensed Rights identification from the garment prior to sales,

display or distribution.

6.4 LICENSEE agrees to make the LICENSEE Investment in the marketing, advertising and promotion of Licensed Products over the first four Contract Years beginning on the signing date of this Agreement. Upon request, LICENSEE shall provide LICENSOR with detailed documentation showing the dollar amount of such LICENSEE Investment. LICENSEE also agrees to dedicate and utilize adequate staffing and resources to develop the business contemplated by this Agreement in a commercially reasonable fashion.

6.5 Annually in conjunction with LICENSEE'S "line review" processes LICENSEE shall provide RTJ2 with a copy of its proposed Marketing, Distribution, Financial and Quality Plan (as generally outlined in Exhibit E) for RTJ2'S approval. If RTJ2 fails to disapprove any such plan within seven (7) days subsequent to its receipt such failure shall constitute an *approval* of the proposed plan or modification.    If RTJ2 should disapprove any such plan within seven (7) days subsequent to its receipt it shall communicate such disapproval in writing to LICENSEE along with RTJ2's reasons for disapproval. LICENSEE shall have seven days to respond to RTJ2's written disapproval with a modified plan and obtain RTJ2's approval prior to implementation of the modified plan. LICENSEE shall, in accordance with its approved Marketing, Distribution, Financial and Quality Plans, design, manufacture, advertise, display, market, sell, distribute and ship the Licensed Products, produce an inventory of Licensed Products, and procure and maintain facilities and trained personnel sufficient to accomplish the foregoing.

6.6 LICENSEE shall establish a toll free customer service telephone number or public e-mail address that shall be open during regular business hours for receiving customer comments and/or complaints regarding the Licensed Products. LICENSEE shall keep a detailed log or e-mail printed history of all communications. LICENSEE shall submit a copy of the customer communications to RTJ2 semi-annually.

## 7. ADVERTISING MATERIALS AND REQUIREMENTS

7.1 All national or regionally directed (non-Locally Directed Advertising), advertising, display, and promotional copy shall be submitted to RTJ2 in conjunction with LICENSEE'S "line review" process or by post or by delivery services to RTJ2 at least seven (7) days in advance of production of the advertising, display, or promotional copy to allow RTJ2 to approve, comment upon, or express its disapproval thereof and for any required changes to be made. LICENSEE shall not use the Licensed Rights or any reproduction thereof in any national or regionally directed advertising, display, or promotional material without such prior written approval. If no written approval is given within seven (7) days from the date of submittal, the sample shall be considered *approved*. Any approval granted by RTJ2 hereunder will extend only to LICENSEE's use of the Licensed Rights. If RTJ2 should disapprove any such national or regionally directed advertising, display, and promotional copy within seven (7) days subsequent to its receipt, it shall communicate

such disapproval in writing to LICENSEE along with RTJ2's reasons for disapproval.  LICENSEE shall have seven days to respond to RTJ2's written disapproval with modified advertising, display and promotional copy and obtain RTJ2's approval prior to implementation of the previously disapproved national or regionally directed advertising, display and promotional copy.

7.2  LICENSEE shall submit to RTJ2 (2) complete sets of LICENSEE's national or regionally directed advertising, sales and promotional materials when the materials are developed and available.  LICENSEE shall keep an adequate supply of such materials in stock to facilitate customer requests.

7.3  RTJ2 may, in its sole discretion, make available to LICENSEE film, Photostats, artwork, and full color reproductions of its Licensed Rights, artwork, designs, and other materials for LICENSEE's use in accordance with this Agreement, including photographs of Robert Trent Jones, Sr. RTJ2 does not object to use of photographs of Robert Trent Jones, Sr. under this License or other references to the history of the Robert Trent Jones name and brand, provided there are no copyright or other intellectual property restrictions on the use of said photographs. LICENSEE may be required to reimburse RTJ2 for RTJ2's out-of-pocket expenses, including, without limitation, reasonable hourly charges for creative personnel, incurred by RTJ2 in the preparation for LICENSEE of new artwork, mechanicals and film.  All charges due RTJ2 under this Subsection will be billed and paid on a "Net 30 Days" basis.

7.4  All advertising, display, promotional copy, and other materials to be submitted and/or made available to RTJ2 under this Section shall be sent to:

> Robert Trent Jones, Jr.
> ROBERT TRENT JONES II LICENSING GROUP, LLC
> 705 Forest Avenue
> Palo Alto, California 94301

7.5  Locally Directed Advertising does not require advance approval by RTJ2 under this Section, but said materials shall be of the same quality and style as the national and regional advertising approved by RTJ2. LICENSEE shall keep an archive of all Locally Directed Advertising during the term of this Agreement and for a period of two (2) years thereafter.  When requested, LICENSEE agrees to send samples of Locally Directed Advertising and any other documents that will permit RTJ2 to determine whether the use of the Licensed Rights meets RTJ2's quality requirements. RTJ2 may disapprove Locally Directed Advertising by providing notice of said disapproval to LICENSEE in writing, at which point LICENSEE shall cease distribution of the disapproved Locally Directed Advertising.     Locally Directed Advertising shall mean advertising, display, promotional copy, and other materials prepared for and directed to specific locations and/or LICENSEE's sales force only, such as sales flyers and notices of promotions.

