LICENSEE shall, within ten (10) days of receipt of notice to cure the deficiency, make payment to RTJ2 of said deficiency, including the interest terms described in the REPORTS AND RECORDS Section. In addition, if the audit reveals a deficiency of more than two percent (2%) of the royalty due in any given year, LICENSEE shall reimburse RTJ2 for the cost of the services of the representatives, accountants, and for any other costs incident thereto (including attorney's fees and costs of collection). RTJ2 representatives and accountants are to meet with LICENSEE's representatives in a closing meeting to discuss their findings and results prior to leaving the LICENSEE'S business location.

If the audit reveals an over payment of royalty, LICENSEE shall apply such overpayment to reduce the royalty amount paid RTJ2 in the next subsequent Sales Period.

## 10. INDEMNIFICATION AND INSURANCE

10.1 LICENSEE shall indemnify and hold RTJ2, its directors, officers, agents, employees, attorneys, dealers, licensees, subsidiaries, affiliates, licensing agent, and distributors, harmless from any liability, loss, damage or expense (including reasonable attorney's fees) arising out of any product liability claim or suit involving the Licensed Products sold by LICENSEE or the manufacture, labeling, sale, distribution or advertisement of any Licensed Product by LICENSEE in violation of any national, provincial, state, local or other law or regulation, excluding any claim alleging that the Licensed Rights infringe the intellectual property rights of others. RTJ2 shall, to the extent it becomes aware of same, give LICENSEE notice of any claim or suit, and LICENSEE shall defend RTJ2 through competent counsel of LICENSEE's own choice, subject to RTJ2's prior approval of such counsel, which approval shall not be unreasonably withheld.

10.2 LICENSEE shall secure and maintain in force, throughout the term of this Agreement and for a period specified in the VARIABLE PROVISIONS Section thereafter, at its own expense, an insurance policy covering comprehensive general liability, including products liability. Such policy shall be with an insurance carrier having an "excellent" rating by Best or an equivalent rating service and shall maintain coverage limits in the amounts stated in the VARIABLE PROVISIONS Section. As proof of such insurance, a fully-paid certificate of insurance naming RTJ2 as a primary or additional insured party shall be submitted by LICENSEE for RTJ2's written approval before any Licensed Product is manufactured or distributed hereunder. In any such policy, RTJ2 shall receive at least thirty (30) days prior written notice of intent to cancel, alter or amend said policy.

10.3 RTJ2 shall indemnify and hold LICENSEE, its directors, officers, agents, employees, attorneys, dealers, licensees, subsidiaries, affiliates, licensing agent, and distributors, harmless from any liability, loss, damage or expense (including reasonable attorney's fees) arising out of any intellectual property infringement claim or suit involving the names, trade

- 15 -

names and marks ROBERT TRENT JONES II; ROBERT TRENT JONES, JR.; ROBERT TRENT JONES II and Design (logo); and RTJ2; provided that the total dollar amount of this indemnification shall be no greater than fifty percent (50%) of royalties paid to date under this Agreement. LICENSEE shall, to the extent it becomes aware of same, give RTJ2 notice of any claim or suit, and RTJ2 shall defend LICENSEE through competent counsel of RTJ2's own choice, subject to LICENSEE's prior approval of such counsel, which approval shall not be unreasonably withheld, up to the amount of royalties paid to date under this Agreement.

## 11. NOTICES

11.1 Except as otherwise provided herein, any notice, request, submission, or other transmittal (Notice) provided pursuant to this Agreement shall be in writing, shall be sent:

(a)    by overnight courier service (DHL, Federal Express or UPS) with delivery receipt and shall be effective on the date which such Notice is sent *or*

(b)    by registered or certified mail, return receipt requested, and shall be effective on the date which such Notice is deposited, properly addressed in a U.S. or other national post office, with postage prepaid.

Except as otherwise provided herein, any such Notice to RTJ2 shall be sent to:

> Robert Trent Jones, Jr.
> ROBERT TRENT JONES II LICENSING GROUP, LLC
> 705 Forest Avenue
> Palo Alto, California 94301

With a copy sent to:

> Joseph V. Norvell
> Brinks Hofer Gilson & Lione
> NBC Tower - Suite 3600
> 455 N. Cityfront Plaza Drive
> Chicago, Illinois  60611-5599

Any such Notice to LICENSEE shall be sent to the address given on the first page hereof unless amended as provided hereafter. Either party may change its address for payment, notice, or otherwise by notifying the other in writing.

11.2 (a) LICENSEE shall promptly notify RTJ2 in writing of any infringements or imitations by others of the Licensed Rights of which LICENSEE becomes aware.  RTJ2 shall have the sole right and discretion, within 90 days of the LICENSEE'S notification, to take legal

action, including initiation of a lawsuit, and to control such legal action and to recover any damages that either RTJ2 or LICENSEE, or both, may have suffered or be suffering by reason of any such infringements or imitations. LICENSEE shall provide RTJ2 with all information and reasonable assistance within the power and control of LICENSEE required to prosecute said legal action. All costs and expenses of such suit or other legal action shall be borne by RTJ2 and any amounts recovered by reasons of such action, suit or other proceeding shall belong to RTJ2.

(b) In the event that RTJ2 decides not to take legal action within 90 days of LICENSEE'S notification, and a valid, nonfrivolous infringement action against others by LICENSEE exists, LICENSEE in its sole right and discretion may, so long as this Agreement is in effect, institute such legal action, suit or other proceeding at LICENSEE's cost and expense and with counsel of LICENSEE's choice, but said counsel subject to RTJ2's written approval, to the extent necessary or advisable in order to protect the rights of LICENSEE hereunder, and to recover any damages that either RTJ2 or LICENSEE, or both, may have suffered or be suffering by reason of any such infringement or imitations. RTJ2 shall provide LICENSEE with all information and reasonable assistance within the power and control of RTJ2 required to prosecute said action. Any amounts recovered by reason of such action, suit or other proceeding brought by LICENSEE shall belong to LICENSEE.

## 12. PROTECTION OF TRADEMARKS, SERVICE MARKS, COPYRIGHTS AND PROPRIETARY INFORMATION

12.1 LICENSEE acknowledges RTJ2's exclusive right, title and interest in and to the Licensed Rights and will not at any time do any act, either directly or indirectly, to contest the validity of or in any way injure or discredit any part thereof. LICENSEE shall not use any language or display the Licensed Rights in such a way as to create the impression that the Licensed Rights belong to LICENSEE.

12.2 LICENSEE agrees that any and all uses by LICENSEE of the Licensed Right shall inure to the benefit of RTJ2.

12.3 LICENSEE agrees to assist RTJ2 in procuring any protection or protecting any of RTJ2's rights herein. Toward that end, LICENSEE agrees to cooperate with RTJ2 in the prosecution of any trademark, service mark, or copyright application that RTJ2 may desire to file at RTJ2's expense, or in the conduct of any litigation relating to the Licensed Rights. LICENSEE shall supply to RTJ2 such samples, containers, labels, sales information and similar material and, upon RTJ2's request, shall procure evidence, give testimony and cooperate with RTJ2 as may reasonably be required in connection with any such application or litigation.

12.4 LICENSEE shall, upon RTJ2's request, provide RTJ2 with a duplicate original of each of the first three (3) invoices for shipments for

sale of the Licensed Products in interstate or international commerce.

