IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT TRENT JONES II, INC. and ROBERT TRENT JONES LICENSING GROUP, LLC<br><br>Plaintiffs,<br><br>v.<br><br>GFSI, INC. d/b/a GEAR FOR SPORTS, INC.<br><br>Defendant. | Case No. 07-CV-04913-EDL<br><br>DECLARATION OF MR. JAY M. BURGETT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Date:    January 8, 2008<br>Time:   2:00 p.m.<br>Judge:  Elizabeth D. Laporte |

**Declaration of Mr. Jay M. Burgett**

1. I am an attorney at the law firm of Norvell IP LLC, located at 1776 Ash Street, Northfield, IL 60093. I have worked at Norvell IP LLC for approximately eight months. I have been an attorney for approximately two years. I am also a registered patent attorney. Prior to my employment at Norvell IP LLC, I was an attorney at a full service intellectual property law firm in Chicago, IL. I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2. On August 28th and 29th of 2007, I accompanied Tom Zetlmeisl, a Manager at the accounting firm of RubinBrown LLP, to GFSI, Inc. d/b/a Gear for Sports, Inc.'s ("GFSI") corporate headquarters located at 9700 Commerce Parkway, Lenexa, Kansas 66219. The purpose of this visit was to review Gear's financial information as it relates to golf apparel bearing the Robert Trent Jones trademarks ("RTJ Apparel")

3. Upon arriving at GFSI on August 28, 2007, Mr. Zetlmeisl and I were met by Erik Olson, Director of Accounting for GFSI. Later that morning, we also met Dan Meadows, Director of Accounting / Controller for GFSI.

4. Prior to our visit to GFSI, I sent GFSI a letter dated August 23, 2007 requesting that certain documents and information be made available for inspection. Attached as Exhibit 1, is a copy of the letter. Despite advance notice of the on-site visit, the GFSI accounting department had no financial data prepared when we arrived. Instead, the accounting department gathered information that we requested and provided it to us piecemeal throughout the two days.

5. During the two day on-site review, Mr. Zetlmeisl and I requested numerous documents from GFSI, but the GFSI accounting department failed to provide a substantial amount of the information we requested. Despite my follow-up request, as of the date of this declaration, the requested information has not been provided.

6. Messrs. Meadows and/or Olson, either together or separately, explained the accounting system, the royalty reports submitted by GFSI and fielded questions relating to the same.

7. Messrs. Meadows and/or Olson detailed how GFSI and its accounting department account for sales to discount stores, which GFSI typically refers to as secondary markets. Based on my understanding, secondary market(s), as that term is used by GFSI, is a type of "discount store," i.e. a retailer that sells product at a discount.

8. Messrs. Meadows and/or Olson explained that a secondary market is determined by the type of product the customer purchases as explained further in paragraphs 10 and 11. A secondary market does not purchase RTJ Apparel at full price, but rather purchases RTJ Apparel at discount prices and sometimes in bulk.

9. Messrs. Meadows and/or Olson explained that GFSI assigns customer types to each of its customers. Examples of GFSI customer types include "golf," "corporate," and "secondary market." Messrs. Meadows and/or Olson acknowledged that at least one secondary market customer, Stein Mart, was classified incorrectly as a golf customer in the accounting system. Messrs. Meadows and/or Olson also acknowledged that there could be other customers that are classified incorrectly.

10. Messrs. Meadows and/or Olson explained that RTJ Apparel sold to secondary markets could include returned products, overstocks, and/or returned sample lines from sales representatives.

11. Messrs. Meadows and/or Olson explained that:

    a. Return products could include damaged or defective products, such as color, size, stitching, decoration or labeling defects, late shipments or other customer satisfaction issues.

    b. All returned products are sent to a returns division with GFSI. The returns division sorts the returned products to determine which products are (1) returned to stock, (2) sold to secondary markets, or (3) destroyed as unsellable.

    c. Returned defective or damaged products that are deemed sellable are sold to secondary markets.

12. Based upon my understanding of GFSI's procedures for selling RTJ Apparel to secondary markets, I believe that returned defective or damaged RTJ Apparel products are sold to secondary markets with the Robert Trent Jones labels remaining on the products.

13. Messrs. Meadows and/or Olson explained that overstocks could include discontinued RTJ Apparel, last season's styles or poor performing products. GFSI's normal practice is to discount overstocks to non-secondary market customers to maximize profits, until the overstocks can no longer be sold to these customers. At this point, the overstocks are sold to secondary markets.

14. Messrs. Meadows and/or Olson explained that GFSI collects all sample lines that are returned by the sales representatives at the end of the season. It is GFSI's general practice to either sell these returned sample lines directly to secondary markets or sell the returned sample lines with other returned products and/or overstocks to secondary markets as a bulk sale.

