1   Richard E. Levine (SB #88729)
    LEVINE & BAKER LLP
2   One Maritime Plaza, Suite 400
    San Francisco, CA 94111
3   Telephone: (415) 391-8177
    Facsimile: (415) 391-8488
4   rlevine@levinebakerlaw.com

5
    Joseph V. Norvell (pro hac vice pending)
6   Joseph T. Kucala (pro hac vice pending)
    Jay M. Burgett (pro hac vice pending)
7   NORVELL IP LLC
    1776 Ash Street
8   Northfield, IL 60093
    Telephone: (847) 809-2212
9   Facsimile: (312) 268-5063
    jnorvell@norvellip.com
10

11  Attorneys for Plaintiffs
    ROBERT TRENT JONES II, INC.
12  ROBERT TRENT JONES LICENSING GROUP, LLC

13

14              **IN THE UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15                      **SAN FRANCISCO DIVISION**

16
    ROBERT TRENT JONES II, INC. and
17  ROBERT TRENT JONES LICENSING          **Case No. 07-CV-04913-EDL**
    GROUP, LLC
18                                         **NOTICE OF MOTION AND**
                           Plaintiffs,     **MEMORANDUM OF POINTS AND**
19                                         **AUTHORITIES IN SUPPORT OF**
                    v.                     **PLAINTIFFS' MOTION FOR**
20                                         **PRELIMINARY INJUNCTION**
    GFSI, INC. d/b/a GEAR FOR SPORTS,
21  INC.
                                           **Date:   January 8, 2008**
22                         Defendants.     **Time:   2:00 pm**
                                           **Judge: Elizabeth D. Laporte**
23

24

25

**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1



PLEASE TAKE NOTICE:

On January 8, 2008, at two o'clock p.m., at Courtroom E, 15th Floor, United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, plaintiffs will move the Court for a preliminary injunction in the within action.

Plaintiffs will seek an order preliminarily enjoining defendants from continuing to (1) sell apparel bearing the "Robert Trent Jones" trademark to discount stores, or (2) sell or distribute damaged, defective, seconds or non-conforming apparel bearing the "Robert Trent Jones" trademark to any person or entity without first removing said trademark and any other rights licensed to defendant pursuant to the license agreement between defendant and plaintiffs.

## TABLE OF CONTENTS

**INTRODUCTION**.................................................................................................................... **6**

**STATEMENT OF FACTS**.................................................................................................... **6**

**I.    The License Agreement** .................................................................................................. **6**

    A.    The Licensed Rights ................................................................................................. 7

    B.    The Preclusion of Sales to Discounters ................................................................... 8

    C.    The Parties' Agreement that Irreparable Harm Would Occur, and Injunctive
        Relief be Appropriate, in the Event of Breach......................................................... 10

**II.   Defendant's Breaches** ................................................................................................... **11**

    A.    Defendant Is Selling to Discount Stores. ................................................................ 11

    B.    Defendant Has Sold Damaged, Defective or Seconds Bearing the RTJ Marks to
        Secondary Markets.................................................................................................... 13

**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

2

C.    Defendant's Apparent Motivation ........................................................................... 13

**III.   RTJ's Efforts to Persuade GFSI to Abide by the Terms of the License Agreement 16**

**ARGUMENT .............................................................................................................................. 16**

A.    Ninth Circuit Standard for Preliminary Injunction ................................................. 16

B.    Plaintiffs Have Demonstrated Probable Success on the Merits and Likelihood
of Irreparable Injury. ............................................................................................... 18

    1.    Plaintiffs Demonstrate Probable Success on the Merits, as Defendant has
Used and Continues to Use RTJ Marks Outside the Scope of the License
Agreement thus Creating Consumer Confusion as a Matter of Law. ............ 18

        a.    Plaintiff Owns Protectable Trademarks. ................................................ 18

        b.    Defendant's Conduct is Clearly Not Authorized by the License
Agreement and is Likely to Cause Consumer Confusion. ..................... 19

    2.    Plaintiffs Will Continue to Suffer Irreparable Injury Without a Preliminary
Injunction. .................................................................................................... 20

        a.    Plaintiffs Enjoy a Presumption of Irreparable Injury in Trademark
Cases. ................................................................................................... 21

        b.    The Irreparable Injury to Plaintiffs Is Actual, Not Only Presumed,
and Already Admitted by Defendant. .................................................... 21

    3.    In addition to the Irreparable Injury that Plaintiffs Will Suffer, the Balance
of Hardships Also Tips Sharply in Their Favor. ............................................ 23

**CONCLUSION ............................................................................................................... 25**

**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

3

1                                **TABLE OF AUTHORITIES**

2                                          **CASES**

3    *Big Country Foods, Inc. v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989).....................17

4    *Brookfield Comms., Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1046
5          (9th Cir. 1999)..........................................................................................................17, 21

6    *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,*
          794 F.2d 38 (2d Cir.1986)..................................................................................19, 21, 22
7
     *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396-97 fn. 1
8          (9th Cir. 1997)...........................................................................................................17

9    *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000) ......................17, 21

10   *Hollywood Athletic Club v. GHAC-CityWalk,* 938 F. Supp. 612, 614 (C.D. Cal. 1996)...............
11          .................................................................................................................18, 19, 21, 22

12   *Int'l Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 827 (9th Cir. 1993) ..........................................17

13   *Omega Nutrition USA Inc. v. Spectrum Marketing, Inc.*, 756 F. Supp. 435, 440 (N.D.
14          Cal. 1991)............................................................................................................. 18-19

