# EXHIBIT B

## ROBERT TRENT JONES II LICENSING GROUP, LLC

### INTELLECTUAL PROPERTY LICENSE AGREEMENT

### TABLE OF CONTENTS

Name and Address of LICENSOR:

**ROBERT TRENT JONES II**
**LICENSING GROUP, LLC**
**705 Forest Avenue**
**Palo Alto, California 94301**
**USA**

Name and Address of LICENSEE:

GFSI, INC.
D/B/A GEAR FOR SPORTS
9700 Commerce Parkway
Lenexa, Kansas 66219
USA

*1. VARIABLE PROVISIONS*.................................................................................. 2
*2. DEFINITIONS*............................................................................................... 4
*3. GRANT OF LICENSE*...................................................................................... 6
*4. ROYALTIES*................................................................................................. 6
*5. TERM*....................................................................................................... 7
*6. QUALITY OF LICENSED PRODUCTS AND MARKETING PLAN*................................ 7
*7. ADVERTISING MATERIALS AND REQUIREMENTS*........................................... 10
*8. REPORTS AND RECORDS*............................................................................. 13
*9. VERIFICATION OF REPORTS AND RECORDS* .................................................. 14
*10. INDEMNIFICATION AND INSURANCE* ......................................................... 15
*11. NOTICES*................................................................................................ 16
*12.   PROTECTION OF TRADEMARKS, SERVICE MARKS, COPYRIGHTS AND*
*     PROPRIETARY INFORMATION* ................................................................ 17
*13. DISTRIBUTION* ....................................................................................... 19
*14. REPRESENTATION AND WARRANTIES OF LICENSEE AND RTJ2*......................... 19
*15. DISCLAIMERS*.......................................................................................... 21
*16. CANCELLATION*........................................................................................ 22
*17. NO WAIVER* ............................................................................................ 22
*18. MISCELLANEOUS* ..................................................................................... 22
*19. TERMINATION*......................................................................................... 24

| | |
|---|---|
| Exhibit A: | Licensed Rights |
| Exhibit B | Licensed Products |
| Exhibit C: | Royalty Report Form |
| Exhibit D: | Product Detail/Approval Form |
| Exhibit E: | Marketing, Distribution, Financial and Quality Plan |

**ROBERT TRENT JONES II LICENSING GROUP, LLC** (hereafter "RTJ2") and LICENSEE, in consideration of the mutual promises of this Agreement, agree as follows:

## 1. VARIABLE PROVISIONS

1.1     Commencement Date:

1.2     Expiration Date:

1.3     Sales Period:

1.4     Actual Royalty Percentage
        (by Contract Year):

1.5     Minimum Royalty
        (by Contract Year):

1.6     Royalty Advance:

1.7     Royalty Advance Payable on:

**REDACTED**

1.8    Insurance Requirement:

**REDACTED**

1.9    Grace Period:

1.10   Sample Quantity:

1.11   LICENSEE Investment:

## 2. DEFINITIONS

2.1  "Agreement" means this ROBERT TRENT JONES II LICENSING GROUP, LLC Intellectual Property License Agreement.

2.2  "Contract Year" means each calendar year period from May 1 through April 30; and the "Last Contract Year," which shall be for the period from May 1 of the Contract Year of this Agreement's expiration through the Expiration Date or termination.

2.3  "Grace Period" means the time in which sales of any Licensed Products are permitted following the termination of the license as defined in Paragraph 1.9.

2.4  "Intellectual Property Rights" includes patents, trademarks, trade names, service marks, trade secrets, copyrights, and rights of publicity.

2.5  "Licensed Right(s)" means the trademarks, service marks, copyrights and/or rights of publicity listed and referenced on Exhibit A entitled Licensed Rights.

2.6  "Licensed Product(s)" or "Product(s)" means any article of merchandise or service listed on attached Exhibit B and having a Licensed Right used upon or in connection therewith.

2.7  "Licensed Territory" means the territory referenced in Exhibit B in the field entitled "Territory Description".

2.8  "Net Sales" means the total gross revenue for Licensed Products sold by LICENSEE, less the following items of expense to the extent to which they are paid or allowed *and* included in gross revenue:  (1) trade or quantity discounts (but not cash discounts); (2) credits for refunded, returned or rejected Licensed Products (provided that amounts equal to such credits have previously been included in gross revenue); (3) sales taxes, use taxes, value added taxes , provincial taxes or turnover taxes on sales invoices; (4) freight and handling charges and (5) payments of royalties to colleges , corporation, professional golf associations, etc.

      (a)      For this Agreement, Licensed Products shall be considered sold upon the earliest occurrence of:

      (1)      when delivered to the purchaser or to a common carrier for delivery to purchaser; or

      (2)      when paid for, if paid in advance of delivery of the good or service; or

      (3)      when billed out

whichever first occurs.

      (b)      Any increase in total billing or receipts resulting from the decoration, imprinting, personalization or customizing of Licensed Products shall be included in calculating Net Sales.

(c)    If LICENSEE makes any sales of Licensed Products to a associated or affiliated company, or through any agency, then the price subject to royalty shall be that charged to the consumer or customer by the LICENSEE subsidiary, associated or affiliated company or agency, or that charged by LICENSEE, whichever is higher. As an exception to the foregoing, for sales by LICENSEE to its wholly owned retail subsidiary Event1, Inc., the price subject to royalty shall equal a twenty-seven percent (27%) gross margin over the cost of goods sold.

(d)    No deductions shall be made for uncollectible accounts.

(e)    If LICENSEE receives or negotiates to receive any consideration which (a) relates in any way to the  sale, display, marketing and/or distribution of any Licensed Product and (b) is not included in the total gross price at which such Licensed Product is sold by the LICENSEE, LICENSEE shall, prior to any sale, display, marketing and/or distribution of such Licensed Product: inform RTJ2 of the details and amount of such consideration; submit to RTJ2, in writing, a proposed total gross price at which the Licensed Products are to be sold by LICENSEE; and obtain RTJ2's express, written approval of such proposed total gross price. Such approved proposed total gross price shall, for purposes of this Agreement, be considered the total gross price at which such Licensed Product is sold.

2.9    "Section" means a portion of this Agreement.

2.10    "Secondary Market(s)" means a LICENSEE customer that LICENSEE customarily sells defective, irregular, seconds or overstocks of products, such as The Paradies Shops (d/b/a PGA Tour Stop Stores), Burlington Coat Factory, Bermo Enterprises, Gabriel Brothers or the like. Defective, irregular, seconds or overstocks cannot be sold to "Mass Retailers" such as Wal-Mart, K-Mart, Ames, Value City, Dollar General and Dollar Stores or "Clubs" such as Costco or Sam's or like stores.

## 3. GRANT OF LICENSE

3.1 The Licensed Rights are limited to use on or in connection with the Licensed Products listed in Exhibit B only and LICENSEE shall not, except as specifically permitted in this Agreement, use the Licensed Rights or give consent to the use of any of them in any manner.

GRANT: RTJ2 hereby grants LICENSEE: an exclusive, personal, and non-transferable license to use the Licensed Rights in connection with the manufacture, display, sale, marketing, distribution and/or reproduction of Licensed Product(s) only for LICENSEE distribution, display, promotion, and ultimate sale only within Licensed Territory; provided, however, that the exclusive grant provided herein shall not limit in any manner use of the Licensed Rights by RTJ2, Robert Trent Jones Jr. and their related companies, including the golf course design company currently known as Robert Trent Jones II, LLC.

3.2 Except to the extent LICENSEE has been granted an exclusive license(s) hereunder for Licensed Product(s), RTJ2 expressly reserves the right to grant to any other party(s) a license(s) of any scope, in any geographical area, for any use, and for any article of merchandise.

3.3 RTJ2 represents and warrants that, during the term of this Agreement, RTJ2 shall not grant to any other party(s) a license(s) to use the rights of publicity of Robert Trent Jones, Sr. for apparel.