7.6  RTJ2 agrees to cooperate with LICENSEE in announcing,

advertising, publicizing or otherwise promoting the Licensed Products.
RTJ2 further agrees to arrange for publicity appearances by Robert Trent
Jones, Jr. for interviews, photographs, personal appearances or films
(hereafter "Personal Appearances") at a reasonable fee, including
reimbursement for out-of-pocket travel and lodging expenses. Personal
Appearances shall occur at mutually convenient times and locations, and
shall not conflict with the activities of Robert Trent Jones, Jr. First class
transportation and lodging is the reasonable travel mode for Robert Trent
Jones, Jr. All promotional materials resulting from Personal Appearances
of Robert Trent Jones, Jr. shall be subject to the approval requirements of
Section 7.1.

## 8. REPORTS AND RECORDS

8.1  By the twenty-fifth day following the close of each Sales Period, and subsequent Grace Period, if any, LICENSEE shall send to RTJ2 by electronic means, post or delivery services, in duplicate, a full and accurate report (Report), certified by the Chief Financial Officer of LICENSEE, detailing the Total Sales of the Licensed Products sold by LICENSEE during preceding Sales Period. The Report shall constitute a completed Royalty Report Form attached hereto as Exhibit C (or reasonable electronic substitution there of) and updated versions thereof as may be provided by RTJ2 from time to time.  Such Report shall be rendered at the times specified regardless of whether LICENSEE has sold any Licensed Product during the preceding Sales Period.  All reports provided for in this Agreement are to be electronically transmitted, mailed or faxed to:

> Robert Trent Jones, Jr.
> ROBERT TRENT JONES II LICENSING GROUP, LLC
> 705 Forest Avenue
> Palo Alto, California 94301
> (650) 326-3090 – facsimile
> bjones@rtj2.com

8.2  At the time of sending each Report hereunder, LICENSEE shall calculate the royalty owed according to the following and remit the greater of the following to RTJ2 in full:

(a) the Minimum Royalty (determined by Contract Year, but quarterly paid) for the Sales Period in question, less any Royalty Advance not previously credited *or*

(b) the total actual royalty payable to date for the Sales Period in question, less:

(i)     any Minimum Royalty amount paid over the actual royalty in previous Sales Periods during the relevant Contract Year, but not previously credited *and*

(ii)     any Royalty Advance not previously credited.

8.3     LICENSEE shall ensure that all royalty payments are received by RTJ2 by the thirtieth (30th) day following the close of each Sales Period. A late payment charge shall be payable to RTJ2 on the amount of any payment not made when due, from the payment due date until the date payment is received by RTJ2. This late payment charge shall include interest compounded daily on the unpaid balance, at a rate per annum equal to five percent (5%) above the rate of interest that is publicly announced by the Bank One of Chicago, Illinois as its "Prime" commercial lending rate in effect at the close of business on the payment due date, and with each change in such publicly announced "Prime" commercial lending rate effective, for purposes of computing the late

payment charge hereunder, as of the date such change is effective.

In no circumstances shall the late payment charge required hereunder exceed the highest charge allowed by applicable law.

8.4  All payments are to be made to:

ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

## 9. VERIFICATION OF REPORTS AND RECORDS

9.1  During the term of this Agreement, and for at least three (3) years following the termination or expiration of this Agreement, LICENSEE shall maintain at LICENSEE's principal office such books and records including, but not limited to, production, inventory and sales records (collectively "Books and Records") as are necessary to substantiate that:

(a)  all statements submitted to RTJ2 hereunder were true, complete and accurate, *and*

(b)  all royalties and other payments due RTJ2 hereunder have been paid to RTJ2 in accordance with the provisions of this Agreement, *and*

(c)  no payments have been made, directly or indirectly, by or on behalf of LICENSEE to or for the benefit of any RTJ2 employee or agent who may reasonably be expected to influence RTJ2's decision to enter into this Agreement or the amount to be paid by LICENSEE under this Agreement. (As used in this sub-section, "payment" shall include money, property, services, and all other forms of consideration.)

All Books and Records shall be maintained in accordance with Accounting Principles Generally Accepted in the United States (GAAP), consistently applied.

9.2  During the term of this Agreement, and for at least three (3) years following the termination or expiration of this Agreement, RTJ2, through its duly authorized representatives (including certified public accountants), shall have the right, at RTJ2's expense, upon five (5) days written notice to annually inspect, audit and copy such Books and Records at any and all times during regular business hours for the purpose of determining the correctness of the Reports and royalty payments due under this Agreement.

To facilitate the examination of LICENSEE's Books and Records with respect to any and all RTJ2 Licensed Products, LICENSEE further agrees to designate a symbol or number which will be used exclusively in connection with the Licensed Products and with no other Articles which LICENSEE may manufacture, sell or distribute.

If the inspection or audit reveals a deficiency of royalty due,

- 14 -