12.5 LICENSEE shall not use any trademark or service mark of RTJ2, any translation thereof or any mark similar thereto, as part of its corporate name or any trade name. RTJ2 acknowledges that LICENSEE customer, vendor, lender and regulatory agency communications (e.g. billings, remittance addresses, return information, web site links, written or implied references to LICENSEE and other like communications) may include incidental identification relating RTJ2 or the Licensed Rights to LICENSEE and its subsidiaries and affiliates. Such incidental identification is permitted under this Subsection (12.5)

12.6 LICENSEE shall appropriately mark each Licensed Product in the same manner as the approved pre-distribution samples or in such manner specified by RTJ2 in writing. LICENSEE shall display the Licensed Right(s) on all Licensed Products sold in each country with a legally sufficient legend in such country to indicate RTJ2's ownership and that such Licensed Right(s) is registered or unregistered, as appropriate; e.g. such legend in the United States constitutes an "®" adjacent the Trademark for a registered Trademark; a "™" adjacent such Trademark for an unregistered Trademark and © [year] Robert Trent Jones II for any copyrighted works.

12.7 LICENSEE shall place:

(a)     its own name or identifying mark, or, if authorized by RTJ2 in writing, the name of a wholly owned subsidiary, and

(b)     LICENSEE's toll free customer service telephone number or public e-mail address

on the Licensed Products and on their packaging in an inconspicuous manner approved by RTJ2 so that RTJ2 can readily identify the source of the Licensed Products.

12.8 RTJ2 recognizes and acknowledges that LICENSEE decorates products with licensed and non-licensed (but otherwise authorized) indicia, logos, art and names as part of its general business operations. RTJ2 also recognizes that LICENSEE markets and decorates products using co-branding or co-labeling techniques identifying the specific customer with the product brand or trade name. LICENSEE'S general business activities promote these activities in the LICENSEE'S promotional materials, cartons, containers, packaging materials, displays and advertising materials. These LICENSEE activities are specifically permitted under this subsection (12.8). LICENSEE shall not decorate or co-brand with immoral, deceptive, scandalous or infringing indicia, logos, art and names.

Except for the co-branding and co-labeling permitted in this Section, unless otherwise authorized by RTJ2 in writing, LICENSEE shall not:

(a)     use or permit the use on any Licensed Product or on any carton, container or packaging any other mark or identification

- 18 -

except the LICENSEE's own identifying mark and toll free customer service telephone number or public e-mail address; and/or

(b)       include or permit the inclusion of its name or any other person or entity with any of the Licensed Rights in any advertising, promotional or other material or on the Licensed Products; and/or

(c)       display, sell, market, distribute, or advertise any other product or service in conjunction or association with any Licensed Product.

12.9 LICENSEE agrees that the Licensed Rights possess special, unique, and extraordinary characteristics which make difficult the assessment of the monetary damage which RTJ2 would sustain by unauthorized use and that irreparable injury would be caused to RTJ2 by unauthorized use of the Licensed Rights.    LICENSEE agrees that injunctive and other equitable relief would be appropriate in the event of a breach of this Agreement by LICENSEE, provided, however, that such remedy shall not exclude any other legal remedies otherwise available.

12.10    RTJ2 and LICENSEE shall maintain in confidence all Proprietary Information provided to each other and both shall use same only for performing their obligations hereunder, and both shall, upon termination or expiration of this Agreement, return to each all Proprietary Information recorded on tangible medium.    Proprietary Information means all information not

(a)       already in RTJ2's or LICENSEE's possession prior to its receipt from either party, *and/or*

(b)       now or hereafter available to the general public through no act or fault of RTJ2 or LICENSEE, *and/or*

(c)       rightfully disclosed to RTJ2 or LICENSEE by a third party without restriction on its use or disclosure.

12.11    LICENSEE shall use reasonable efforts to ensure that the Licensed Products do not infringe Intellectual Property Rights not owned by LICENSEE and shall notify RTJ2 of any claim by any third party involving infringement of third party Intellectual Property Rights for which the Licensed Products are the subject of such claims.

## 13. DISTRIBUTION

LICENSEE warrants it will not use the Licensed Products for sales to Mass Retailers, Clubs or discount stores except as permitted by Sections (2.10) and (6) of this Agreement without prior written consent of RTJ2.

## 14. REPRESENTATION AND WARRANTIES OF LICENSEE AND RTJ2

14.1 LICENSEE warrants that the Licensed Products shall be merchantable and fit for the purpose for which they are intended.

14.2 LICENSEE represents and warrants that the Licensed Products, packaging, displays, marketing, sales and distribution shall meet or exceed all federal, state and local laws, rules, regulations, ordinances, guidelines, standards and other enactments and industry standards pertaining to such products or activities including, but not limited to, those relating to product safety, quality, labeling and propriety. LICENSEE agrees that it will not package, market, display, sell or distribute any Licensed Products or cause or permit any Licensed Products to be packaged, marketed, displayed, sold or distributed in violation of any such federal, state and local laws, rules, regulations, ordinances, guidelines, standards and other enactments and industry standards.

14.3 LICENSEE represents and warrants that LICENSEE is a member of one of the world's largest human rights protection apparel industry group, the Fair Labor Association, which establishes guidelines for national and international inhuman manufacturing practices, and that LICENSEE shall abide by the Fair Labor Association's guidelines in the manufacture of the Licensed Products.  Further, LICENSEE'S contracted factories are regularly subjected to audit and inspection by the Fair Labor Association.

14.4 LICENSEE:

(a)     grants an irrevocable, unrestricted license to RTJ2 under any intellectual property that is utilized in the Licensed Products and created by or for LICENSEE and owned by LICENSEE for use under this Agreement with RTJ2 and, upon termination or expiration of this Agreement or upon RTJ2's earlier request, shall assign to RTJ2 in perpetuity the entire, unencumbered title and all rights to all intellectual property that utilizes the Licensed Rights created by or for LICENSEE for use under this Agreement. LICENSEE agrees to execute any additional documents proposed by RTJ2 at RTJ2's sole expense to effectuate and confirm RTJ2's sole and exclusive ownership of all such intellectual property rights, and LICENSEE irrevocably appoints RTJ2 as its attorney-in-fact to execute any and all such documents if LICENSEE fails to return executed copies of such documents to RTJ2 within five (5) days following submission. LICENSEE:

(i)     warrants that RTJ2 may modify any such work or design without restriction; and
(ii)     waives all moral rights in all such works or designs.

(b)     shall send assignments under this Section to:

Robert Trent Jones, Jr.
ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

- 20 -

14.5 LICENSEE shall not assign, sub-license, convey, pledge, encumber or otherwise dispose of this Agreement or any right or interest hereunder without the prior written consent of RTJ2, such consent not to be unreasonably withheld. This Agreement may be assigned by RTJ2.

14.6 RTJ2 represents and warrants that it has the right to grant the License Rights as set out on Exhibit (A) and other rights granted under this Agreement. It is a limited liability company duly formed, validly existing and in good standing. RTJ2 has full power and authority to enter into this Agreement and to perform its obligations hereunder.

14.7 LICENSEE recognizes and acknowledges that Robert Trent Jones, Sr. was also a well-known golf course architect, and that some of the golf courses designed by Robert Trent Jones, Sr. may have certain rights to use of the name and mark Robert Trent Jones in connection with their golf courses. Subject to the foregoing, RTJ2 represents and warrants to the best of its knowledge that the use of the License Rights by the LICENSEE as contemplated by this Agreement does not and will not infringe any trademarks, copyrights, trade secrets or other proprietary rights of any third party. RTJ2 represents and warrants that to the best of its knowledge no current threatened or actual claims exist that could adversely affect the License Rights granted LICENSEE under this agreement.