15. Based on our discussions with Messrs. Meadows and/or Olson, GFSI's accounting system does not track within the RTJ Apparel that is sold to secondary markets whether such product is damaged or defective. When asked, Messrs. Meadows and/or Olson could not state that damaged or defective RTJ Apparel was not sold to secondary markets. In contrast, Messrs. Meadows and/or Olson stated that returned defective or damaged products that are deemed sellable are sold to secondary markets.

16. Messrs. Meadows and/or Olson explained that the product designated for secondary markets is accumulated and stored in temporary storage bins. Mr. Meadows took Mr. Zetlmeisl and me to view the storage bins. The storage bins are large cardboard boxes that contained a wide variety of RTJ Apparel intermixed together. I sifted through some of the RTJ Apparel stored in the storage bins. Some of the RTJ Apparel was still in its packaging. However, a significant amount of the RTJ Apparel was placed in the storage

bins in disarray. The storage bins contained RTJ Apparel that had noticeable defects, such as color and label defects, and other RTJ Apparel that did not appear to have any defects. The RTJ Apparel that I viewed in the storage bins all had the Robert Trent Jones labeling still intact.

17. Messrs. Meadows and/or Olson explained that when sufficient bulk of RTJ Apparel accumulates in the temporary storage bins, GFSI sells the product to a secondary market customer for the best price it can negotiate. Messrs. Meadows and/or Olson explained that non-secondary market sales have prices that are based on system generated information. However, the secondary market pricing is based solely on the ability of GFSI to negotiate the best price for the product available.

18. Messrs. Meadows and/or Olson indicated that no documentation was kept in the ordinary course of business relating to the negotiation of sales with secondary markets. The price, the product and the condition of the product varies on a case-by-case basis.

19. Based on my understanding of GFSI's procedures for selling RTJ Apparel to secondary markets, it is not GFSI's practice to remove the labels and/or tags from RTJ Apparel prior to selling the RTJ Apparel to secondary markets. I asked Messrs. Meadows and/or Olson if the labels and/or tags were removed prior to selling the RTJ Apparel to secondary markets and Messrs. Meadows and/or Olson stated that they were not aware of the labels and/or tags being removed prior to sale. We requested GFSI's procedures for the handling of RTJ Apparel that is sold to secondary markets; however, Messrs. Meadows and/or Olson have failed to provide this information. Unless there is a label and/or tag removal step that I was not informed of, GFSI does not remove the labels and/or tags from RTJ Apparel prior to selling the product to secondary markets.

20. Based upon my interviews with Messrs. Meadows and/or Olson, my onsite review of GFSI's operations, and unless I was not informed of a label and/or tag removal step, damaged and defective RTJ Apparel was sold to secondary markets with the ROBERT TRENT JONES trademarks remaining on the product.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of November, 2007, in Chicago, Illinois.

_____
Jay M. Burgett

# Exhibit 1

# Norvell IP llc
Intellectual Property Law

Jay M. Burgett
Direct: (312) 659-7157
jburgett@NorvellIP.com

August 23, 2007

**VIA ELECTRONIC MAIL (lswain@stklaw)**
*(Confirmation Copy via UPS Next Day Air)*

Lawrence Swain, Esq.
Shughart Thomson & Kilroy
32 Corporate Woods
9225 Indian Creek Pkwy, Suite 1100
Overland Park, KS 66210

Re:  Robert Trent Jones Apparel License Agreement
     Our Ref. No.: 12702/8

Dear Larry:

Further to your phone conversation today with Joe Norvell, I write to confirm that Robert Trent Jones II Licensing Group ("RTJ2") shall be auditing Gear For Sports pursuant to Section 9 of the ROBERT TRENT JONES II LICENSING GROUP, LLC Intellectual Property License Agreement ("Agreement"). The audit will take place on Tuesday, August 28, 2007 and Wednesday, August 29, 2007. We understand that the audit will take place at Gear For Sports' facilities in Lenexa, Kansas. We reserve the right to schedule follow-up dates if additional time and/or information is needed to complete the audit.

Pursuant to this notice, we ask that all Books and Records, as those terms are defined in the Agreement, be provided to RTJ2's representatives at the start of business, i.e. 9:00 AM, on Tuesday. In addition, pursuant to Section 6.4 of the Agreement, we ask that all detailed documentation substantiating Gear For Sports' investment in the RTJ2 Apparel Line be provided for inspection at this same time as well.

If you wish to discuss the foregoing, feel free to contact Joe Norvell. In the meantime, we remain available to continue discussions concerning a resolution to this matter in hopes that an agreement can be reached sooner rather than later as to not further jeopardize the RTJ Apparel Line for 2008.

1776 Ash Street, Northfield, Illinois 60093   Fax 312-268-5063   www.NorvellIP.com

Lawrence Swain, Esq.
Page 2 of 2

Very truly yours,

Jay M. Burgett

JMB/mkh
cc:   Joseph V. Norvell, Esq.