15   *Opticians Ass'n of Amer. V. Indep. Opticians of Amer.*, 920 F.2d 187, 197
          (3rd Cir. 1990..............................................................................................................24

16   *Paisa, Inc. v. N & G Auto, Inc.,* 928 F. Supp. 1009, 1012 n. 4 (C.D. Cal.1996) .........................19

17   *Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067, 1075 (C.D. Cal. 2004).....................24

18   *Resource Lenders, Inc. v. Source Solutions, Inc.*, 404 F.Supp.2d 1232, 1249-50 (E.D.
19          Cal. 2005).....................................................................................................................24

20   *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984)...............17

21                    **STATUTES AND SECONDARY SOURCES**

22   McCarthy, J. Thomas, McCarthy on Trademarks (2007).....................................................15, 21

23   15 U.S.C. § 1114(1)(a)..........................................................................................................18

24   15 U.S.C. § 1115(a) .............................................................................................................18
25
     15 U.S.C. §1115(b) ............................................................................................................7, 18

1

15 U.S.C. § 1116(a) ................................................................................................................16

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# INTRODUCTION

Plaintiffs, Robert Trent Jones II, Inc. and Robert Trent Jones Licensing Group, LLC (collectively "RTJ2"), own and use registered trademarks and service marks (the "RTJ Marks"), as well as rights of publicity of prominent golf course architect Robert Trent Jones, Jr., a principal owner of Plaintiffs. This litigation arose out of various wrongful acts by Defendant, Gear For Sports, Inc. ("GFSI"), including breaches of its license agreement with RTJ2 (the "License Agreement"). The License Agreement granted GFSI the right to manufacture and sell certain specific articles of high quality clothing bearing the RTJ trademark in certain *specific* channels of commerce.

This motion seeks to preliminarily enjoin two of Defendant's particularly destructive ongoing breaches of the License Agreement. Defendant, despite clear prohibitions in the License Agreement and repeated demands to cease and desist, continues to (1) sell clothing bearing the licensed rights to "discount stores" and (2) sell defective and damaged clothing without first removing the RTJ marks. Defendant's actions are causing, and will continue to cause – as a matter of law – "irreparable harm" to the value of marks previously – and carefully – associated by Plaintiffs only with high quality golf courses and high-end, luxury products.

# STATEMENT OF FACTS

## I.    The License Agreement

For over thirty years, the name Robert Trent Jones, Jr. has been synonymous with premier golf course design. (Declaration of Robert Trent Jones, Jr. ("Jones") ¶¶ 8 & 12). The sheer number of awards and recognitions for these design achievements is a testament to the strength of the name and the goodwill it represents. (Jones ¶ 8). The Robert Trent Jones brand reflects high quality design and previously has only been aligned with other high-end, luxury

products, such Rolex watches and Lexus cars. (Jones ¶¶ 12-14, Ex. D-F). Plaintiffs have exercised great care to avoid associations of the brand that would reflect negatively upon it or otherwise detract from its value.

In 2004, GFSI approached RTJ2 proposing to license Robert Trent Jones, Jr.'s rights of publicity, the Robert Trent Jones brand and registered marks for use in connection with a line of high quality golf apparel. (Jones ¶ 17). GFSI presented RTJ2 with a comprehensive Robert Trent Jones Golf Apparel Business Plan ("Plan"), (Jones ¶ 17, Ex. G). The Plan outlined GFSI's goals for a line of RTJ branded "tasteful, high quality" apparel, including sales to "Green Grass golf pro shops," and "high end specialty department stores the caliber of Nordstrom, Saks 5th Ave., and Neiman Marcus." (*Id.*). Following extensive discussion and negotiation, the parties finalized the License Agreement, a copy of which is submitted herewith as Exhibit H to the Jones Dec. (and attached to the Complaint as Exhibit B). The License Agreement was signed in September, 2004, and commenced on May 1, 2005. (*Id.*)

## A.    The Licensed Rights

The License Agreement licenses to GFSI on an exclusive basis specific intellectual property ("Licensed Rights") for use in connection with golf apparel, including the mark "Robert Trent Jones." This Mark is the subject of a U.S. federal trademark registration (U.S. Reg. No. 1,899,912) in connection with "men's accessories, namely, jackets, shirts, pants, shorts and sweaters" (i.e., men's clothing commonly worn in connection with or associated with golf). (Jones ¶ 15). This registration issued on June 13, 1995 and has since become incontestable. 15 U.S.C. §1115(b). (*Id.*) In addition to the mark, the License Agreement licensed the Robert Trent Jones, Jr. name, the Robert Trent Jones, Jr. signature and the Robert Trent Jones, Jr. likeness, image and persona for use in connection with golf apparel. (Jones ¶ 17, Ex. G).

**B.    The Preclusion of Sales to Discounters**

The License Agreement tightly controls the nature of resellers GFSI may sell to,

precluding, at Section 13, sales to "Mass Retailers, Clubs or discount stores":

> LICENSEE [GFSI] warrants **it will not use** the Licensed Products for sales to Mass
> Retailers, Clubs or discount stores except as permitted by Sections (2.10) and (6) of this
> Agreement without prior written consent of RTJ2. [Emphasis supplied.]

(Jones Ex. H).   Discount stores, while not expressly defined in the License Agreement, are

understood generally as stores that sell products at a discount.   For example, GFSI stated that

Stein Mart, a national retailer, is a "**discount retailer**." (Emphasis added). (Jones ¶ 20).