## 4. ROYALTIES

4.1 Accounting Principles Generally Accepted in the United States (GAAP) will be consistently applied in all areas of this agreement including, but not limited to, calculation of Net Sales and royalties.

4.2 All amounts due under this Agreement shall be denominated, reported and paid in U.S. dollars.

4.3 LICENSEE shall, in accordance with the REPORTS AND RECORDS Section, pay RTJ2 a non-refundable, actual royalty equal to the Actual Royalty Percentage listed in the VARIABLE PROVISIONS Section for the applicable Contract Year, multiplied by the Net Sales of all Licensed Products sold by LICENSEE.

4.4 LICENSEE shall, in accordance with the REPORTS AND RECORDS Section and the VARIABLE PROVISIONS Section, pay to RTJ2:

(a)     the Minimum Royalty for each Contract Year in equal payments on the dates specified herein for sending reports *and*

(b)     the Royalty Advance as agreed in the VARIABLE PROVISIONS Section.

4.5 Should there be any withholding or other taxes remitted by the

LICENSEE to any government or subdivision thereof upon royalty payments by LICENSEE to RTJ2 as specified herein, LICENSEE agrees to provide to RTJ2, at the time of such payments, signed copies of the official receipts evidencing such payments for RTJ2's filing for foreign income tax credits on their Federal income tax return. The royalty on Net Sales in currencies other than U.S. Dollars shall be calculated using the appropriate foreign exchange rate for such currency quoted by the United States edition of the *Wall Street Journal*, on the close of business on the last business day of each Sales Period.

## 5. TERM

The term of this Agreement shall, respectively, commence and expire on the Commencement Date and Expiration Date indicated in the VARIABLE PROVISIONS Section, at midnight Pacific Standard Time, USA, unless terminated or extended as herein provided.

## 6. QUALITY OF LICENSED PRODUCTS AND MARKETING PLAN

6.1    LICENSEE agrees that all Licensed Products shall be of high standards and of such style, appearance, quality and consistency as shall be adequate and suitable for their intended use.    RTJ2, at its sole discretion, shall render any decision and/or answer any questions regarding quality.    Any and all approvals for Licensed Products given by RTJ2 to LICENSEE prior to this Agreement are hereby revoked.    Any previously Licensed Products must follow the same sample approval process as new Licensed Products.

At least twice a year, LICENSEE shall conduct RTJ2 Licensed Products "line review" sessions at LICENSEE's offices.    Upon at least thirty (30) days prior notice by LICENSEE, RTJ2 personnel shall be invited to attend the "line review" sessions.    The "line review" sessions shall be conducted on a mutually agreed upon date and time, said date or time to be within five days (before or after) of the date noticed by LICENSEE.    It is anticipated that RTJ2 personnel shall comment and advise during the final selection of the seasonal Licensed Product offerings at LICENSEE'S semi annual "line review" sessions.    At or within seven (7) days subsequent to these sessions the approvals and the approval documentation contemplated by this Section 6 will be obtained from RTJ2.

(a)    *Pre-distribution Sample Approval* - LICENSEE shall submit to RTJ2 at the "line review" or by post or by delivery services for approval a pre-distribution Sample of any Licensed Product and promotional and packaging material relating to the Licensed Product at least seven (7) days prior to any distribution or sale.    Each pre-distribution sample submission must include a completed Product Detail/ Approval Form (Exhibit D).    LICENSEE may manufacture, sell, display, market or distribute Licensed Products only after approval by RTJ2 of pre-distribution samples of

- 7 -

such Licensed Products, provided that, all comments and changes requested by RTJ2 in the pre-distribution sample approval process have been addressed by the LICENSEE and approved by RTJ2 .

If RTJ2 fails to approve or disapprove in writing any pre-distribution sample submitted by LICENSEE within seven (7) days after receipt of LICENSEE's submission of both the Product Detail/Approval Form (Exhibit D) and the pre-distribution sample, such failure shall constitute an *approval* of the submission.   RTJ2 will provide a written explanation of the reasons for a disapproval.  RTJ2 reserves the right, in its sole discretion, to disapprove a previously-approved pre-distribution sample if the commercial production quality does not meet the standards defined in the construction of the pre-distribution sample or on the Product Detail/Approval Form upon notification to the LICENSEE in writing.  Should such disapproval occur subsequent to LICENSEE'S commencement of manufacture, sale, display, marketing or distribution, LICENSEE shall cease manufacture within thirty (30) days, and RTJ2 may, at its request, timely inspect LICENSEE'S inventory of disapproved product and identify items of poor quality.  LICENSEE shall dispose of the identified poor quality Licensed Product within the Grace Period to Secondary Markets only, and LICENSEE shall remove any and all Licensed Rights identification from the garment prior to sales, display or distribution

　　　(b)　　　*Testing* - RTJ2 may, from time to time, require LICENSEE to submit to RTJ2 LICENSEE's testing data whether done internally by LICENSEE personnel or by an independent laboratory.  Should the LICENSEE not have existing reasonably accurate independent testing data, LICENSEE will submit the Licensed Product to an independent laboratory for quality testing. LICENSEE shall pay for the cost of these testing services.

　　　(c)　　　*Random Samples* - From time to time during the term of this Agreement upon RTJ2's request, LICENSEE shall furnish to RTJ2 a reasonable number of random samples of each Licensed Product together with any labeling or packaging in which, or in conjunction with which, the Licensed Product is to be marketed.

　　　(d)　　　*Quantity of Samples/Shipping Arrangements* - The number of samples to be furnished hereunder shall be the Sample Quantity indicated in the VARIABLE PROVISIONS Section, or such other reasonable number as RTJ2 may from time to time designate.  All samples furnished to RTJ2 may be excluded from Net Sales.  All samples shall be provided free of charge to RTJ2 and shall be transmitted to RTJ2, shipment prepaid, via a carrier of LICENSEE's choice.

　　　(e)　　　All samples, labeling, packaging, and other materials to be submitted and/or made available to RTJ2 under this Section shall be sent to:

　　　　　Robert Trent Jones, Jr.

ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

(f)    *Changes* - If during the term of this Agreement there are any changes in the quality or significant changes in appearance of the Licensed Products or the promotional and packaging material relating to the Licensed Products after the approval of the pre-distribution samples, LICENSEE must comply with the provisions of *Pre-distribution Sample Approval, Random Samples and Quantity of Samples/Shipping Arrangements,* for such Licensed Product before its manufacture, sale, display, marketing or distribution. A change in the fabric type, i.e. leather in place of cotton, or visually significant color changes in a Licensed Product, among other things, shall constitute a change for purposes of this Agreement.

(g)    *Inspection* - LICENSEE agrees to allow RTJ2's representatives or their authorized agents at any and all times during regular business hours, to enter LICENSEE's or manufacturers' premises to inspect the Licensed Products.

(h)    *Documentation* - Evidence of RTJ2's approval of pre-distribution sample(s) is the mutual responsibility of RTJ2 and LICENSEE.

6.2    Each Licensed Product shall be of the same materials, quality and workmanship as the sample approved in *Pre-distribution Sample Approval,* and in the manufacture thereof LICENSEE shall use quality control procedures in order to ensure that the Licensed Products will consistently so comply. Under no circumstances shall LICENSEE display, sell, distribute, give away or otherwise deal in Licensed Products that bear a distortion of the Licensed Rights.