## 15. DISCLAIMERS

15.1 Nothing in this Agreement shall be construed as:

(a)     a warranty or representation that anything made, used, displayed, sold, or otherwise disposed of under any license granted in this Agreement is or will be free from the rightful claim of any third party by way of infringement or the like except as specifically provided herein; or

(b)     a requirement that RTJ2 shall file or prosecute any trademark application, secure any copyright or maintain any trademark, service mark, or copyright registration in force or notify LICENSEE of any action or failure to act with respect to any application or renewal; or

(c)     an obligation that RTJ2 bring or prosecute actions or suits against third parties for infringement or the like; or

(d)     granting by implication, estoppel, or otherwise, any licenses or rights of RTJ2 other than the Licensed Rights.

15.2 Except as specifically provided herein, RTJ2 makes no representations, extends no warranties of any kind, either express or implied, and assumes no responsibilities whatever with respect to use, sale, or other disposition by LICENSEE or its vendees or other transferees of Licensed Products.

- 21 -

## 16. CANCELLATION

The parties understand that RTJ2, its subsidiaries, affiliates, and authorized licensees use the Licensed Rights which are the subject of this license to advance and promote RTJ2 golf course design services and other quality products and services, and that RTJ2 has a paramount obligation to preserve its ability to so use such Licensed Rights. Should, in RTJ2's or LICENSEE'S reasonable discretion, any use of any Licensed Rights become threatened as a result of any rule, regulation, or policy of governmental administrative agencies, then RTJ2 or LICENSEE may cancel or amend this Agreement to the extent necessary without any legal, moral or financial obligation to RTJ2 (other than LICENSEE'S royalty obligations) or LICENSEE or any third parties.

## 17. NO WAIVER

Any failure of RTJ2 or LICENSEE to enforce at any time any of the provisions of this Agreement or any rights or remedies with respect thereto or to exercise any election therein provided shall not constitute a waiver of any such provision, right, remedy or election or in any way affect the validity of any thereof or of this Agreement. The exercise by RTJ2 or LICENSEE of any of its rights, remedies or elections under the terms of this Agreement shall not preclude or prejudice RTJ2's or LICENSEE'S rights to exercise at any other time the same or any other right, remedy or election they may have under this Agreement. The rights of termination provided in this Agreement are in addition to any other right, remedy or election RTJ2 and LICENSEE may have with respect to this Agreement, including the right to sue for breach without terminating.

## 18. MISCELLANEOUS

18.1 Nothing in this Agreement nor anything done by either party in the discharge of its obligations hereunder shall be deemed to constitute either party the agent of the other in any sense. Likewise, this Agreement is not a franchise agreement. Nothing contained herein shall be deemed to preclude or impair any rights which RTJ2 may have as a creditor in any bankruptcy proceeding.

18.2 During the term of this Agreement, LICENSEE shall not negotiate with respect to, enter into agreements relating to, or participate in business transactions which are inconsistent with the purpose of this Agreement. LICENSEE shall consistently distinguish the Licensed Products from other products manufactured or sold by LICENSEE and shall avoid confusing similarity between such other products and the Licensed Products.

18.3 During the term of this Agreement, except as permitted under Sections (6.3) and (12.8) LICENSEE shall not manufacture, display, sell, market, distribute and/or reproduce, or, at LICENSEE's direction to have manufactured and/or reproduced any product under a different brand that is identical to a Licensed Product.

18.4 During the term of this Agreement, LICENSEE shall not enter into a competing license agreement with another golf course designer, current or former golf professional, or golf equipment manufacturer for the sale of the same or similar products at same or similar price level without RTJ2's express approval.

18.5 This writing constitutes the entire agreement between the parties hereto relating to the subject matter of this Agreement and no term or provision of this Agreement shall be varied or modified by any prior or subsequent statement, conduct, or act of either of the parties except that RTJ2 may amend:

    (a)    Exhibit A and/or Exhibit B by unilaterally adding Licensed Rights, Licensed Products, and Licensed Territories respectively, thereto;

    (b)    revises names of countries in Exhibit B as they are changed by governments or successor nations are created; and

    (c)    the balance of the Agreement to the extent necessary to reference such additions made to Exhibit A and/or Exhibit B.

by providing written notification of same signed by an authorized representative of RTJ2 to LICENSEE. Any other amendment to this Agreement must be in writing, specifically refer to this Agreement, and be executed by both parties in the same manner as this instrument.

18.6 The captions for each Section have been inserted for the sake of convenience and shall not be deemed to be binding upon the parties for the purpose of interpretation of this Agreement.

18.7 The terms and provisions of this Agreement shall be interpreted in accordance with and governed by the laws of the State of California, USA, excluding the conflict of laws portion thereof. LICENSEE consents to jurisdiction for any dispute hereunder between the parties to be in San Francisco, California, U.S.A.

18.8 Licensee shall reimburse RTJ2 for all reasonable expenses, legal fees and costs required to enforce LICENSEE's obligations under this Agreement. RTJ2 shall reimburse LICENSEE for all reasonable expenses, legal fees and costs required to enforce RTJ2's obligations under this Agreement.

18.9 The provisions of SECTION 1 of this Agreement shall be held in confidence between the parties and shall not be disclosed to others except as may be required by a court, governmental agency, statute, rule, or regulation. Nothing herein shall be interpreted as a limitation on LICENSEE's duty of public disclosure as required for the issuance or maintenance of publicly traded securities. The remaining Sections of and Attachments to this Agreement shall not be disseminated or distributed outside the management, accounting and/or legal counsel of the LICENSEE without the prior written consent of RTJ2.

## 19. TERMINATION

19.1    RTJ2 shall have the right, without prejudice to any other rights which it may have, to terminate this Agreement in its entirety, pursuant to subsections (c) through (p), or with respect to certain Licensed Products, pursuant to subsections (a) and (b), if LICENSEE fails to cure any of the following termination events within twenty (20) days after receiving Notice from RTJ2 of the occurrence of such termination event. Such termination event shall occur if LICENSEE:

(a)    shall have failed to commence the manufacture, sale or distribution of any Licensed Product within one year of the Commencement Date, or such time as agreed upon in writing by the parties, or, for an approved Licensed Product, within sixty (60) days after the pre-distribution sample approval date hereof; or

(b)    shall have discontinued manufacturing or distributing any Licensed Product in commercial quantities for a period longer than one year without RTJ2's written approval, not to be unreasonably withheld. This Section (19.1 (b)) shall apply to a specific product on Exhibit (B) on a product by product basis and not all products listed on Exhibit (B) in the aggregate; or

(c)    commits any material breach of its obligations under this Agreement. or

(d)    fails to make any payment due hereunder or any report or statement required hereunder; or

(e)    shall be unable to pay its obligations when due, shall make any assignment for the benefit of creditors, shall file a voluntary petition in bankruptcy, shall be adjudicated bankrupt or insolvent, or shall have any receiver or trustee in bankruptcy or insolvency appointed for its business or property; or

(f)    markets, sells, or distributes any Licensed Products for which the quality as determined by RTJ2 is lower than the approved samples referred to in the QUALITY OF LICENSED PRODUCTS Section except for Secondary Market sales as allowed under Section (6); or

(g)    manufactures, markets, displays, sells, distributes and/or reproduces uses any Licensed Products or directs any other to manufacture and/or reproduce any product under a different brand that is identical to a Licensed Product except as permitted under Sections (6.3), and (12.8).