The exception to the Section 13 prohibition is set forth in Section 6.3 (Section 2.10, a

definition section defining the term "Secondary Markets" as used in Section 6.3, is discussed

below).   Section 6.3 is intended to afford GFSI relief with respect to damaged or non-conforming

product.   (Jones Ex. H)   Section 6.3, like Section 13, begins with language of preclusion:

> LICENSEE [GFSI] shall not except as provided in this Section (6.3) sell, display, market,
> distribute or use for any purpose or permit any third party to sell, display, market,
> distribute or use for any purpose any Licensed Products or promotional and packaging
> material relating to the Licensed Products **that are damaged, defective, seconds, or
> otherwise fail to meet RTJ2's specifications or quality standards or the trademark
> and copyright usage and notice requirements of this Agreement.**
> [Emphasis supplied.]

(*Id.*)   Section 6.3 then carves out its narrow and specific exception to the above preclusion:

> Should LICENSEE elect to sell *such* product to **Secondary Markets**, LICENSEE shall
> remove any and all License Rights identification from the garment prior to sales, display
> or distribution. . . . LICENSEE may, however, sell at its reasonable discretion any and all
> of these substandard Licensed Products to **Secondary Markets** upon removal of all
> Licensed Rights identification from the garment prior to sales, display or distribution.
> [Emphasis supplied.]

"Such product" is, thus, "damaged, defective, seconds, or [products] otherwise fail[ing] to meet

RTJ2's specifications or quality standards." (*Id.*)   It may be sold to "Secondary Markets" – but

only if "all Licensed Rights identification" is first "removed" from such garments.   This is the

**only** exception to the Section 13 prohibition appearing in the License Agreement, and the only exception to which the parties agreed.[1]  The purpose of Sections 13 and 6.3, taken together, is to **preclude** discount sales of *non*-damaged, conforming trademark bearing product, while permitting sales of damaged or non-conforming product to the "Secondary Market" so long as the trademark is first removed.

The definition of "Secondary Market(s)" is set forth at Section 2.10, in Article 2, the "Definitions" article of the License Agreement:

"Secondary Market(s)" means a LICENSEE [GFSI] customer that LICENSEE customarily sells defective, irregular, seconds or overstocks of products, such as The Paradies Shops (d/b/a PGA Tour Stop Stores), Burlington Coat Factory, Bermo Enterprises, Gabriel Brothers or the like.

(*Id.*) Section 2.10 goes on to limit the definition as follows:

Defective, irregular, seconds or overstocks cannot be sold to "Mass Retailers" such as Wal-Mart, K-Mart, Ames, Value City, Dollar General and Dollar Stores or "Clubs" such as Costco or Sam's or like stores.

(*Id.*). GFSI's representatives confirmed that Secondary Markets typically do not purchase RTJ branded apparel at full price, but at discount prices and sometimes in bulk. (Declaration of Thomas B. Zetlmeisl ("Zetlmeisl") ¶ 8; Declaration of Jay M. Burgett ("Burgett") ¶ 8).

Thus, Section 6.3 provides an exception to the Section 13 prohibition on sales to "discount stores," permitting *only* sales of "damaged, defective, seconds, or [goods] otherwise fail[ing] to meet RTJ2's specifications" to "Secondary Markets," so long as the trademark is first removed; and Section 2.10 defines "Secondary Markets" to mean those customers of GFSI to which GFSI customary sells seconds, defects, irregulars or overstock – though noting that certain

---

[1] Section 13 also provides an exception upon prior written consent of Plaintiff. (Jones, Ex. H, §13). This exception is not applicable in this situation because no such consent was ever provided. (Jones ¶ 19).

types of discount stores (referred to as "Mass Retailers") cannot be sold to at all, even if they are customers of GFSI to which it customarily sells defective or overstock product, and even if the licensed rights (the trademarks) are first removed.

The logical progression, then, is as follows: Sales to "Mass Retailers, Clubs or discount stores" are prohibited (Sec. 13), with the exception that "Licensed Products that are damaged, defective, seconds, or otherwise fail to meet RTJ2's specifications or quality standards" may be sold to "Secondary Markets" provided that the labels and marks are first removed (Sec. 6.3). "Secondary Markets" are those GFSI customers to which GFSI customarily sells "defective, irregular, seconds or overstocks of products;" though the definition explicitly excludes "Mass Retailers" and "Clubs" (Sec. 2.10) – thus removing these sorts of resellers from the class to which even defective product – with labels removed – can be sold.

These provisions were material to Plaintiffs, which did not want the Licensed Rights associated with discount or cut-rate resellers. Prior to the GFSI License Agreement, the Licensed Rights had been granted sparingly in connection with the promotion of a very few full-priced, high quality products marketed to consumers interested in and attracted to luxury products, such as Lexus and Rolex (*Id.* at ¶¶15-16). Plaintiffs have been consistently careful – as they were in their negotiations with Defendant here – to contractually protect against ROBERT TRENT JONES branded product being sold in discount stores or defective product bearing the licensed rights being sold at all. It was Plaintiffs' view (a correct view, in fact), that such sales would detract from the value of the mark. (*Id.* at ¶ 22).

**C.    The Parties' Agreement that Irreparable Harm Would Occur, and Injunctive Relief be Appropriate, in the Event of Breach.**

1    Defendant GFSI agreed with Plaintiffs that the violation of Section 13 (or any other

2    unauthorized use of the licensed rights) would cause "irreparable injury," and that injunctive

3    relief would be appropriate:

4    12.9    LICENSEE [GFSI] agrees that the Licensed Rights possess special, unique, and
     extraordinary characteristics which make difficult the assessment of the monetary
5    damage which RTJ2 would sustain by unauthorized use and that irreparable injury would
     be caused to RTJ2 by unauthorized use of the Licensed Rights. LICENSEE agrees that
6    injunctive and other equitable relief would be appropriate in the event of a breach of this
     Agreement by LICENSEE, provided, however, that such a remedy shall not exclude any
7    other legal remedies otherwise available.