6.3    LICENSEE shall not except as provided in this Section (6.3) sell, display, market, distribute, or use for any purpose or permit any third party to sell, display, market, distribute or use for any purpose any Licensed Products or promotional and packaging material relating to the Licensed Products that are damaged, defective, seconds, or otherwise fail to meet RTJ2's specifications or quality standards or the trademark and copyright usage and notice requirements of this Agreement. Should LICENSEE elect to sell such product to Secondary Markets, LICENSEE shall remove any and all Licensed Rights identification from the garment prior to sales, display or distribution. If in RTJ2's opinion any Licensed Products fail to meet the quality standards reflected in the pre-distribution samples of the Licensed Products approved by RTJ2 or the trademark and copyright usage and notice requirements of this Agreement, then, upon RTJ2's request, LICENSEE immediately will cease all further manufacture and distribution of such Licensed Products and/or materials until the failure is corrected and RTJ2 approves the correction. LICENSEE may, however, sell at its reasonable discretion any and all of these substandard Licensed Products to Secondary Markets upon removal of all Licensed Rights identification from the garment prior to sales,

- 9 -

display or distribution.

6.4 LICENSEE agrees to make the LICENSEE Investment in the marketing, advertising and promotion of Licensed Products over the first four Contract Years beginning on the signing date of this Agreement. Upon request, LICENSEE shall provide LICENSOR with detailed documentation showing the dollar amount of such LICENSEE Investment. LICENSEE also agrees to dedicate and utilize adequate staffing and resources to develop the business contemplated by this Agreement in a commercially reasonable fashion.

6.5 Annually in conjunction with LICENSEE'S "line review" processes LICENSEE shall provide RTJ2 with a copy of its proposed Marketing, Distribution, Financial and Quality Plan (as generally outlined in Exhibit E) for RTJ2'S approval. If RTJ2 fails to disapprove any such plan within seven (7) days subsequent to its receipt such failure shall constitute an *approval* of the proposed plan or modification. If RTJ2 should disapprove any such plan within seven (7) days subsequent to its receipt it shall communicate such disapproval in writing to LICENSEE along with RTJ2's reasons for disapproval. LICENSEE shall have seven days to respond to RTJ2's written disapproval with a modified plan and obtain RTJ2's approval prior to implementation of the modified plan. LICENSEE shall, in accordance with its approved Marketing, Distribution, Financial and Quality Plans, design, manufacture, advertise, display, market, sell, distribute and ship the Licensed Products, produce an inventory of Licensed Products, and procure and maintain facilities and trained personnel sufficient to accomplish the foregoing.

6.6 LICENSEE shall establish a toll free customer service telephone number or public e-mail address that shall be open during regular business hours for receiving customer comments and/or complaints regarding the Licensed Products. LICENSEE shall keep a detailed log or e-mail printed history of all communications. LICENSEE shall submit a copy of the customer communications to RTJ2 semi-annually.

## 7. ADVERTISING MATERIALS AND REQUIREMENTS

7.1 All national or regionally directed (non-Locally Directed Advertising), advertising, display, and promotional copy shall be submitted to RTJ2 in conjunction with LICENSEE'S "line review" process or by post or by delivery services to RTJ2 at least seven (7) days in advance of production of the advertising, display, or promotional copy to allow RTJ2 to approve, comment upon, or express its disapproval thereof and for any required changes to be made. LICENSEE shall not use the Licensed Rights or any reproduction thereof in any national or regionally directed advertising, display, or promotional material without such prior written approval. If no written approval is given within seven (7) days from the date of submittal, the sample shall be considered *approved*. Any approval granted by RTJ2 hereunder will extend only to LICENSEE's use of the Licensed Rights. If RTJ2 should disapprove any such national or regionally directed advertising, display, and promotional copy within seven (7) days subsequent to its receipt, it shall communicate

such disapproval in writing to LICENSEE along with RTJ2's reasons for disapproval. LICENSEE shall have seven days to respond to RTJ2's written disapproval with modified advertising, display and promotional copy and obtain RTJ2's approval prior to implementation of the previously disapproved national or regionally directed advertising, display and promotional copy.

7.2  LICENSEE shall submit to RTJ2 (2) complete sets of LICENSEE's national or regionally directed advertising, sales and promotional materials when the materials are developed and available. LICENSEE shall keep an adequate supply of such materials in stock to facilitate customer requests.

7.3  RTJ2 may, in its sole discretion, make available to LICENSEE film, Photostats, artwork, and full color reproductions of its Licensed Rights, artwork, designs, and other materials for LICENSEE's use in accordance with this Agreement, including photographs of Robert Trent Jones, Sr. RTJ2 does not object to use of photographs of Robert Trent Jones, Sr. under this License or other references to the history of the Robert Trent Jones name and brand, provided there are no copyright or other intellectual property restrictions on the use of said photographs. LICENSEE may be required to reimburse RTJ2 for RTJ2's out-of-pocket expenses, including, without limitation, reasonable hourly charges for creative personnel, incurred by RTJ2 in the preparation for LICENSEE of new artwork, mechanicals and film. All charges due RTJ2 under this Subsection will be billed and paid on a "Net 30 Days" basis.

7.4  All advertising, display, promotional copy, and other materials to be submitted and/or made available to RTJ2 under this Section shall be sent to:

> Robert Trent Jones, Jr.
> ROBERT TRENT JONES II LICENSING GROUP, LLC
> 705 Forest Avenue
> Palo Alto, California 94301

7.5  Locally Directed Advertising does not require advance approval by RTJ2 under this Section, but said materials shall be of the same quality and style as the national and regional advertising approved by RTJ2. LICENSEE shall keep an archive of all Locally Directed Advertising during the term of this Agreement and for a period of two (2) years thereafter. When requested, LICENSEE agrees to send samples of Locally Directed Advertising and any other documents that will permit RTJ2 to determine whether the use of the Licensed Rights meets RTJ2's quality requirements. RTJ2 may disapprove Locally Directed Advertising by providing notice of said disapproval to LICENSEE in writing, at which point LICENSEE shall cease distribution of the disapproved Locally Directed Advertising. Locally Directed Advertising shall mean advertising, display, promotional copy, and other materials prepared for and directed to specific locations and/or LICENSEE's sales force only, such as sales flyers and notices of promotions.

7.6  RTJ2 agrees to cooperate with LICENSEE in announcing,

- 11 -

advertising, publicizing or otherwise promoting the Licensed Products. RTJ2 further agrees to arrange for publicity appearances by Robert Trent Jones, Jr. for interviews, photographs, personal appearances or films (hereafter "Personal Appearances") at a reasonable fee, including reimbursement for out-of-pocket travel and lodging expenses. Personal Appearances shall occur at mutually convenient times and locations, and shall not conflict with the activities of Robert Trent Jones, Jr. First class transportation and lodging is the reasonable travel mode for Robert Trent Jones, Jr. All promotional materials resulting from Personal Appearances of Robert Trent Jones, Jr. shall be subject to the approval requirements of Section 7.1.

## 8. REPORTS AND RECORDS

8.1    By the twenty-fifth day following the close of each Sales Period, and subsequent Grace Period, if any, LICENSEE shall send to RTJ2 by electronic means, post or delivery services, in duplicate, a full and accurate report (Report), certified by the Chief Financial Officer of LICENSEE, detailing the Total Sales of the Licensed Products sold by LICENSEE during preceding Sales Period. The Report shall constitute a completed Royalty Report Form attached hereto as Exhibit C (or reasonable electronic substitution there of) and updated versions thereof as may be provided by RTJ2 from time to time. Such Report shall be rendered at the times specified regardless of whether LICENSEE has sold any Licensed Product during the preceding Sales Period. All reports provided for in this Agreement are to be electronically transmitted, mailed or faxed to:

> Robert Trent Jones, Jr.
> ROBERT TRENT JONES II LICENSING GROUP, LLC
> 705 Forest Avenue
> Palo Alto, California 94301
> (650) 326-3090 – facsimile
> bjones@rtj2.com

8.2    At the time of sending each Report hereunder, LICENSEE shall calculate the royalty owed according to the following and remit the greater of the following to RTJ2 in full:

(a) the Minimum Royalty (determined by Contract Year, but quarterly paid) for the Sales Period in question, less any Royalty Advance not previously credited *or*

(b) the total actual royalty payable to date for the Sales Period in question, less:

(i)    any Minimum Royalty amount paid over the actual royalty in previous Sales Periods during the relevant Contract Year, but not previously credited *and*

(ii)    any Royalty Advance not previously credited.