(h)    negotiates or enters into a license with another golf course designer, current or former golf professional, or golf equipment manufacturer for the sale of the same or similar products at same or similar price level without first obtaining RTJ2's express

approval

(i)    manufactures, markets, displays, sells, distributes or uses any Licensed Products or promotional or packaging material relating to the Licensed Products without RTJ2's approval or after receipt of written notice from RTJ2 disapproving such items except for the sale of items through Secondary Markets as permitted under Section 6.1(a) and Section 6.3; or

(j)    manufactures, markets, displays, sells, distributes or uses any product and/or promotional or packaging material which is derived from designs, drawings or artwork provided by RTJ2 or developed for use with the Licensed Products without RTJ2's written approval or after receipt of notice from RTJ2 disapproving such items; or

(k)    becomes subject to any voluntary or involuntary order of any governmental agency involving the recall of any Licensed Products or promotional or packaging material relating to the Licensed Products because of safety, health or other hazards or risks to the public; or

(l)    breaches any provision of this Agreement relating to the unauthorized assertion of rights in the Licensed Rights; or

(m)    breaches any provision of this Agreement prohibiting LICENSEE from directly or indirectly arranging for manufacture by third parties, assigning, transferring, sub-licensing, delegating or otherwise encumbering this Agreement or any of its rights or obligations; or

(n)    fails to obtain or maintain product liability insurance as required by the provisions of this Agreement.

(o)    commits any material act that is inconsistent with any provision(s) of this Agreement or fails to act in accordance with any provision(s) of this Agreement.

(p)    Current Period Royalties are less than the Minimum Royalty (by Contract Year) for two consecutive years.

19.2 If reasonable grounds for insecurity arise with respect to the quality of Licensed Product(s) RTJ2 may in writing request adequate assurance from LICENSEE of such quality compliance. If RTJ2 does not receive such written assurance within ten (10) days after the date of its request, the failure by LICENSEE to furnish such assurance will constitute a material breach of this Agreement as per Section (19.1(c))

19.3 If any third party, either alone or pursuant to an arrangement or understanding with one or more persons in the future directly or indirectly acquires by stock ownership more than 51% voting control of LICENSEE, LICENSEE shall immediately give notice to RTJ2 and RTJ2 shall have the right, without prejudice to any other rights which RTJ2 may have, to terminate this Agreement. Public offerings of the LICENSEE'S and its subsidiaries' or affiliates' common or preferred stock or public

offerings of securities convertible into its common or preferred stock and the resultant change in ownership is specifically permitted under this Section (19.3).

19.4 RTJ2 shall have the right to terminate this Agreement to the extent necessary to: settle a claim or lawsuit by a third party against RTJ2 or LICENSEE concerning LICENSEE'S use of the Licensed Rights for infringement of such third party's trademark and or service mark rights; or comply with a final lawsuit judgment in favor of such third party in such circumstances. Said termination shall not be considered a limitation of any rights or remedies that either party may have under this Agreement.

19.5 RTJ2 may terminate, to the extent necessary, the license(s) granted hereunder with respect to any Licensed Product which is the subject of a claim for infringement, misuse, and/or misappropriation of Intellectual Property Rights if, in RTJ2's reasonable discretion, such claim is legitimate. Said termination shall not be considered a limitation of any rights or remedies that either party may have under this Agreement.

19.6 LICENSEE shall have the right, without prejudice to any other rights which it may have, to terminate this Agreement in its entirety or with respect to certain Licensed Products, effective immediately, if RTJ2:

(a) commits any material breach of its obligations under this Agreement;

(b) commits actions, or by its non-action, that a reasonable individual would believe diminishes in the public domain the commercial value of the License Rights. LICENSEE may in writing request adequate written assurance from RTJ2 that no such diminishment has occurred. If LICENSEE does not receive such written assurance within ten (10) days after the date of its request, the failure by RTJ2 to furnish such assurance will constitute a material breach of this Agreement as per Section (19.6.(a));

(c) or Robert Trent Jones, Jr. ceases to actively perform golf course design or other quality related services to the golf market;

(d) assigns this Agreement to a competitor of Gear for Sports.

19.7 Upon any termination of this Agreement, the license herein granted shall terminate. However, for a Grace Period (specified in the VARIABLE PROVISIONS Section) thereafter, LICENSEE may sell the Licensed Products which are already manufactured and ready for sale prior to the date of termination; *provided* that:

(a) LICENSEE shall not begin to manufacture or cause to be manufactured any Licensed Products after receiving or sending notice of termination, *and*

(b) that all payments under this Agreement then due are first made to RTJ2, *and*

(c) that such sales are in accordance with the terms of this

- 26 -

Agreement, *and*

(d)    that, except for sales made to Secondary Markets where LICENSEE has removed any and all Licensed Rights from the Licensed Products, sales shall not be discounted below LICENSEE's cost of manufacture, *and*

(e)    that report and payments with respect to that period are made in accordance with this Agreement.

Such final Report and payment shall be made within twenty-five (25) days after the end of said Grace Period. Upon expiration of said Grace Period, any remaining inventory of Licensed Products shall be destroyed and evidence of such destruction shall be given to RTJ2.

19.8 Upon termination or expiration of this Agreement, LICENSEE's obligations set forth in Sections:

ROYALTIES

REPORTS AND RECORDS

QUALITY OF LICENSED PRODUCTS

ADVERTISING MATERIALS AND REQUIREMENTS

PROTECTION OF TRADEMARKS, SERVICE MARKS; COPYRIGHTS AND PROPRIETARY INFORMATION

INDEMNIFICATION AND INSURANCE,

and such others which by their own terms are effective thereafter, shall remain in full force and effect.

RTJ2 and LICENSEE have caused this Agreement to be executed, in duplicate, by their respective, duly authorized representatives on the dates and at the places indicated below.

ROBERT TRENT JONES II
LICENSING GROUP, LLC

LICENSEE

By:  _Robert Trent Jones_

By:  _____

Name:  Robert Trent Jones, Jr.

Name:  Larry Gravel

Title:  President

Title:  President/CEO

Date:  September 22, 2004

Date:  SEPTEMBER 22, 2004

- 27 -

Page left blank intentionally

**Licensed Rights**

LICENSED TRADEMARKS AND SERVICE MARKS:

ROBERT TRENT JONES
ROBERT TRENT JONES II
ROBERT TRENT JONES, JR.
RTJ2
ROBERT TRENT JONES II and Design (logo)

LICENSED RIGHTS OF PUBLICITY:

The Robert Trent Jones, Jr. Name
The Robert Trent Jones, Jr. Signature
Likeness, Image and Persona of Robert Trent Jones, Jr.