8

9    (Jones Ex. H).

10   ## II.    Defendant's Breaches

11   ### A.  Defendant Is Selling to Discount Stores.

12   In late June, 2007, RTJ2 discovered – by reviewing GFSI's own documents – that GFSI

13   was in breach of the above discussed provisions of the License Agreement.   (Jones ¶ 20).  The

14   2007 GFSI Marketing, Distribution, Financial and Quality Plan, submitted to RTJ2 on or about

15   June 25, 2007 (the "2007 GFSI Plan") revealed – indeed, admits – that three of the top ten GFSI

16   accounts for RTJ apparel – including THE top account – are discount stores: Stein Mart, The

17   Golf Warehouse, and Neiman Marcus Last Call:

18        Three of the top ten accounts **are accounts which are considered discounters**.
19        The top account is Steinmart **a discount retailer**."

20   (Emphasis supplied) (*Id.*)

21   Not only does GFSI's own document concede the point, but these retailers present

22   themselves to the market as discounters.  Stein Mart's website represents that "all [merchandise]

23   are at prices 20% to 60% below department stores and specialty shops."  (Declaration of Mary K.

24   Hadley ("Hadley") ¶ 9, Ex. L).  The second largest GFSI account for RTJ apparel, The Golf

25   Warehouse, describes itself as a "discount retailer" and announces "that it is committed to being

1    your **discount retailer** of golf equipment and apparel." (Emphasis added). (Hadley ¶ 5, Ex. G).

2    Neiman Marcus Last Call (the third discount store on the list of GFSI's highest volume

3    customers for RTJ branded product) states on its website that all of its products are at "savings of

4    30% to 65% (or more!) off original Neiman Marcus prices!" (Hadley ¶ 10, Ex. M).   Other

5    discount stores to which GFSI sells RTJ branded product promote the fact that they are discount

6    operations.   Gabriel Brothers is an "off-price retail company . . .[with] fantastic deals . . .[and]

7    deep discounts").  (Hadley ¶ 8, Ex. K).  Hockabees, an eBay store and another GFSI customer,

8    advertises "Robert Trent Jones golf priced at 50% off and more."   (Hadley ¶ 6, Ex. H).

9

10        Finally, all such discounters or discount stores (with the possible exception of Neiman

11   Marcus Last Call, which, according to GFSI's President, is selling the product without the mark)

12   are selling the product **with the mark intact** (i.e., not removed).  (Jones ¶ 23, Ex. J).

13        Plaintiffs have confirmed that several of the above-mentioned discount stores are

14   continuing to offer for sale golf apparel bearing the RTJ Marks.  Plaintiffs purchased a Robert

15   Trent Jones Polo from The Golf Warehouse.  (Hadley ¶ 3, Ex. C).  Photographs of this product

16   clearly show the RTJ Marks on the label and hangtag.  (Hadley ¶ 3, Ex. D).  The Golf

17   Warehouse continues to offer RTJ branded golf apparel on its website and at 50% off in its

18   Holiday 2007 catalog.  (Hadley ¶¶ 4 &11, Exs. E & N).  Plaintiffs purchased a Robert Trent

19   Jones Polo Shirt from Hockabees.  (Hadley ¶ 2, Ex. A).  Photographs clearly show the RTJ

20   Marks on the label and hangtag.  (Hadley ¶ 2, Ex. B).  Hockabees continues to offer RTJ branded

21   golf apparel on its website, "priced at 50% off and more."  (Hadley ¶ 6, Ex. H).

22

23        Under the License Agreement's Section 6.3 exception to Section 13's prohibition on

24   sales to discount stores, GFSI might be able to sell to the above discount retailers *if* the product

25   offered were defective or damaged, seconds, or product otherwise failing to meet RTJ

specifications – provided, of course, that GFSI first removed the RTJ mark. But what is being sold by the above discount retailers are not seconds or defective or damaged product. **This is the very product that GFSI agreed to sell only to full price retailers**. Not only is the RTJ marked apparel being sold to such discounters, but such discounters are GFSI's most significant customers for the RTJ apparel! For RTJ2, this current state of affairs is precisely what the License Agreement's preclusion was designed to avoid: the association of the RTJ mark – previously associated only with prestigious golf courses and a very few high-end luxury products – with cut-rate merchandise sold at discount stores. That association threatens to dramatically change the consumer's perception of the mark from one associated with full price luxury items, to one associated with cut-rate, discount-priced items.

### B. Defendant Has Sold Damaged, Defective or Seconds Bearing the RTJ Marks to Secondary Markets.

Defendant has sold, and continues to sell, damaged, defective or seconds to Secondary Markets with the RTJ Marks **still intact**. Representatives for GFSI admit that returned products that are damaged, defectives or seconds are sold to Secondary Markets, including products with color, size, stitching, decoration or labeling defects. (Zetlmeisl ¶¶ 20-21& 29; Burgett ¶¶ 11-12 & 19). Representatives for GFSI admit that they are not aware of the RTJ Marks being removed prior to selling such defective products to Secondary Markets. (Zetlmeisl ¶ 29; Burgett ¶ 19). Also, information provided by GFSI during a financial review conducted at GFSI's facilities in August 2007, confirmed that it is not GFSI's practice to remove RTJ Marks prior to selling such defective product to Secondary Markets. (*Id.*). During this financial review, Plaintiffs' own representatives were informed that specific defective product, with the RTJ Marks intact, was to be sold to secondary markets. (Zetlmeisl ¶¶ 26-27; Burgett ¶¶ 16-17).