8.3    LICENSEE shall ensure that all royalty payments are received by RTJ2 by the thirtieth (30th) day following the close of each Sales Period. A late payment charge shall be payable to RTJ2 on the amount of any payment not made when due, from the payment due date until the date payment is received by RTJ2. This late payment charge shall include interest compounded daily on the unpaid balance, at a rate per annum equal to five percent (5%) above the rate of interest that is publicly announced by the Bank One of Chicago, Illinois as its "Prime" commercial lending rate in effect at the close of business on the payment due date, and with each change in such publicly announced "Prime" commercial lending rate effective, for purposes of computing the late

payment charge hereunder, as of the date such change is effective.

In no circumstances shall the late payment charge required hereunder exceed the highest charge allowed by applicable law.

8.4    All payments are to be made to:

ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

## 9. VERIFICATION OF REPORTS AND RECORDS

9.1    During the term of this Agreement, and for at least three (3) years following the termination or expiration of this Agreement, LICENSEE shall maintain at LICENSEE's principal office such books and records including, but not limited to, production, inventory and sales records (collectively "Books and Records") as are necessary to substantiate that:

(a)    all statements submitted to RTJ2 hereunder were true, complete and accurate, *and*

(b)    all royalties and other payments due RTJ2 hereunder have been paid to RTJ2 in accordance with the provisions of this Agreement, *and*

(c)    no payments have been made, directly or indirectly, by or on behalf of LICENSEE to or for the benefit of any RTJ2 employee or agent who may reasonably be expected to influence RTJ2's decision to enter into this Agreement or the amount to be paid by LICENSEE under this Agreement. (As used in this sub-section, "payment" shall include money, property, services, and all other forms of consideration.)

All Books and Records shall be maintained in accordance with Accounting Principles Generally Accepted in the United States (GAAP), consistently applied.

9.2    During the term of this Agreement, and for at least three (3) years following the termination or expiration of this Agreement, RTJ2, through its duly authorized representatives (including certified public accountants), shall have the right, at RTJ2's expense, upon five (5) days written notice to annually inspect, audit and copy such Books and Records at any and all times during regular business hours for the purpose of determining the correctness of the Reports and royalty payments due under this Agreement.

To facilitate the examination of LICENSEE's Books and Records with respect to any and all RTJ2 Licensed Products, LICENSEE further agrees to designate a symbol or number which will be used exclusively in connection with the Licensed Products and with no other Articles which LICENSEE may manufacture, sell or distribute.

If the inspection or audit reveals a deficiency of royalty due,

- 14 -

LICENSEE shall, within ten (10) days of receipt of notice to cure the deficiency, make payment to RTJ2 of said deficiency, including the interest terms described in the REPORTS AND RECORDS Section. In addition, if the audit reveals a deficiency of more than two percent (2%) of the royalty due in any given year, LICENSEE shall reimburse RTJ2 for the cost of the services of the representatives, accountants, and for any other costs incident thereto (including attorney's fees and costs of collection). RTJ2 representatives and accountants are to meet with LICENSEE's representatives in a closing meeting to discuss their findings and results prior to leaving the LICENSEE'S business location.

If the audit reveals an over payment of royalty, LICENSEE shall apply such overpayment to reduce the royalty amount paid RTJ2 in the next subsequent Sales Period.

## 10. INDEMNIFICATION AND INSURANCE

10.1 LICENSEE shall indemnify and hold RTJ2, its directors, officers, agents, employees, attorneys, dealers, licensees, subsidiaries, affiliates, licensing agent, and distributors, harmless from any liability, loss, damage or expense (including reasonable attorney's fees) arising out of any product liability claim or suit involving the Licensed Products sold by LICENSEE or the manufacture, labeling, sale, distribution or advertisement of any Licensed Product by LICENSEE in violation of any national, provincial, state, local or other law or regulation, excluding any claim alleging that the Licensed Rights infringe the intellectual property rights of others. RTJ2 shall, to the extent it becomes aware of same, give LICENSEE notice of any claim or suit, and LICENSEE shall defend RTJ2 through competent counsel of LICENSEE's own choice, subject to RTJ2's prior approval of such counsel, which approval shall not be unreasonably withheld.

10.2 LICENSEE shall secure and maintain in force, throughout the term of this Agreement and for a period specified in the VARIABLE PROVISIONS Section thereafter, at its own expense, an insurance policy covering comprehensive general liability, including products liability. Such policy shall be with an insurance carrier having an "excellent" rating by Best or an equivalent rating service and shall maintain coverage limits in the amounts stated in the VARIABLE PROVISIONS Section. As proof of such insurance, a fully-paid certificate of insurance naming RTJ2 as a primary or additional insured party shall be submitted by LICENSEE for RTJ2's written approval before any Licensed Product is manufactured or distributed hereunder. In any such policy, RTJ2 shall receive at least thirty (30) days prior written notice of intent to cancel, alter or amend said policy.

10.3 RTJ2 shall indemnify and hold LICENSEE, its directors, officers, agents, employees, attorneys, dealers, licensees, subsidiaries, affiliates, licensing agent, and distributors, harmless from any liability, loss, damage or expense (including reasonable attorney's fees) arising out of any intellectual property infringement claim or suit involving the names, trade

- 15 -

names and marks ROBERT TRENT JONES II; ROBERT TRENT JONES, JR.; ROBERT TRENT JONES II and Design (logo); and RTJ2; provided that the total dollar amount of this indemnification shall be no greater than fifty percent (50%) of royalties paid to date under this Agreement. LICENSEE shall, to the extent it becomes aware of same, give RTJ2 notice of any claim or suit, and RTJ2 shall defend LICENSEE through competent counsel of RTJ2's own choice, subject to LICENSEE's prior approval of such counsel, which approval shall not be unreasonably withheld, up to the amount of royalties paid to date under this Agreement.

## 11. NOTICES

11.1 Except as otherwise provided herein, any notice, request, submission, or other transmittal (Notice) provided pursuant to this Agreement shall be in writing, shall be sent:

(a) by overnight courier service (DHL, Federal Express or UPS) with delivery receipt and shall be effective on the date which such Notice is sent *or*

(b) by registered or certified mail, return receipt requested, and shall be effective on the date which such Notice is deposited, properly addressed in a U.S. or other national post office, with postage prepaid.

Except as otherwise provided herein, any such Notice to RTJ2 shall be sent to:

Robert Trent Jones, Jr.
ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

With a copy sent to:

Joseph V. Norvell
Brinks Hofer Gilson & Lione
NBC Tower - Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611-5599

Any such Notice to LICENSEE shall be sent to the address given on the first page hereof unless amended as provided hereafter. Either party may change its address for payment, notice, or otherwise by notifying the other in writing.

11.2 (a) LICENSEE shall promptly notify RTJ2 in writing of any infringements or imitations by others of the Licensed Rights of which LICENSEE becomes aware. RTJ2 shall have the sole right and discretion, within 90 days of the LICENSEE'S notification, to take legal

action, including initiation of a lawsuit, and to control such legal action and to recover any damages that either RTJ2 or LICENSEE, or both, may have suffered or be suffering by reason of any such infringements or imitations. LICENSEE shall provide RTJ2 with all information and reasonable assistance within the power and control of LICENSEE required to prosecute said legal action. All costs and expenses of such suit or other legal action shall be borne by RTJ2 and any amounts recovered by reasons of such action, suit or other proceeding shall belong to RTJ2.