LICENSED COPYRIGHTS:

N/A

EXHIBIT A

- 29 -

## Licensed Products

| Grant No. | Detailed Description of Licensed Product | Territory Description |
|---|---|---|
| 1 | Men's 60 doubles, mercerized 100% cotton *jersey* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 2 | Men's 60 doubles, mercerized 100% cotton *pique* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 3 | Men's basic golf sweaters, and sweater vests, in mercerized cottons, merino wools, and cashmere or like quality fabrications | United States of America and its territories, Canada, Mexico |
| 4 | Men's traditional trousers made of wool, wool blend, cotton or silk or microfiber fabrications | United States of America and its territories, Canada, Mexico |
| 5 | Men's traditional golf shorts made of silk, microfiber and cotton fabrications | United States of America and its territories, Canada, Mexico |
| 6 | Men's windshirts made of water-resistant, breathable fabrications | United States of America and its territories, Canada, Mexico |
| 7 | Men's light-weight golf jacket made of synthetic, natural fiber, synthetic and natural fiber blend, leather or suede fabrications | United States of America and its territories, Canada, Mexico |
| 8 | Men's mock neck, crew neck knit shirt. | United States of America and its territories, Canada, Mexico |
| 9 | Men's woven shirt. | United States of America and its territories, Canada, Mexico |
| 10 | Men's headwear. | United States of America and its territories, Canada, Mexico |

## Exhibit B

**Royalty Report Form**           **Sales Period: From** _____ **to** _____

| Licensee: |
| --- |

| Licensee Address: |
| --- |

| Date Due: | Date Reported: | Submitted By: | Signature: |
| --- | --- | --- | --- |
| | | | |

| Grant No.* | Total Sales | Allowances | Net Sales | Royalty % | Royalty Due |
| --- | --- | --- | --- | --- | --- |
| | | | | | |
| | | | | | |
| | | | | | |

| Totals: | | | | |
| --- | --- | --- | --- | --- |

| Current Sales Period Royalties |
| --- |

*Calculate Payment Due*

| Comments and Notes: | 1. Current Period Royalties based on sales (from above) minus any credits listed in Agreement Section 8.2. | US$ |
| --- | --- | --- |
| | 2. Current period Minimum Guaranteed Royalty for the Current Sales Period (if any) minus any credits listed in Agreement Section 8.2. See Agreement Sections 1.5 & 8.2. | US$ |
| | 3. Royalties owed for current Sales Period. Enter the greater of lines 1 or 2. See Agreement Section 8.2. | US$ |
| | 4. Late payment charges and interest on Past Due Balance (if any). See License Agreement Section 8.3 | US$ |
| | 5. Balance of any Royalties overdue from previous contract Sales Periods. | US$ |
| | **6. Royalties Due Robert Trent Jones II INC. including Interest (Add lines 3, 4, & 5).** | US$ |
| | | |

* From Exhibit B: See the definition of Net Sales in the Agreement (Section 2). All payments are to be made to
ROBERT TRENT JONES II LICENSING GROUP, LLC

Exhibit C

## Product Detail/Approval Form

| Licensee: | Submission Date: |
|---|---|

**Licensee Address:**

**Licensee Fax Number:**

Products submitted for approval:

| Grant No. | Detailed description of Licensed Product, including packaging and promotional materials | Previously submitted for Approval Yes or No | Approved to be completed by RTJ2 | Disapproved to be completed by RTJ2 |
|---|---|---|---|---|
| | | | | |

Please submit Product Detail / Approval Form to:

Robert Trent Jones, Jr.
ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

RTJ2 COMMENTS:

By: _____      Date: _____

Robert Trent Jones, Jr.

Exhibit D

## Robert Trent Jones Licensing

## Marketing, Distribution, Financial and Quality Plan Outline

### I.    COMPANY INFORMATION

Organization Chart — Qualifications and responsibilities of leadership and other significant personnel connected with the RTJ2 account.

### II.    BACKGROUND

Review of activity to date, including but not limited to, accomplishments to date, current Licensed Products, previous goals met (or not met), etc.

### III.    STRATEGIC PLAN

**Vision**

Where is the business going?  What can RTJ2 expect it to become?

**Mission**

What is the purpose?

**Five Year Goals**

What must be achieved?  What are the benchmarks?

**Critical Issues**

Obstacles, constraints, concerns.

Exhibit E

## Strategies

How to achieve goals, critical success factors and overcome critical issues?

## Objectives

Measurable, specific targets for the period (not activities). (Product improvements, customer satisfaction, brand awareness & preference, sales coverage)

## Tactics

Activities and programs planned to attain the objectives. (Surveys, products, distribution, catalogs & promotion, public relations, trade shows, sales initiatives, inventory, order handling & shipping methods).

## Distribution Outlets

Description of current and future.

## End Users

Description of current and future.

## IV.   FINANCIAL PLAN

**Balance Sheet** — Actual for last fiscal year and forecast for this fiscal year, all certified by the chief financial officer.

**Income Statement** — Actual for last fiscal year, forecast for this fiscal year all certified by the chief financial officer.

Exhibit E

**Advertising and Promotional Expenditures** — Actual for last calendar year,

forecast for this and next calendar year; all certified by the chief financial officer.

**Sales of RTJ2 Licensed Products by Territory** — Actual for last calendar year,

forecast for this and next calendar year; all certified by the chief financial officer.

## V.    QUALITY PLAN

Because Licensed Products directly affects public perceptions of RTJ2, all

licensees are required to provide a detailed report of their plans for maintaining product

and service quality, from design and manufacture to retail sale and post-sale support.


Submitted by _____

Title _____


Exhibit E

- 35 -

## ADDENDUM

THIS ADDENDUM is by and between Robert Trent Jones II Licensing Group, LLC, a Delaware limited liability company with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereinafter "RTJ2") and GFSI, Inc., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 (hereinafter "LICENSEE").

WHEREAS RTJ2 and LICENSEE entered an agreement entitled Intellectual Property License Agreement with a Commencement Date of May 1, 2005 for the design, manufacture, distribution and sale of apparel under the trademarks and related rights of RTJ2 (hereinafter "License Agreement");

WHEREAS RTJ2 is the owner of all intellectual property licensed under the License Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises hereinafter provided, and intending to be legally bound, the parties hereby agree as follows:

1. LICENSEE shall provide RTJ2 with the opportunity to meet and interview at the offices of RTJ2 and at a mutually convenient date and time the individual designated by LICENSEE to have primary responsibility for the design, manufacture, distribution and sale of apparel under the License Agreement (hereafter "Candidate"). All travel expenses of the Candidate shall be paid by LICENSEE.

2. If, within 24 hours of the interview, RTJ2 provides LICENSEE with written notice of objection to LICENSEE's designation of the Candidate as having primary responsibility for the design, manufacture, distribution and sale of apparel under the License Agreement, LICENSEE shall not hire the Candidate and shall designate a new Candidate for interview under Paragraph 1. This procedure shall repeat until both RTJ2 and LICENSEE agree on a mutually acceptable Candidate.

By execution hereof, this Addendum is incorporated into and made a part of the License Agreement.

ROBERT TRENT JONES II
LICENSING GROUP, LLC

LICENSEE

By: _Robert Trent Jones_

Name: ___Robert Trent Jones, Jr.___

Title: ___President___

Date: ___September 22, 2004___

By: _____

Name: ___Larry Graveel___

Title: ___President / COO___

Date: ___September 22, 2004___

## AMENDMENT #1 TO
## INTELLECTUAL PROPERTY LICENSE AGREEMENT

THIS AMENDMENT is by and between Robert Trent Jones II Licensing Group, LLC, a Delaware limited liability company with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereinafter "RTJ2") and GFSI, Inc., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 (hereinafter "LICENSEE").