### C. Defendant's Apparent Motivation

1    This fundamental and massive breach of the License Agreement may appear inexplicable.

2    Why would GFSI choose to sell a luxury brand name to and through discount retailers,

3    particularly where the License Agreement precluded such sales? Wouldn't GFSI make more

4    money selling to the intended market? Indeed, when Plaintiffs first received the 2007 GFSI

5    Plan, Plaintiffs asked these very questions. Plaintiffs believe that they now have the answer.

6        At the time GFSI solicited RTJ2, it represented that it would create a stand-alone

7
     company to market the RTJ line of golf clothes (Jones ¶ 17, Ex. G; see also Complaint, at paras.
8
     12, 13, quoting verbatim GFSI's proposal to RTJ2.) GFSI also undertook, at Section 18.2 of the
9
     License Agreement, not to enter into business transactions "inconsistent with the purpose of the
10
11   [License] Agreement." (Jones ¶ 18, Ex. H). RTJ2 will prove at trial that GFSI has violated that

12   undertaking.

13       GFSI's 10-Q Report, filed with the SEC on November 10, 2005, discloses that in October

14   2005, **barely six months into its 10-year License Agreement with RTJ2,** GFSI entered into a

15   license agreement with Under Armour, Inc.,

16           "to market Under Armour ® garments in selected markets.  Under Armour develops and
             markets performance apparel to athletic consumers for all climates and conditions.  The
17           six year license agreement is for the Company's [GFSI's] collegiate, golf and military
             retail sales channels. The Company plans to commence product shipments in June 2006.
18           Sales for the Under Armour brands are not expected to be significant in fiscal 2006."

19
     (Hadley ¶ 13, Ex. P). GFSI's Under Armour sales may not have been "significant" in fiscal 2006,
20
     but they are significant now. GFSI is the "exclusive licensee for decorated Under Armour
21
     apparel in the . . . green grass golf [market] . . ." (Hadley ¶ 12, Ex. O). And Under Armour's
22
23   golf offerings (featuring standard golf polo shirt designs in direct competition with RTJ product)

24   are, according to Under Armour's publicly filed quarterly reports, doing quite well:

25           Net revenues increased 46.3% in the third quarter of 2007 to $186.9 million compared to
             net revenues of $127.7 million in the third quarter of 2006. . . . [A]n expanded product

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

assortment in Golf and the launch of the Mountain product category also made healthy contributions to top line growth. (Hadley ¶ 14, Ex. Q).

Simply stated, Under Armour is the hot athletic apparel label of the moment. GFSI achieved a coup by bringing the Under Armour label into its stable, and Plaintiffs will prove that GFSI is exploiting that coup aggressively. Indeed, it is exploiting it by selling to the same target market in which, six months prior to signing Under Armour, it was promoting RTJ golf apparel. Thus, after an initial year in which GFSI's RTJ golf apparel sales exceeded the parties' expectations, it is now the neglected brand, consigned to discount racks while GFSI sells the hotter Under Armour brand.

In defense of its decision to dump the RTJ brand, Defendant may seek to twist the License Agreement to find some license for its behavior (as it has done in correspondence between the parties). Defendant purports to find permission to sell non-damaged, non-defective apparel with the RTJ Marks to Secondary Markets, relying solely upon Section 2.10, the "secondary market" definition. Defendant will likely argue that because there is no express prohibition on such sales in section 2.10 (ignoring the fact that section 13 has precisely such an express prohibition), it is authorized to do so. Section 2.10, however, is not a grant clause and defendant's anticipated argument contradicts the remaining provisions of the License Agreement and Defendant's own admissions. Stein Mart is a discount retailer, by GFSI's own statements, and Section 13's preclusion would apply. There is no applicable exception in Sections 2.10 and 6.3. Silence in an intellectual property License Agreement is not an authorization. "The fact that the license is silent on a particular type of use of the mark does not mean that such use is permitted." J. Thomas McCarthy, McCarthy on Trademarks § 25:30 (2007). GFSI cannot rewrite the License Agreement. It has simply chosen to breach it and to promoting Under Armour aggressively, while dumping RTJ branded apparel in the discount stores.

**III. RTJ's Efforts to Persuade GFSI to Abide by the Terms of the License Agreement**

RTJ2 has acted diligently to protect its brand. Once RTJ2 absorbed the information provided by GFSI in late June, RTJ2 made repeated attempts to resolve the matter without resort to legal action. (Jones ¶¶ 22, 24, 26-29). RTJ2 made repeated settlement overtures to GFSI to resolve the dispute amicably, including written correspondence, telephone exchanges and a meeting with GFSI. (*Id.*). Such attempts were rebuffed consistently. (Jones ¶¶ 23, 25, 26-29). As authorized under the License Agreement, RTJ2 conducted a financial review of GFSI in late August. (Jones ¶28; Zetlmeisl ¶ 2; Burgett ¶ 2), from which it learned additional information regarding sales in breach of the License Agreement. (Zetlmeisl ¶¶19, 21 & 30; Burgett ¶¶ 10, 12 & 20).

Left with no choice, RTJ2 filed this action in late September. (Jones ¶ 29). Upon filing the complaint, RTJ2's counsel again indicated to GFSI its desire to resume settlement discussions "sparing both sides the substantial cost and distraction of litigation." (*Id.*, Ex. K). No response was received. (*Id.*). GFSI continues to dump branded apparel to discount retailers. RTJ2 continues to suffer irreparable harm (the irreparable harm issue is discussed below within the "Argument" heading).