(b)   In the event that RTJ2 decides not to take legal action within 90 days of LICENSEE'S notification, and a valid, nonfrivolous infringement action against others by LICENSEE exists, LICENSEE in its sole right and discretion may, so long as this Agreement is in effect, institute such legal action, suit or other proceeding at LICENSEE's cost and expense and with counsel of LICENSEE's choice, but said counsel subject to RTJ2's written approval, to the extent necessary or advisable in order to protect the rights of LICENSEE hereunder, and to recover any damages that either RTJ2 or LICENSEE, or both, may have suffered or be suffering by reason of any such infringement or imitations. RTJ2 shall provide LICENSEE with all information and reasonable assistance within the power and control of RTJ2 required to prosecute said action. Any amounts recovered by reason of such action, suit or other proceeding brought by LICENSEE shall belong to LICENSEE.

## 12. PROTECTION OF TRADEMARKS, SERVICE MARKS, COPYRIGHTS AND PROPRIETARY INFORMATION

12.1 LICENSEE acknowledges RTJ2's exclusive right, title and interest in and to the Licensed Rights and will not at any time do any act, either directly or indirectly, to contest the validity of or in any way injure or discredit any part thereof. LICENSEE shall not use any language or display the Licensed Rights in such a way as to create the impression that the Licensed Rights belong to LICENSEE.

12.2 LICENSEE agrees that any and all uses by LICENSEE of the Licensed Right shall inure to the benefit of RTJ2.

12.3 LICENSEE agrees to assist RTJ2 in procuring any protection or protecting any of RTJ2's rights herein. Toward that end, LICENSEE agrees to cooperate with RTJ2 in the prosecution of any trademark, service mark, or copyright application that RTJ2 may desire to file at RTJ2's expense, or in the conduct of any litigation relating to the Licensed Rights. LICENSEE shall supply to RTJ2 such samples, containers, labels, sales information and similar material and, upon RTJ2's request, shall procure evidence, give testimony and cooperate with RTJ2 as may reasonably be required in connection with any such application or litigation.

12.4 LICENSEE shall, upon RTJ2's request, provide RTJ2 with a duplicate original of each of the first three (3) invoices for shipments for

- 17 -

sale of the Licensed Products in interstate or international commerce.

12.5 LICENSEE shall not use any trademark or service mark of RTJ2, any translation thereof or any mark similar thereto, as part of its corporate name or any trade name. RTJ2 acknowledges that LICENSEE customer, vendor, lender and regulatory agency communications (e.g. billings, remittance addresses, return information, web site links, written or implied references to LICENSEE and other like communications) may include incidental identification relating RTJ2 or the Licensed Rights to LICENSEE and its subsidiaries and affiliates. Such incidental identification is permitted under this Subsection (12.5)

12.6 LICENSEE shall appropriately mark each Licensed Product in the same manner as the approved pre-distribution samples or in such manner specified by RTJ2 in writing. LICENSEE shall display the Licensed Right(s) on all Licensed Products sold in each country with a legally sufficient legend in such country to indicate RTJ2's ownership and that such Licensed Right(s) is registered or unregistered, as appropriate; e.g. such legend in the United States constitutes an "®" adjacent the Trademark for a registered Trademark; a "™" adjacent such Trademark for an unregistered Trademark and © [year] Robert Trent Jones II for any copyrighted works.

12.7 LICENSEE shall place:

      (a)     its own name or identifying mark, or, if authorized by RTJ2 in writing, the name of a wholly owned subsidiary, and

      (b)     LICENSEE's toll free customer service telephone number or public e-mail address

on the Licensed Products and on their packaging in an inconspicuous manner approved by RTJ2 so that RTJ2 can readily identify the source of the Licensed Products.

12.8 RTJ2 recognizes and acknowledges that LICENSEE decorates products with licensed and non-licensed (but otherwise authorized) indicia, logos, art and names as part of its general business operations. RTJ2 also recognizes that LICENSEE markets and decorates products using co-branding or co-labeling techniques identifying the specific customer with the product brand or trade name. LICENSEE'S general business activities promote these activities in the LICENSEE'S promotional materials, cartons, containers, packaging materials, displays and advertising materials. These LICENSEE activities are specifically permitted under this subsection (12.8). LICENSEE shall not decorate or co-brand with immoral, deceptive, scandalous or infringing indicia, logos, art and names.

Except for the co-branding and co-labeling permitted in this Section, unless otherwise authorized by RTJ2 in writing, LICENSEE shall not:

      (a)     use or permit the use on any Licensed Product or on any carton, container or packaging any other mark or identification

- 18 -

except the LICENSEE's own identifying mark and toll free customer service telephone number or public e-mail address; and/or

(b)    include or permit the inclusion of its name or any other person or entity with any of the Licensed Rights in any advertising, promotional or other material or on the Licensed Products; and/or

(c)    display, sell, market, distribute, or advertise any other product or service in conjunction or association with any Licensed Product.

12.9 LICENSEE agrees that the Licensed Rights possess special, unique, and extraordinary characteristics which make difficult the assessment of the monetary damage which RTJ2 would sustain by unauthorized use and that irreparable injury would be caused to RTJ2 by unauthorized use of the Licensed Rights.    LICENSEE agrees that injunctive and other equitable relief would be appropriate in the event of a breach of this Agreement by LICENSEE, provided, however, that such remedy shall not exclude any other legal remedies otherwise available.

12.10    RTJ2 and LICENSEE shall maintain in confidence all Proprietary Information provided to each other and both shall use same only for performing their obligations hereunder, and both shall, upon termination or expiration of this Agreement, return to each all Proprietary Information recorded on tangible medium.    Proprietary Information means all information not

(a)    already in RTJ2's or LICENSEE's possession prior to its receipt from either party, *and/or*

(b)    now or hereafter available to the general public through no act or fault of RTJ2 or LICENSEE, *and/or*

(c)    rightfully disclosed to RTJ2 or LICENSEE by a third party without restriction on its use or disclosure.

12.11    LICENSEE shall use reasonable efforts to ensure that the Licensed Products do not infringe Intellectual Property Rights not owned by LICENSEE and shall notify RTJ2 of any claim by any third party involving infringement of third party Intellectual Property Rights for which the Licensed Products are the subject of such claims.

## 13. DISTRIBUTION

LICENSEE warrants it will not use the Licensed Products for sales to Mass Retailers, Clubs or discount stores except as permitted by Sections (2.10) and (6) of this Agreement without prior written consent of RTJ2.

## 14. REPRESENTATION AND WARRANTIES OF LICENSEE AND RTJ2

14.1 LICENSEE warrants that the Licensed Products shall be merchantable and fit for the purpose for which they are intended.

- 19 -

14.2 LICENSEE represents and warrants that the Licensed Products, packaging, displays, marketing, sales and distribution shall meet or exceed all federal, state and local laws, rules, regulations, ordinances, guidelines, standards and other enactments and industry standards pertaining to such products or activities including, but not limited to, those relating to product safety, quality, labeling and propriety. LICENSEE agrees that it will not package, market, display, sell or distribute any Licensed Products or cause or permit any Licensed Products to be packaged, marketed, displayed, sold or distributed in violation of any such federal, state and local laws, rules, regulations, ordinances, guidelines, standards and other enactments and industry standards.

14.3 LICENSEE represents and warrants that LICENSEE is a member of one of the world's largest human rights protection apparel industry group, the Fair Labor Association, which establishes guidelines for national and international inhuman manufacturing practices, and that LICENSEE shall abide by the Fair Labor Association's guidelines in the manufacture of the Licensed Products. Further, LICENSEE'S contracted factories are regularly subjected to audit and inspection by the Fair Labor Association.