WHEREAS RTJ2 and LICENSEE entered an agreement entitled Intellectual Property License Agreement with a Commencement Date of May 1, 2005 for the design, manufacture, distribution and sale of apparel under the intellectual property rights of RTJ2 (hereinafter "License Agreement");

WHEREAS LICENSEE is desirous of adding neckwear to the products licensed under the License Agreement;

WHEREAS LICENSEE created certain copyrighted works under the License Agreement as set forth in Exhibit C (hereinafter "Copyrighted Works") that are subject to assignment to RTJ2 upon RTJ2's request pursuant to Section 14.4(a) of the License Agreement;

WHEREAS RTJ2 and LICENSEE are also desirous of adding, amending, and deleting certain language in the License Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises hereinafter provided, and intending to be legally bound, the parties hereby agree as follows:

1.  RTJ2 and LICENSEE hereby agree to amend Exhibit A to the License Agreement by adding to the list of Licensed Rights the mark "RTJ2 and Design (logo)" and the Copyrighted Works. A revised Exhibit A is attached.

2.  RTJ2 and LICENSEE hereby agree to amend Exhibit B to the License Agreement to add the product category "neckwear." A revised Exhibit B is attached.

3.  Simultaneously with the Execution of this Amendment No. 1, and pursuant to Section 14.4(a) of the License Agreement, LICENSEE agrees to assign all right, title and interest in and to the Copyrighted Works in the form attached hereto as Exhibit C.

4.  RTJ2 and LICENSEE hereby agree to delete Paragraphs 19.6(b) and 19.6(c) of the License Agreement.

By execution hereof, this Amendment is incorporated into and made a part of the License Agreement.

**EXHIBIT B1**

ROBERT TRENT JONES II
LICENSING GROUP, LLC

GFSI, INC.

By: _Robert Trent Jones Jr._

By: _____

Name: __Robert Trent Jones, Jr.__

Name: _Larry Graveel_

Title: ____President____

Title: _President / COO_

Date: _Sept 19, 2005_

Date: _September 1, 2005_

**Licensed Rights (Amendment No. 1)**

LICENSED TRADEMARKS AND SERVICE MARKS:

ROBERT TRENT JONES
ROBERT TRENT JONES II
ROBERT TRENT JONES, JR.
RTJ2

ROBERT
TRENT JONES.

Golf Course Architects



LICENSED RIGHTS OF PUBLICITY:

The Robert Trent Jones, Jr. Name
The Robert Trent Jones, Jr. Signature
Likeness, Image and Persona of Robert Trent Jones, Jr.

LICENSED COPYRIGHTS:

2005 Robert Trent Jones Apparel Label
2005 Robert Trent Jones Apparel Hang Tag
2005 Robert Trent Jones Apparel Brochure
2005 Robert Trent Jones Apparel Tissue Paper with Monogram and Route Map Design

EXHIBIT A

## Licensed Products (Amendment No. 1)

| Grant No. | Detailed Description of Licensed Product | Territory Description |
|---|---|---|
| 1 | Men's 60 doubles, mercerized 100% cotton *jersey* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 2 | Men's 60 doubles, mercerized 100% cotton *pique* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 3 | Men's basic golf sweaters, and sweater vests, in mercerized cottons, merino wools, and cashmere or like quality fabrications | United States of America and its territories, Canada, Mexico |
| 4 | Men's traditional trousers made of wool, wool blend, cotton or silk or microfiber fabrications | United States of America and its territories, Canada, Mexico |
| 5 | Men's traditional golf shorts made of silk, microfiber and cotton fabrications | United States of America and its territories, Canada, Mexico |
| 6 | Men's windshirts made of water-resistant, breathable fabrications | United States of America and its territories, Canada, Mexico |
| 7 | Men's light-weight golf jacket made of synthetic, natural fiber, synthetic and natural fiber blend, leather or suede fabrications | United States of America and its territories, Canada, Mexico |
| 8 | Men's mock neck, crew neck knit shirt. | United States of America and its territories, Canada, Mexico |
| 9 | Men's woven shirt. | United States of America and its territories, Canada, Mexico |
| 10 | Men's headwear. | United States of America and its territories, Canada, Mexico |
| 11 | Neckwear | United States of America and its territories, Canada, Mexico |

Exhibit B

## COPYRIGHT ASSIGNMENT

WHEREAS, GFSI, INC., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 (hereafter GFSI), is the owner of all worldwide right, title and interest, including all copyrights, in the works listed in the attached Schedule 1 (hereinafter "Copyrighted Works");

WHEREAS, ROBERT TRENT JONES II, INC., a California corporation, with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereafter RTJ2) is desirous of acquiring all right, title and interest in and to the Copyrighted Works, including all registrations thereof, or applications therefor;

WHEREAS RTJ2 and GFSI entered an agreement entitled Intellectual Property License Agreement with a Commencement Date of May 1, 2005 for the design, manufacture, distribution and sale of apparel under the intellectual property rights of RTJ2 (hereinafter "License Agreement"), and the parties desire that the Copyrighted Works be assigned to RTJ2 pursuant to Section 14.4(a) of the License Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to Section 14.4(a) of the License Agreement, GFSI, itself and on behalf of any related companies, hereby sells, assigns, transfers and conveys unto RTJ2 all right, title and interest in and to the Copyrighted Works, including but not limited to the right to pursue legal actions for past infringements of the Copyrighted Works and related damages and all registrations thereof or applications therefor, *nunc pro tunc*, now for then, effective as of the date creation of the Copyrighted Works was completed.

GFSI, INC.

Dated: Sept. 1, 2005

By: _____

Name: Larry Gravee l

Title: President / COO

State of Kansas )
County of Johnson )

On this 1st day of September , 2005, before me appeared Larry Gravee l , the person who signed this instrument, who acknowledges that s/he signed it as a free act.

_____
Notary Public

My Commission expires: 4/22/08

MICHELLE WILKINSON
STATE OF KANSAS   My Appt. Exp. 4/22/08

Exhibit C

Schedule 1

2005 Robert Trent Jones Apparel Label

2005 Robert Trent Jones Apparel Hang Tag

2005 Robert Trent Jones Apparel Image Piece 7"X8.75"

2005 Robert Trent Jones Apparel Tissue Paper with Monogram and Route Map Design

2005 Robert Trent Jones Joker Tag

2005 www.roberttrentjonesapparel.com Website

Fall 2005 Robert Trent Jones Apparel Catalog 8.5"X11"

Spring 2006 Robert Trent Jones Apparel Catalog 8.5"X11"

## AMENDMENT #2 TO
## INTELLECTUAL PROPERTY LICENSE AGREEMENT

THIS AMENDMENT is by and between Robert Trent Jones Licensing Group, LLC, a Delaware limited liability company with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereinafter "RTJ2") and GFSI, Inc., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 (hereinafter "LICENSEE").

WHEREAS RTJ2 and LICENSEE entered an agreement entitled Intellectual Property License Agreement with a Commencement Date of May 1, 2005 for the design, manufacture, distribution and sale of apparel under the intellectual property rights of RTJ2 (hereinafter "License Agreement");

WHEREAS LICENSEE is desirous of expanding the Licensed Territory to include Japan;

WHEREAS RTJ2 and LICENSEE anticipate that BONMAX CO., LTD. of Tokyo, Japan ("BONMAX") will be the exclusive distributor of Licensed Products in Japan;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises hereinafter provided, and intending to be legally bound, the parties hereby agree as follows:

1. RTJ2 and LICENSEE agree to amend Exhibit B to the License Agreement to add the Territory Description "Japan." A revised Exhibit B is attached.