## ARGUMENT

Injunctions are appropriate in trademark infringement cases. As a matter of law trademark owners have no adequate remedy at law. 15 U.S.C. § 1116(a). As discussed below, the standard for preliminary injunctions in the Ninth Circuit is met on Plaintiffs' showing. There is, here, both a high likelihood of success on the merits and a high likelihood that Plaintiffs will continue to suffer irreparable injury in the absence of an injunction.

**A. Ninth Circuit Standard for Preliminary Injunction**

In order to prevail upon a motion for preliminary injunctive relief in the Ninth Circuit, "the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in his favor." *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396-97 fn. 1 (9th Cir. 1997) (quoting *Big Country Foods, Inc. v. Board of Educ.*, 868 F.2d 1085, 1088 (9th Cir. 1989)). "These formulations are not different tests but represent two points on a sliding scale in which the degree of likelihood of success [from "serious questions are raised" to "probable success on the merits"] determines the degree of likely harm to be suffered in the absence of relief [from "balance of hardships tipping" toward the moving party to "the "possibility of irreparable harm")." *Id.* Thus, the higher the probability of ultimate success on the merits, the lower the requirement of irreparable harm, and vice versa. "Under either formulation, [however], the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of injury." *Id.*; *see also Brookfield Comms., Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999); *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204-05 (9th Cir. 2000).

Plaintiffs here qualify under either formula. First, at one end of the spectrum Plaintiffs' showing demonstrates a probability of success on the merits – not simply that "serious questions are raised." It was a fundamental element of the License Agreement that product containing the licensed rights (the RTJ mark) **not** be sold to discount stores. But discount stores are GFSI's largest customers! The lower, "serious questions," element of the balancing test requires merely that a plaintiff demonstrate a "fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984); *see also Omega Nutrition USA Inc.*

*v. Spectrum Marketing, Inc.*, 756 F. Supp. 435, 440 (N.D. Cal. 1991). Plaintiffs' showing easily hurdles this lower standard.

Second, at the other end of the spectrum, irreparable injury is not merely established by the association of the RTJ mark with discount houses; it is **presumed** as a matter of law (not to mention admitted by the president of GFSI in a letter to Robert Trent Jones; see below). Moreover, the balance of hardships tips sharply in Plaintiffs' favor because Defendant is unlikely to suffer any harm, while products bearing the RTJ Marks (a name reflective of high-quality and character) is being sold at discount prices.

**B. Plaintiffs Have Demonstrated Probable Success on the Merits and Likelihood of Irreparable Injury.**

**1. Plaintiffs Demonstrate Probable Success on the Merits, as Defendant has Used and Continues to Use RTJ Marks Outside the Scope of the License Agreement thus Creating Consumer Confusion as a Matter of Law.**

Plaintiffs need not show to a certainty that they will prevail on the merits; they need demonstrate merely a probability of success. To prevail on their infringement claim, Plaintiffs must show: (1) ownership of a protectable trademark; and (2) a likelihood of "consumer confusion." *Hollywood Athletic Club v. GHAC-CityWalk*, 938 F. Supp. 612, 614 (C.D. Cal. 1996); *see also* 15 U.S.C. § 1114(1)(a).

**a. Plaintiff Owns Protectable Trademarks.**

The RTJ Marks are registered with the United States Patent and Trademark Office. (Jones ¶ 18). The federal registration of a trademark constitutes *prima facie* evidence of the ownership and validity of the mark. 15 U.S.C. § 1115(a). Indeed, RTJ2, Inc.'s right to use the mark ROBERT TRENT JONES, as portrayed in U.S. Registration No. 1,899,912, has become incontestable. 15 U.S.C. §1115(b). RTJ2, Inc.'s incontestable registration is conclusive evidence of the validity and ownership of the mark and the exclusive right to use the registered

mark in commerce. (Jones ¶ 18). Defendant expressly acknowledges RTJ2, Inc.'s "exclusive right, title and interest in and to the" RTJ marks in the License Agreement. (Jones Ex. E, § 12.1). There is no dispute on this issue.

### b. Defendant's Conduct Is Clearly Not Authorized by the License Agreement and Is Likely to Cause Consumer Confusion.

Likelihood of confusion cannot be disputed here because Defendant is a licensee of the RTJ Marks and is using the RTJ Marks in offering its apparel products. *See Hollywood Athletic Club*, 938 F. Supp. at 614. The continued use of a mark by a license amounts to a likelihood of confusion. *See Paisa, Inc. v. N & G Auto, Inc.*, 928 F. Supp. 1009, 1012 n. 4 (C.D. Cal.1996); *see also Hollywood Athletic Club*, 938 F. Supp. at 614-15 (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir.1986) for the proposition that a licensor need only prove unauthorized use by its licensee to establish likelihood of confusion and irreparable harm).

The courts' association of unauthorized use with "likelihood of confusion" is not merely a formula; it makes sense. The use of the RTJ mark by the licensee on a non-authorized product signifies to the market that the owner of the mark approves of or authorizes the product, when in fact it has not. Here, the presence of substantial quantities of RTJ branded golf clothes at The Golf Warehouse, selling at bargain basement prices, signifies to the market that RTJ2 intends that its mark be sold at such prices in such channels of distribution, which is not the case. The "confusion" goes to the question of what the rights holder (here, RTJ2) has authorized. *See also Paisa, Inc. v. N & G Auto, Inc.*, 928 F. Supp. 1009, 1012 n. 4 (C.D. Cal.1996); *Hollywood Athletic Club*, 938 F. Supp. at 614-15 (C.D. Cal. 1996) (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir.1986)). In such situations (i.e., unauthorized, extra-contractual use of a mark), the courts typically spend little time in

traditional "likelihood of confusion" analysis. They determine, rather, whether or not the use by the Defendant was authorized by the License Agreement. If not, the requisite confusion is established.