14.4 LICENSEE:

     (a)     grants an irrevocable, unrestricted license to RTJ2 under any intellectual property that is utilized in the Licensed Products and created by or for LICENSEE and owned by LICENSEE for use under this Agreement with RTJ2 and, upon termination or expiration of this Agreement or upon RTJ2's earlier request, shall assign to RTJ2 in perpetuity the entire, unencumbered title and all rights to all intellectual property that utilizes the Licensed Rights created by or for LICENSEE for use under this Agreement. LICENSEE agrees to execute any additional documents proposed by RTJ2 at RTJ2's sole expense to effectuate and confirm RTJ2's sole and exclusive ownership of all such intellectual property rights, and LICENSEE irrevocably appoints RTJ2 as its attorney-in-fact to execute any and all such documents if LICENSEE fails to return executed copies of such documents to RTJ2 within five (5) days following submission. LICENSEE:

         (i)     warrants that RTJ2 may modify any such work or design without restriction; and

         (ii)     waives all moral rights in all such works or designs.

     (b)     shall send assignments under this Section to:

Robert Trent Jones, Jr.
ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

- 20 -

14.5 LICENSEE shall not assign, sub-license, convey, pledge, encumber or otherwise dispose of this Agreement or any right or interest hereunder without the prior written consent of RTJ2, such consent not to be unreasonably withheld. This Agreement may be assigned by RTJ2.

14.6 RTJ2 represents and warrants that it has the right to grant the License Rights as set out on Exhibit (A) and other rights granted under this Agreement. It is a limited liability company duly formed, validly existing and in good standing. RTJ2 has full power and authority to enter into this Agreement and to perform its obligations hereunder.

14.7 LICENSEE recognizes and acknowledges that Robert Trent Jones, Sr. was also a well-known golf course architect, and that some of the golf courses designed by Robert Trent Jones, Sr. may have certain rights to use of the name and mark Robert Trent Jones in connection with their golf courses. Subject to the foregoing, RTJ2 represents and warrants to the best of its knowledge that the use of the License Rights by the LICENSEE as contemplated by this Agreement does not and will not infringe any trademarks, copyrights, trade secrets or other proprietary rights of any third party. RTJ2 represents and warrants that to the best of its knowledge no current threatened or actual claims exist that could adversely affect the License Rights granted LICENSEE under this agreement.

## 15. DISCLAIMERS

15.1 Nothing in this Agreement shall be construed as:

(a)    a warranty or representation that anything made, used, displayed, sold, or otherwise disposed of under any license granted in this Agreement is or will be free from the rightful claim of any third party by way of infringement or the like except as specifically provided herein; or

(b)    a requirement that RTJ2 shall file or prosecute any trademark application, secure any copyright or maintain any trademark, service mark, or copyright registration in force or notify LICENSEE of any action or failure to act with respect to any application or renewal; or

(c)    an obligation that RTJ2 bring or prosecute actions or suits against third parties for infringement or the like; or

(d)    granting by implication, estoppel, or otherwise, any licenses or rights of RTJ2 other than the Licensed Rights.

15.2 Except as specifically provided herein, RTJ2 makes no representations, extends no warranties of any kind, either express or implied, and assumes no responsibilities whatever with respect to use, sale, or other disposition by LICENSEE or its vendees or other transferees of Licensed Products.

- 21 -

## 16. CANCELLATION

The parties understand that RTJ2, its subsidiaries, affiliates, and authorized licensees use the Licensed Rights which are the subject of this license to advance and promote RTJ2 golf course design services and other quality products and services, and that RTJ2 has a paramount obligation to preserve its ability to so use such Licensed Rights. Should, in RTJ2's or LICENSEE'S reasonable discretion, any use of any Licensed Rights become threatened as a result of any rule, regulation, or policy of governmental administrative agencies, then RTJ2 or LICENSEE may cancel or amend this Agreement to the extent necessary without any legal, moral or financial obligation to RTJ2 (other than LICENSEE'S royalty obligations) or LICENSEE or any third parties.

## 17. NO WAIVER

Any failure of RTJ2 or LICENSEE to enforce at any time any of the provisions of this Agreement or any rights or remedies with respect thereto or to exercise any election therein provided shall not constitute a waiver of any such provision, right, remedy or election or in any way affect the validity of any thereof or of this Agreement. The exercise by RTJ2 or LICENSEE of any of its rights, remedies or elections under the terms of this Agreement shall not preclude or prejudice RTJ2's or LICENSEE'S rights to exercise at any other time the same or any other right, remedy or election they may have under this Agreement. The rights of termination provided in this Agreement are in addition to any other right, remedy or election RTJ2 and LICENSEE may have with respect to this Agreement, including the right to sue for breach without terminating.

## 18. MISCELLANEOUS

18.1 Nothing in this Agreement nor anything done by either party in the discharge of its obligations hereunder shall be deemed to constitute either party the agent of the other in any sense. Likewise, this Agreement is not a franchise agreement. Nothing contained herein shall be deemed to preclude or impair any rights which RTJ2 may have as a creditor in any bankruptcy proceeding.

18.2 During the term of this Agreement, LICENSEE shall not negotiate with respect to, enter into agreements relating to, or participate in business transactions which are inconsistent with the purpose of this Agreement. LICENSEE shall consistently distinguish the Licensed Products from other products manufactured or sold by LICENSEE and shall avoid confusing similarity between such other products and the Licensed Products.

18.3 During the term of this Agreement, except as permitted under Sections (6.3) and (12.8) LICENSEE shall not manufacture, display, sell, market, distribute and/or reproduce, or, at LICENSEE's direction to have manufactured and/or reproduced any product under a different brand that is identical to a Licensed Product.

18.4 During the term of this Agreement, LICENSEE shall not enter into a competing license agreement with another golf course designer, current or former golf professional, or golf equipment manufacturer for the sale of the same or similar products at same or similar price level without RTJ2's express approval.

18.5 This writing constitutes the entire agreement between the parties hereto relating to the subject matter of this Agreement and no term or provision of this Agreement shall be varied or modified by any prior or subsequent statement, conduct, or act of either of the parties except that RTJ2 may amend:

    (a)      Exhibit A and/or Exhibit B by unilaterally adding Licensed Rights, Licensed Products, and Licensed Territories respectively, thereto;

    (b)      revises names of countries in Exhibit B as they are changed by governments or successor nations are created; and

    (c)      the balance of the Agreement to the extent necessary to reference such additions made to Exhibit A and/or Exhibit B.

by providing written notification of same signed by an authorized representative of RTJ2 to LICENSEE. Any other amendment to this Agreement must be in writing, specifically refer to this Agreement, and be executed by both parties in the same manner as this instrument.

18.6 The captions for each Section have been inserted for the sake of convenience and shall not be deemed to be binding upon the parties for the purpose of interpretation of this Agreement.

18.7 The terms and provisions of this Agreement shall be interpreted in accordance with and governed by the laws of the State of California, USA, excluding the conflict of laws portion thereof. LICENSEE consents to jurisdiction for any dispute hereunder between the parties to be in San Francisco, California, U.S.A.

18.8 Licensee shall reimburse RTJ2 for all reasonable expenses, legal fees and costs required to enforce LICENSEE's obligations under this Agreement. RTJ2 shall reimburse LICENSEE for all reasonable expenses, legal fees and costs required to enforce RTJ2's obligations under this Agreement.

18.9 The provisions of SECTION 1 of this Agreement shall be held in confidence between the parties and shall not be disclosed to others except as may be required by a court, governmental agency, statute, rule, or regulation. Nothing herein shall be interpreted as a limitation on LICENSEE's duty of public disclosure as required for the issuance or maintenance of publicly traded securities. The remaining Sections of and Attachments to this Agreement shall not be disseminated or distributed outside the management, accounting and/or legal counsel of the LICENSEE without the prior written consent of RTJ2.