2. RTJ2 and LICENSEE agree that distribution of Licensed Products in Japan by third parties will occur only pursuant to the terms of a fully executed Distributor Authorization Agreement in the form attached hereto.

3. For purposes of calculating the actual royalty to be paid by LICENSEE to RTJ2, LICENSEE and RTJ2 agree that any Japanese distributor is an agent of LICENSEE and that, pursuant to Section 2.8 of the License Agreement, the price subject to royalty shall be that charged to the consumer or customer by the Japanese distributor or that charged by LICENSEE, whichever is higher.

4. By the twenty-fifth day following the close of each Sales Period, and subsequent Grace Period, if any, LICENSEE shall send to RTJ2 by electronic means, post or delivery services, a summary report on the results of all in-line audits as well as final audits conducted on Licensed Products to be sold in Japan. In the event that said Licensed Products failed to meet a 2.5 AQL level, LICENSEE shall also report on all actions taken to ensure that the Licensed Products meet RTJ2's quality control standards.

**EXHIBIT B2**

By execution hereof, this Amendment is incorporated into and made a part of the License Agreement.

ROBERT TRENT JONES LICENSING     GFSI, INC.
GROUP, LLC

By:  _Robert Trent Jones_          By:  _TIM CONLIN_

Name:  _Robert Trent Jones, Jr._   Name:  _Tim Conlin_

Title:  _President_                Title:  _DIRECTOR_

Date:  _7/31/06_                   Date:  _8/28/06_

2

**Licensed Products (Amendment No. 2)**

| Number | Detailed Description of the Licensed Products | Territory Description |
|---|---|---|
| 1 | Men's 60 doubles, mercerized 100% cotton *jersey* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico, Japan |
| 2 | Men's 60 doubles, mercerized 100% cotton *pique* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico, Japan |
| 3 | Men's basic golf sweaters, and sweater vests, in mercerized cottons, merino wools, and cashmere or like quality fabrications | United States of America and its territories, Canada, Mexico, Japan |
| 4 | Men's traditional trousers made of wool, wool blend, cotton or silk or microfiber fabrications | United States of America and its territories, Canada, Mexico, Japan |
| 5 | Men's traditional golf shorts made of silk, microfiber and cotton fabrications | United States of America and its territories, Canada, Mexico, Japan |
| 6 | Men's windshirts made of water-resistant, breathable fabrications | United States of America and its territories, Canada, Mexico, Japan |
| 7 | Men's light-weight golf jacket made of synthetic, natural fiber, synthetic and natural fiber blend, leather or suede fabrications | United States of America and its territories, Canada, Mexico, Japan |
| 8 | Men's mock neck, crew neck knit shirt. | United States of America and its territories, Canada, Mexico, Japan |
| 9 | Men's woven shirt. | United States of America and its territories, Canada, Mexico, Japan |
| 10 | Men's headwear. | United States of America and its territories, Canada, Mexico, Japan |
| 11 | Neckwear | United States of America and its territories, Canada, Mexico, Japan |

Exhibit B [to License Agreement]

3

## ROBERT TRENT JONES LICENSING GROUP, LLC
## DISTRIBUTOR AUTHORIZATION AGREEMENT

| | |
|---|---|
| Licensor: | Robert Trent Jones Licensing Group, LLC, a Delaware limited liability company with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereinafter "RTJ2") |
| Licensee Name ("LICENSEE"): | GFSI, Inc., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 |
| Expiration Date of Distribution Agreement | April 30, 2015 (hereinafter "Distribution Term") (term must be equal to or less than the Term of the License Agreement between LICENSEE and RTJ2) BONMAX CO., LTD.   (hereinafter "Distributor") |
| Distributor Name and Address: | 3-5-8, Higashi Nihonbashi, Chuo-ku, Tokyo, 103-0004 Japan Phone: 81-3-3663-9705 Fax:   81-3-3663-5474 |

Distributor enters into this Distributor Authorization Agreement (the "DAA") for the express purpose of inducing the reliance thereon by RTJ2, and/or its parents, subsidiaries, and/or affiliates (who are also embraced within the defined term "RTJ2") and LICENSEE. LICENSEE has entered into an agreement with Distributor for Distributor to distribute approved licensed products ("Licensed Product(s)") bearing the intellectual property rights of RTJ2 ("Licensed Right(s)"). Licensed Products are manufactured by LICENSEE pursuant to the Intellectual Property License Agreement between RTJ2 and LICENSEE (the "License Agreement")).

Distributor intends and agrees to be bound by all of the terms and conditions hereof, for the benefit and in favor of RTJ2 and the LICENSEE.

This DAA shall remain in effect for the Distribution Term, unless it is terminated earlier pursuant to the terms and conditions of this Agreement, or upon termination by RTJ2 of the Licensee Agreement referenced above.

In consideration for RTJ2's and LICENSEE's agreement to permit the distribution of Licensed Products by the Distributor, Distributor covenants and agrees that:

1. Distributor will distribute Licensed Products strictly in accordance with the terms and conditions of this DAA in the following territory: ___Japan___ ("Distribution Territory").
   tconlin@ rtjapparel.com

2. Distributor shall record and report to LICENSEE and RTJ2 via electronic mail (addressed to _____ and bjones@rtj2.com, respectively) Distributor's Net Sales of Licensed Products for the following quarterly Sales Periods:

May 1 through July 31
August 1 through October 31
November 1 through January 31
February 1 through April 30

Said reports shall be due no later than fourteen (14) calendar days after the close of
each of the above Sales Periods and shall be certified as true and correct by
Distributor's Chief Financial Officer. "Net Sales" means the total gross revenue for
Licensed Products sold by Distributor, less the following items of expense to the
extent to which they are paid or allowed and included in gross revenue: (1) trade or
quantity discounts (but not cash discounts); (2) credits for refunded, returned or
rejected Licensed Products (provided that amounts equal to such credits have
previously been included in gross revenue); (3) sales taxes, use taxes, value added
taxes, provincial taxes or turnover taxes on sales invoices; (4) freight and handling
charges and (5) payments of royalties to colleges , corporation, professional golf
associations, etc.

    (a)    For this Agreement, Licensed Products shall be
considered sold upon the earliest occurrence of:

    (1)    when delivered to the purchaser or to a
common carrier for delivery to purchaser;
or

    (2)    when paid for, if paid in advance of
delivery of the good or service; or

    (3)    when billed out

whichever first occurs.

    (b)    Any increase in total billing or receipts resulting from the
decoration, imprinting, personalization or customizing of Licensed
Products shall be included in calculating Net Sales.

    (c)    If Distributor makes any sales of Licensed Products to an
associated or affiliated company, or through any agency, then the price
subject to royalty shall be that charged to the consumer or customer by
the Distributor subsidiary, associated or affiliated company or agency,
or that charged by Distributor, whichever is higher.

    (d)    No deductions shall be made for uncollectible accounts.