As discussed above in the Statement of Facts, GFSI is, indeed, selling beyond the license granted in the License Agreement. Section 13 prohibits sales to "discount stores," with a limited and specific exception. (Jones Ex. H). Section 6.3 sets forth that limited and specific exception. (*Id.*). GFSI may sell "damaged, defective, seconds" or products that otherwise fail to meet Plaintiffs' specifications or quality standards to "secondary markets," so long as the RTJ Marks are removed prior to sale, display or distribution. (*Id.*). Section 2.10 defines the term "secondary markets" as those customers to which GFSI customarily sells defective, irregular, seconds or overstocks of products, but excludes from the definition "mass retailers " and "Clubs." (*Id.*). In fact, (1) GFSI is selling undamaged, conforming apparel to discount stores; and (2) GFSI is selling damaged, non-conforming apparel to Secondary Markets with the RTJ marks intact. Indeed, Plaintiffs' financial review of GFSI revealed that the problem was greater than expected. Sales were made to the secondary market in bulk and at **discount prices**. (Emphasis added). (Zetlmeisl ¶ 8; Burgett ¶ 8). Apparel sold to secondary markets included returned products that was damaged or defective. (Zetlmeisl ¶¶ 19-21 & 25; Burgett ¶¶ 10-12 & 15).

## 2. Plaintiffs Will Continue to Suffer Irreparable Injury Without a Preliminary Injunction.

Plaintiffs have suffered, and will continue to suffer, irreparable injury in the absence of preliminary relief. First, as noted, for purposes of this motion, Plaintiffs enjoy a presumption of irreparable injury. There is, however, more than that presumption here.

1

2

    **a. Plaintiffs Enjoy a Presumption of Irreparable Injury in Trademark Cases.**

3

    Irreparable injury is presumed where plaintiff demonstrates a likelihood of consumer

4

confusion on its trademark infringement claim. *Brookfield*, 174 F.3d at 1066. As the Ninth

5

Circuit noted in *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (2000), "[t]he

6

articulation of this prong as a bifurcated one is somewhat misleading. In a trademark

7

infringement claim, 'irreparable injury may be presumed from a showing of likelihood of success

8

on the merits.'" (Citing *Brookfield*, 174 F.3d at 1066.) This is a well-established principle in

9

trademark infringement cases. J. Thomas McCarthy, McCarthy on Trademarks §30:32, p 30-

10

70.2 (2005).

11

12

    Irreparable injury is presumed more readily in a licensor/licensee trademark dispute than

13

in other contexts. *See e.g., Hollywood Athletic Club Licensing Corp. v. GHAC-Citywalk*, 938 F.

14

Supp. 612, 615 (C.D. Cal. 1996) (granting preliminary injunction against defendant licensee). "In

15

a licensor/licensee case, the reasons for issuing a preliminary injunction for trademark

16

infringement are more compelling than in the ordinary case." *Id.* Indeed, in *Church of*

17

*Scientology Int'l v. Elmira Mission of the Church of Scientology*. 794 F.2d 38, 42 (2d Cir.1986),

18

the Second Circuit that "a licensor who establishes a likelihood of confusion as to product source

19

in a trademark simultaneously demonstrates the requisite irreparable harm essential to obtaining

20

a preliminary injunction;" characterizing the irreparable harm finding as "automatic" where a

21

likelihood of confusion is established in a licensor/licensee case. Thus, Plaintiffs' showing

22

establishes irreparable injury as a matter of law. *See Hollywood Athletic Club*, 938 F. Supp. at

23

615.

24

25

    **b. The Irreparable Injury to Plaintiffs Is Actual, Not Only Presumed, and Already Admitted by Defendant.**

---

NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    The palpable harm to Plaintiffs is not just a matter of a legal presumption. Defendant has

2    acknowledged and agreed to the appropriateness of an injunction for any unauthorized use of the

3    RTJ marks:

4
> LICENSEE agrees that the Licensed Rights possess special, unique, and
5    extraordinary characteristics which make difficult the assessment of the monetary
> damage which RTJ2 would sustain by unauthorized use and that irreparable injury
6    would be caused to RTJ2 by unauthorized use of the Licensed Rights.
> LICENSEE agrees that injunctive and other equitable relief would be appropriate
7    in the event of a breach of this Agreement by LICENSEE, provided, however,
> that such remedy shall not exclude any other legal remedies otherwise available.

8

9    (Jones Ex. H§ 12.9).   The recognition of validity and strength of RTJ2, Inc.'s rights in the Marks

10   further reinforces the irreparable harm that is occurring and will continue to occur, unless an

11   injunction is entered. *See Church of Scientology*, 794 F.2d at 42. Moreover, the president of

12   Defendant himself, Mr. Larry Graveel, affirmatively and specifically admitted that significant

13   quantities of RTJ marked product in discount stores will harm Plaintiffs: "[H]aving your [RTJ]

14   brand in those stores in significant quantities over time is not a good thing for your brand

15   image...." (Jones ¶ 24, Ex. G).

16   Further, Plaintiffs "need not prove that the unauthorized licensee has in fact damaged the

17   licensor's reputation, but only that the licensor has lost control over its reputation, which 'is the

18   very thing that constitutes irreparable harm in the licensing context.'" *Hollywood,* 938 F. Supp.