## 19. TERMINATION

19.1    RTJ2 shall have the right, without prejudice to any other rights which it may have, to terminate this Agreement in its entirety, pursuant to subsections (c) through (p), or with respect to certain Licensed Products, pursuant to subsections (a) and (b), if LICENSEE fails to cure any of the following termination events within twenty (20) days after receiving Notice from RTJ2 of the occurrence of such termination event. Such termination event shall occur if LICENSEE:

(a)    shall have failed to commence the manufacture, sale or distribution of any Licensed Product within one year of the Commencement Date, or such time as agreed upon in writing by the parties, or, for an approved Licensed Product, within sixty (60) days after the pre-distribution sample approval date hereof; or

(b)    shall have discontinued manufacturing or distributing any Licensed Product in commercial quantities for a period longer than one year without RTJ2's written approval, not to be unreasonably withheld.  This Section (19.1 (b)) shall apply to a specific product on Exhibit (B) on a product by product basis and not all products listed on Exhibit (B) in the aggregate; or

(c)    commits any material breach of its obligations under this Agreement. or

(d)    fails to make any payment due hereunder or any report or statement required hereunder; or

(e)    shall be unable to pay its obligations when due, shall make any assignment for the benefit of creditors, shall file a voluntary petition in bankruptcy, shall be adjudicated bankrupt or insolvent, or shall have any receiver or trustee in bankruptcy or insolvency appointed for its business or property; or

(f)    markets, sells, or distributes any Licensed Products for which the quality as determined by RTJ2 is lower than the approved samples referred to in the QUALITY OF LICENSED PRODUCTS Section except for Secondary Market sales as allowed under Section (6); or

(g)    manufactures, markets, displays, sells, distributes and/or reproduces uses any Licensed Products or directs any other to manufacture and/or reproduce any product under a different brand that is identical to a Licensed Product except as permitted under Sections (6.3), and (12.8).

(h)    negotiates or enters into a license with another golf course designer, current or former golf professional, or golf equipment manufacturer for the sale of the same or similar products at same or similar price level without first obtaining RTJ2's express

approval

(i)    manufactures, markets, displays, sells, distributes or uses any Licensed Products or promotional or packaging material relating to the Licensed Products without RTJ2's approval or after receipt of written notice from RTJ2 disapproving such items except for the sale of items through Secondary Markets as permitted under Section 6.1(a) and Section 6.3; or

(j)    manufactures, markets, displays, sells, distributes or uses any product and/or promotional or packaging material which is derived from designs, drawings or artwork provided by RTJ2 or developed for use with the Licensed Products without RTJ2's written approval or after receipt of notice from RTJ2 disapproving such items; or

(k)    becomes subject to any voluntary or involuntary order of any governmental agency involving the recall of any Licensed Products or promotional or packaging material relating to the Licensed Products because of safety, health or other hazards or risks to the public; or

(l)    breaches any provision of this Agreement relating to the unauthorized assertion of rights in the Licensed Rights; or

(m)    breaches any provision of this Agreement prohibiting LICENSEE from directly or indirectly arranging for manufacture by third parties, assigning, transferring, sub-licensing, delegating or otherwise encumbering this Agreement or any of its rights or obligations; or

(n)    fails to obtain or maintain product liability insurance as required by the provisions of this Agreement.

(o)    commits any material act that is inconsistent with any provision(s) of this Agreement or fails to act in accordance with any provision(s) of this Agreement.

(p)    Current Period Royalties are less than the Minimum Royalty (by Contract Year) for two consecutive years.

19.2  If reasonable grounds for insecurity arise with respect to the quality of Licensed Product(s) RTJ2 may in writing request adequate assurance from LICENSEE of such quality compliance. If RTJ2 does not receive such written assurance within ten (10) days after the date of its request, the failure by LICENSEE to furnish such assurance will constitute a material breach of this Agreement as per Section (19.1(c))

19.3  If any third party, either alone or pursuant to an arrangement or understanding with one or more persons in the future directly or indirectly acquires by stock ownership more than 51% voting control of LICENSEE, LICENSEE shall immediately give notice to RTJ2 and RTJ2 shall have the right, without prejudice to any other rights which RTJ2 may have, to terminate this Agreement. Public offerings of the LICENSEE'S and its subsidiaries' or affiliates' common or preferred stock or public

offerings of securities convertible into its common or preferred stock and the resultant change in ownership is specifically permitted under this Section (19.3).

19.4 RTJ2 shall have the right to terminate this Agreement to the extent necessary to: settle a claim or lawsuit by a third party against RTJ2 or LICENSEE concerning LICENSEE'S use of the Licensed Rights for infringement of such third party's trademark and or service mark rights; or comply with a final lawsuit judgment in favor of such third party in such circumstances. Said termination shall not be considered a limitation of any rights or remedies that either party may have under this Agreement.

19.5 RTJ2 may terminate, to the extent necessary, the license(s) granted hereunder with respect to any Licensed Product which is the subject of a claim for infringement, misuse, and/or misappropriation of Intellectual Property Rights if, in RTJ2's reasonable discretion, such claim is legitimate. Said termination shall not be considered a limitation of any rights or remedies that either party may have under this Agreement.

19.6  LICENSEE shall have the right, without prejudice to any other rights which it may have, to terminate this Agreement in its entirety or with respect to certain Licensed Products, effective immediately, if RTJ2:

(a) commits any material breach of its obligations under this Agreement;

(b)  commits actions, or by its non-action, that a reasonable individual would believe diminishes in the public domain the commercial value of the License Rights. LICENSEE may in writing request adequate written assurance from RTJ2 that no such diminishment has occurred. If LICENSEE does not receive such written assurance within ten (10) days after the date of its request, the failure by RTJ2 to furnish such assurance will constitute a material breach of this Agreement as per Section (19.6.(a));

(c) or Robert Trent Jones, Jr. ceases to actively perform golf course design or other quality related services to the golf market;

(d) assigns this Agreement to a competitor of Gear for Sports.

19.7 Upon any termination of this Agreement, the license herein granted shall terminate.  However, for a Grace Period (specified in the VARIABLE PROVISIONS Section) thereafter, LICENSEE may sell the Licensed Products which are already manufactured and ready for sale prior to the date of termination; *provided* that:

(a)  LICENSEE shall not begin to manufacture or cause to be manufactured any Licensed Products after receiving or sending notice of termination, *and*

(b)  that all payments under this Agreement then due are first made to RTJ2, *and*

(c)  that such sales are in accordance with the terms of this

Agreement, *and*

(d)    that, except for sales made to Secondary Markets where LICENSEE has removed any and all Licensed Rights from the Licensed Products, sales shall not be discounted below LICENSEE's cost of manufacture, *and*

(e)    that report and payments with respect to that period are made in accordance with this Agreement.

Such final Report and payment shall be made within twenty-five (25) days after the end of said Grace Period.  Upon expiration of said Grace Period, any remaining inventory of Licensed Products shall be destroyed and evidence of such destruction shall be given to RTJ2.

19.8 Upon termination or expiration of this Agreement, LICENSEE's obligations set forth in Sections:

ROYALTIES

REPORTS AND RECORDS

QUALITY OF LICENSED PRODUCTS

ADVERTISING MATERIALS AND REQUIREMENTS

PROTECTION OF TRADEMARKS, SERVICE MARKS; COPYRIGHTS AND PROPRIETARY INFORMATION

INDEMNIFICATION AND INSURANCE,

and such others which by their own terms are effective thereafter, shall remain in full force and effect.


RTJ2 and LICENSEE have caused this Agreement to be executed, in duplicate, by their respective, duly authorized representatives on the dates and at the places indicated below.


ROBERT TRENT JONES II
LICENSING GROUP, LLC                          LICENSEE


By:  _Robert Trent Jones J_          By:  _(signature)_

Name:  _Robert Trent Jones, Jr._     Name:  _Larry Graveel_

Title:  _President_                  Title:  _President/CEO_

Date:  _September 22, 2004_          Date:  _September, 22, 2004_

Page left blank intentionally

**Licensed Rights**

LICENSED TRADEMARKS AND SERVICE MARKS:

ROBERT TRENT JONES
ROBERT TRENT JONES II
ROBERT TRENT JONES, JR.
RTJ2
ROBERT TRENT JONES II and Design (logo)

LICENSED RIGHTS OF PUBLICITY:

The Robert Trent Jones, Jr. Name
The Robert Trent Jones, Jr. Signature
Likeness, Image and Persona of Robert Trent Jones, Jr.