    (e)    If Distributor receives or negotiates to receive any
consideration which (a) relates in any way to the sale, display,
marketing and/or distribution of any Licensed Product and (b) is not
included in the total gross price at which such Licensed Product is sold
by the Distributor, Distributor shall, prior to any sale, display,
marketing and/or distribution of such Licensed Product: inform RTJ2
of the details and amount of such consideration; submit to RTJ2, in
writing, a proposed total gross price at which the Licensed Products are
to be sold by Distributor; and obtain RTJ2's express, written approval

2

of such proposed total gross price. Such approved proposed total gross price shall, for purposes of this Agreement, be considered the total gross price at which such Licensed Product is sold.

3. From time to time, Distributor will permit RTJ2's or LICENSEE's authorized representative to inspect its activities and premises, accounting books and invoices relevant to its distribution and sales of Licensed Products, with seven (7) days advance notice. During the Distribution Term and for a period of three (3) years thereafter, Distributor shall keep in its possession or control accurate records covering all transactions relating to the DAA, Net Sales, and Distributor's distribution of Licensed Products hereunder. RTJ2 and/or LICENSEE or their representatives have the right to conduct an audit and make copies of all such records and to make a physical inventory count of Licensed Products in production or storage. RTJ2 and/or LICENSEE or their representatives will also have the right to interview employees with the distribution operations, with seven (7) days advance notice, with respect to any aspect of the DAA, including labor practices and compliance with laws and the terms of this DAA.

4. Distributor, in distributing and selling the Licensed Products, will follow high ethical standards and in no way will Distributor's activities reflect negatively on RTJ2's reputation or goodwill, its products and services, or the Licensed Rights. In distributing and selling the Licensed Products, Distributor will comply with all applicable local and national laws and regulations, treaties, voluntary industry standards, codes or other obligations (collectively, "laws"), including but not limited to, applicable health and safety standards and labor laws, and advertising laws and regulations. In addition to, and without limiting the generality of the foregoing, Distributor shall make no use of child, prison or slave labor, nor shall Distributor engage in any unfair labor practice or violation of human rights. RTJ2 may identify additional requirements relating to the workplace or other code of conduct issues from time to time during the Term, and Distributor agrees to comply with such terms.

5. Distributor acknowledges that RTJ2 is the sole beneficial owner of all rights in and to the Licensed Rights and the goodwill relating thereto. Distributor will not challenge the validity of, or RTJ2's exclusive ownership of, any of the Licensed Rights. Distributor acknowledges that distribution by it of the Licensed Products will not vest in Distributor any rights whatsoever in any of the Licensed Rights.

6. Distributor will not and acknowledges that it has no right to produce, distribute, have produced or have distributed products that incorporate in any way any of the Licensed Rights or anything confusingly similar thereto except as expressly authorized by this Agreement. Distributor will not do or cause or permit to be done anything that would constitute an infringement of RTJ2's rights or would adversely affect RTJ2's rights in the Licensed Rights.

7. Distributor and LICENSEE understand and acknowledge that the sale of Licensed Products in the Distribution Territory may increase the likelihood of the manufacture

3

and sale of infringements, counterfeits or imitations by others of the Licensed Products as defined in the License Agreement ("Infringing Products"). Accordingly, the parties agree as follows:

Distributor and LICENSEE agree to promptly notify RTJ2 in writing of any Infringing Products of which Distributor or LICENSEE becomes aware in Asia. RTJ2 shall have the sole right and discretion to take legal action, including initiation of a lawsuit, and to control such legal action. Distributor and LICENSEE shall provide RTJ2 with all information and reasonable assistance within their power and control to help RTJ2 prosecute said legal action (Distributor shall not be required to assist outside of Japan). Distributor agrees to reimburse RTJ2 (within thirty (30) days of invoice) for two-thirds (2/3) of RTJ2's costs and expenses of such suit or other legal action taken in Asia on a quarterly basis, said reimbursement not to exceed two percent (2%) of the average of Distributor's Net Sales in the Distribution Territory over the preceding four Sales Periods. LICENSEE agrees to reimburse RTJ2 (within thirty (30) days of invoice) for one-third (1/3) of RTJ2's costs and expenses of such suit or other legal action taken in Asia on a quarterly basis, said reimbursement not to exceed one percent (1%) of the average of Distributor's Net Sales in the Distribution Territory over the preceding four Sales Periods. All additional costs and expenses of such suit or other legal action shall be borne by RTJ2 and any amounts recovered by reasons of such action, suit or other proceeding shall be redistributed among the parties according to the proportion of costs and expenses paid, with any recovery exceeding the costs and expenses belonging to RTJ2.

8. RTJ2 shall have the right, without prejudice to any other rights which it may have, to terminate this DAA immediately:

   a.  Upon RTJ2's termination of the Licensee Agreement with LICENSEE; or

   b.  If Distributor commits any material breach of its obligations under the DAA; or

   c.  If Distributor fails to commence the distribution of any Licensed Product within one year of Distributor's execution of the DAA; or

   d.  If Distributor discontinues distributing Licensed Products in commercial quantities for a period longer than one year without RTJ2's written approval; or

   e.  If RTJ2's costs and expenses from taking legal action against Infringing Products in Asia during any Sales Period are greater than RTJ2's royalty revenue from sales in the Distribution Territory during the same Sales Period.

4

9. Within ninety (90) days of (1) expiration (2) termination of this DAA without cause or (3) termination of the License Agreement between RTJ2 and LICENSEE, Distributor will (a) immediately cease distributing and selling the Licensed Products and immediately cease the use of or reference to any and all of the Licensed Rights; (b) provide RTJ2 and LICENSEE with an inventory of all stock of Licensed Products, labels, tags, packaging material, boxes or any other material upon which the Licensed Rights appear or are embodied; (c) deliver to RTJ2 or at RTJ2's direction, to LICENSEE, all Licensed Products then in stock, and all labels, tags, packaging material, boxes or any other material upon which the Licensed Rights appears or is embodied; and (d) allow RTJ2 or LICENSEE or their representatives to inspect all distribution operations with or without notice to ensure compliance with the terms of this Section.

10. This DAA shall be deemed to be entered into in the State of California and the United States of America, and shall be governed and interpreted according to the laws of the State of California and the United States of America applicable to contracts made and to be fully performed in California. Any legal actions pertaining to this DAA shall be commenced within the State of California and state and federal courts in San Francisco, California, and Distributor hereby consents to the jurisdiction of the appropriate court within the State of California. RTJ2 may rely for any and all purposes on the Distributor's faxed signature of this DAA, but faxing the DAA does not excuse the Distributor from its obligation to return the original executed DAA so that RTJ2 may maintain the original executed DAA in its files.

11. Distributor acknowledges that RTJ2 shall be irreparably injured by any breach of the terms of this DAA by Distributor and that RTJ2 shall be entitled to injunctive relief to remedy such breach, in addition to any other remedies available to Licensor at law or in equity.

12. The provisions of Sections 2, 3, 4, 5, 6, 7, 8, 9, 10,11 and 12shall survive any termination of this Agreement.

Agreed:

| DISTRIBUTOR | GFSI, Inc. ("LICENSEE") | Robert Trent Jones Licensing Group, LLC ("RTJ2") |
|---|---|---|
| By: _BONMAX Co.,Ltd._ | By: _Tim Conlin_ | By: Date: _7/31/06_ |
| Name: _Yuichi Togawa_ | Name: _TIM CONLIN_ | Name: Robert Trent Jones, Jr. |
| Title: _President & CEO_ | Title: _DIRECTOR_ | Title: President |
| Date: _Yu Togawa_  _8/8/06_ | Date: _8/22/06_ | Date: Robert Trent Jones |

5