19   at 615 (citing *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794

20   F.2d 38, 44 (2d Cir. 1986)).   Sales outside the scope of the license is precisely such loss of

21   control. Moreover, a trademark owner's duty to monitor and exercise quality control over

22   licensees further highlights the need for Plaintiffs to retain such control and the need for entry of

23   the requested injunction. *See Church of Scientology Int'l*, 794 F.2d at 43 (stating "[c]ontrol of

24

25

1    the trademark is crucial in the licensing context because a licensor who fails to monitor its mark

2    risks a later determination that it has been abandoned").

3       The record discloses more. GFSI representatives have stated that a discount store does

4    not purchase RTJ Apparel at full price, but at discount prices and frequently in bulk. (Zetlmeisl

5    ¶ ¶ 8 & 23; Burgett ¶¶ 8 & 14). Where a branded product is widely available at a steep discount

6    (particularly one advertised on the internet), the likelihood that a seller can get full price for such

7    branded product necessarily diminishes; the mark loses value.

8

### 3. In addition to the Irreparable Injury that Plaintiffs Will Suffer, the Balance of Hardships Also Tips Sharply in Their Favor.

9

10      While, given the context of this dispute, the appropriate legal analysis might not require a

11   balancing of the "hardships," Plaintiffs will address this point.[2] "In evaluating the balance of

12   hardships a court must consider the impact granting or denying a motion for a preliminary

13   injunction will have on the respective enterprises." *Int'l Jensen v. Metrosound U.S.A.*, 4 F.3d

14   819, 827 (9th Cir. 1993).

15      First of all, as discussed above, a denial of the instant motion would, as both a matter of

16   law and a matter of fact cause Plaintiffs irreparable harm to the good will and commercial value

17   of their federally registered and unique trademark. The RTJ marks are famous and recognized

18   by virtually every segment of the U.S. golfing population. (Jones ¶17) Plaintiffs' imperative

19   need to control the use of those marks and preserve both their quality and their exclusive rights is

20   thwarted by Defendant's unauthorized sales to discount stores. And Defendant's unauthorized

21   sales to discount stores create a damaging association between the marks and deep discount

22   sales, as well "confusion" as to Plaintiffs' authorization of such discount sales. The damage

23

24

25   [2] As argued above, by showing probable success on the merits (which they have done), plaintiffs need only show the possibility of irreparable injury to prevail on a motion for preliminary injunction. Plaintiffs go on further to demonstrative that the balance of hardships also tips sharply in their favor satisfying the other end of the spectrum.

**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

1   caused to Plaintiffs and the RTJ marks as a result of Defendant's infringing actions is difficult, if

2   not impossible, to quantify.

3       On the other side of the balance, a grant of the motion will cause minimal harm to

4   Defendant. Plaintiffs seek a preliminary injunction narrow in scope; they seek only (1) to stop

5   defendant from selling RTJ branded apparel to discount stores in breach of the License

6   Agreement, and (2) to stop Defendant from selling damaged and non-conforming apparel to

7   Secondary Markets with the RTJ marks still attached. Such a limited injunction should not harm

8   Defendant or its business. It is precisely what Defendant bargained for. And, to be frank,

9   Defendant has apparently already made the decision to jettison the RTJ brand in favor of its new

10  favorite golf clothes label, Under Armour. The RTJ product is sitting in bulk bins in Defendants'

11  warehouse. Rather obviously, Defendant does not particularly value the RTJ product it retains.

12  It is apparent that the potential harm to Plaintiffs far outweighs any hardship to Defendant. Thus,

13  the balance of the hardships tips decidedly in Plaintiffs' favor.

14      There is an additional factor to weigh in the balance. "It is well established that

15  trademark law protects not only the private interests of the trademark owner but also the public's

16  interest in not being confused by the infringing products." *Resource Lenders, Inc. v. Source*

17  *Solutions, Inc.*, 404 F.Supp.2d 1232, 1249-50 (E.D. Cal. 2005) (*quoting Phillip Morris USA Inc.*

18  *v. Shalabi*, 352 F.Supp.2d 1067, 1075 (C.D. Cal. 2004)). In trademark infringement cases, the

19  public interest is served when an injunction would protect the "right of the public not to be

20  deceived or confused." *Id.* at 1250 (*quoting Opticians Ass'n of Amer. V. Indep. Opticians of*

21  *Amer.*, 920 F.2d 187, 197 (3rd Cir. 1990)).

22      If the Defendant is not enjoined from continuing to sell conforming, non-damaged RTJ

23  marked product in discount stores, the public will be deceived or confused as to RTJ2's

24  intentions and as to Defendant's authority. A grant of preliminary injunction here will serve the

25  public interest, in addition to forestalling further irreparable injury to Plaintiffs.

---

1

## CONCLUSION

2        Plaintiffs have demonstrated both a probability of success on the merits and an imminent

3    threat of continuing irreparable injury. The balance of hardships tips sharply in Plaintiffs' favor.

4    Based upon these facts, and all of the foregoing, Plaintiffs respectfully request that the Court

5    enter the Preliminary Injunction against Defendant, as set forth in the attached Proposed Order.

6

7

8                                    Respectfully submitted,

9

10
                                     Richard Levine
11                                   LEVINE & BAKER LLP

12                                   Joseph V. Norvell (pro hac vice pending)
                                     Joseph T. Kucala (pro hac vice pending)
13                                   Jay M. Burgett (pro hac vice pending)
                                     NORVELL IP LLC
14
                                     Attorneys for Plaintiffs
15                                   ROBERT TRENT JONES II, INC.
                                     ROBERT TRENT JONES LICENSING GROUP, LLC
16

17

18

19

20

21

22

23

24

25