LICENSED COPYRIGHTS:

N/A

EXHIBIT A

**Licensed Products**

| Item No. | Detailed Description of Licensed Product | Territory Description |
|---|---|---|
| 1 | Men's 60 doubles, mercerized 100% cotton *jersey* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 2 | Men's 60 doubles, mercerized 100% cotton *pique* golf shirts in solids, stripes, and patterns | United States of America and its territories, Canada, Mexico |
| 3 | Men's basic golf sweaters, and sweater vests, in mercerized cottons, merino wools, and cashmere or like quality fabrications | United States of America and its territories, Canada, Mexico |
| 4 | Men's traditional trousers made of wool, wool blend, cotton or silk or microfiber fabrications | United States of America and its territories, Canada, Mexico |
| 5 | Men's traditional golf shorts made of silk, microfiber and cotton fabrications | United States of America and its territories, Canada, Mexico |
| 6 | Men's windshirts made of water-resistant, breathable fabrications | United States of America and its territories, Canada, Mexico |
| 7 | Men's light-weight golf jacket made of synthetic, natural fiber, synthetic and natural fiber blend, leather or suede fabrications | United States of America and its territories, Canada, Mexico |
| 8 | Men's mock neck, crew neck knit shirt. | United States of America and its territories, Canada, Mexico |
| 9 | Men's woven shirt. | United States of America and its territories, Canada, Mexico |
| 10 | Men's headwear. | United States of America and its territories, Canada, Mexico |

Exhibit B

- 30 -

**Royalty Report Form**                    Sales Period: From _____ to _____

| Licensee: |
|---|
| Licensee Address: |

| Date Due: | Date Reported: | Submitted By: | Signature: |
|---|---|---|---|
| | | | |

| Grant No.* | Total Sales | Allowances | Net Sales | Royalty % | Royalty Due |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| Totals: | | | | | Current Sales Period Royalties |
|---|---|---|---|---|---|

*Calculate Payment Due*

| Comments and Notes: | 1. Current Period Royalties based on sales (from above) minus any credits listed in Agreement Section 8.2. | US$ |
|---|---|---|
| | 2. Current period Minimum Guaranteed Royalty for the Current Sales Period (if any) minus any credits listed in Agreement Section 8.2. See Agreement Sections 1.5 & 8.2. | US$ |
| | 3. Royalties owed for current Sales Period. Enter the greater of lines 1 or 2. See Agreement Section 8.2. | US$ |
| | 4. Late payment charges and interest on Past Due Balance (if any). See License Agreement Section 8.3 | US$ |
| | 5. Balance of any Royalties overdue from previous contract Sales Periods. | US$ |
| | 6. Royalties Due Robert Trent Jones II INC. including Interest (Add lines 3, 4, & 5). | US$ |

* From Exhibit B: See the definition of Net Sales in the Agreement (Section 2). All payments are to be made to ROBERT TRENT JONES II LICENSING GROUP, LLC

Exhibit C

- 31 -

## Product Detail/Approval Form

| Licensee: | Submission Date: |
|---|---|
| Licensee Address: | |
| Licensee Fax Number: | |

Products submitted for approval:

| Grant No. | Detailed description of Licensed Product, including packaging and promotional materials | Previously Submitted for Approval Yes or No? | Approved (to be completed by RTJ2) | Disapproved (to be completed by RTJ2) |
|---|---|---|---|---|
| | | | | |

Please submit Product Detail / Approval Form to:

Robert Trent Jones, Jr.
ROBERT TRENT JONES II LICENSING GROUP, LLC
705 Forest Avenue
Palo Alto, California 94301

RTJ2 COMMENTS:

By: _____     Date: _____
    Robert Trent Jones, Jr.

Exhibit D

**Robert Trent Jones Licensing**

**Marketing, Distribution, Financial and Quality Plan Outline**

## I.     COMPANY INFORMATION

Organization Chart — Qualifications and responsibilities of leadership and other significant personnel connected with the RTJ2 account.

## II.     BACKGROUND

Review of activity to date, including but not limited to, accomplishments to date, current Licensed Products, previous goals met (or not met), etc.

## III.     STRATEGIC PLAN

**Vision**

Where is the business going?  What can RTJ2 expect it to become?

**Mission**

What is the purpose?

**Five Year Goals**

What must be achieved?  What are the benchmarks?

**Critical Issues**

Obstacles, constraints, concerns.

Exhibit E

- 33 -

## Strategies

How to achieve goals, critical success factors and overcome critical issues?

## Objectives

Measurable, specific targets for the period (not activities). (Product improvements, customer satisfaction, brand awareness & preference, sales coverage)

## Tactics

Activities and programs planned to attain the objectives. (Surveys, products, distribution, catalogs & promotion, public relations, trade shows, sales initiatives, inventory, order handling & shipping methods).

## Distribution Outlets

Description of current and future.

## End Users

Description of current and future.

### IV.    FINANCIAL PLAN

**Balance Sheet** — Actual for last fiscal year and forecast for this fiscal year, all certified by the chief financial officer.

**Income Statement** — Actual for last fiscal year, forecast for this fiscal year all certified by the chief financial officer.

Exhibit E

**Advertising and Promotional Expenditures** — Actual for last calendar year, forecast for this and next calendar year; all certified by the chief financial officer.

**Sales of RTJ2 Licensed Products by Territory** — Actual for last calendar year, forecast for this and next calendar year; all certified by the chief financial officer.

## V.    QUALITY PLAN

Because Licensed Products directly affects public perceptions of RTJ2, all licensees are required to provide a detailed report of their plans for maintaining product and service quality, from design and manufacture to retail sale and post-sale support.

Submitted by _____

Title _____

Exhibit E

# ADDENDUM

THIS ADDENDUM is by and between Robert Trent Jones II Licensing Group, LLC, a Delaware limited liability company with a principal place of business at 705 Forest Avenue, Palo Alto, California 94301 (hereinafter "RTJ2") and GFSI, Inc., a Delaware corporation with a principal place of business at 9700 Commerce Parkway, Lenexa, Kansas 66219 (hereinafter "LICENSEE").

WHEREAS RTJ2 and LICENSEE entered an agreement entitled Intellectual Property License Agreement with a Commencement Date of May 1, 2005 for the design, manufacture, distribution and sale of apparel under the trademarks and related rights of RTJ2 (hereinafter "License Agreement");

WHEREAS RTJ2 is the owner of all intellectual property licensed under the License Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises hereinafter provided, and intending to be legally bound, the parties hereby agree as follows:

1. LICENSEE shall provide RTJ2 with the opportunity to meet and interview at the offices of RTJ2 and at a mutually convenient date and time the individual designated by LICENSEE to have primary responsibility for the design, manufacture, distribution and sale of apparel under the License Agreement (hereafter "Candidate"). All travel expenses of the Candidate shall be paid by LICENSEE.

2. If, within 24 hours of the interview, RTJ2 provides LICENSEE with written notice of objection to LICENSEE's designation of the Candidate as having primary responsibility for the design, manufacture, distribution and sale of apparel under the License Agreement, LICENSEE shall not hire the Candidate and shall designate a new Candidate for interview under Paragraph 1. This procedure shall repeat until both RTJ2 and LICENSEE agree on a mutually acceptable Candidate.

By execution hereof, this Addendum is incorporated into and made a part of the License Agreement.

ROBERT TRENT JONES II                    LICENSEE
LICENSING GROUP, LLC


By:  _Robert Trent Jones J_              By:  _[signature]_

Name:  _Robert Trent Jones, Jr._         Name:  _Larry Graveel_

Title:  _President_                      Title:  _President / COO_

Date:  _September 22, 2004_              Date:  _September 22, 2004_