# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT TRENT JONES II, INC. and ROBERT TRENT JONES LICENSING GROUP, LLC<br><br>Plaintiffs,<br><br>v.<br><br>GFSI, INC. d/b/a GEAR FOR SPORTS, INC.<br><br>Defendant. | Case No. 07-CV-04913-EDL<br><br>**DECLARATION OF MR. THOMAS B. ZETLMEISL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    January 8, 2008<br>Time:    2:00 p.m.<br>Judge:   Elizabeth D. Laporte |

**Declaration of Mr. Thomas B. Zetlmeisl**

1. I am a Manager at the accounting firm of RubinBrown LLP, located at One North Brentwood, St. Louis, MO 63105. I have worked at RubinBrown LLP for approximately four years and I have been a Manager that entire time. I have been a Certified Public Accountant for approximately six and a half years. I am also a Certified Fraud Examiner. Prior to my employment at RubinBrown LLP, I was an accountant at Arthur Andersen and Protiviti. I have personal knowledge of the matters stated in this declaration. If called upon to do so, I am competent to testify to all matters set forth herein.

2. On August 28th and 29th of 2007, I accompanied Jay Burgett, an attorney at the law firm of Norvell IP, to GFSI, Inc. d/b/a Gear for Sports, Inc.'s ("GFSI") corporate headquarters located at 9700 Commerce Parkway, Lenexa, Kansas 66219. The purpose of this visit was to review GFSI's financial information as it relates to golf apparel bearing the Robert Trent Jones trademarks ("RTJ Apparel").

3. Upon arriving at GFSI on August 28, 2007, Mr. Burgett and I were met by Erik Olson, Director of Accounting for GFSI. Later that morning, we also met Dan Meadows, Director of Accounting / Controller for GFSI.

4. Prior to our visit to GFSI, Mr. Burgett sent GFSI a letter dated August 23, 2007 requesting that certain documents and information be made available for inspection. Attached as Exhibit 1, is a copy of Mr. Burgett's letter. Despite advance notice of the on-site visit, the GFSI accounting department had no financial data prepared when we arrived. Instead, the accounting department gathered information that we requested and provided it to us piecemeal throughout the two days.

5. During the two day on-site review, Mr. Burgett and I requested numerous documents from GFSI, but the GFSI accounting department failed to provide a substantial amount of the information we requested. Despite a follow-up request from Mr. Burgett, as of the date of this declaration, the requested information has not been provided.

6. Messrs. Meadows and/or Olson, either together or separately, explained the accounting system, the royalty reports submitted by GFSI and fielded questions relating to the same.

7. Messrs. Meadows and/or Olson detailed how GFSI and its accounting department account for sales to discount stores, which GFSI typically refers to as secondary markets. Based on my experience, secondary market(s), as that term is used by GFSI, is a type of "discount store," i.e. a retailer that sells product at a discount.

8. Messrs. Meadows and/or Olson explained that a secondary market is determined by the type of product the customer purchases as explained further in paragraphs 19 and 20. A secondary market does not purchase RTJ Apparel at full price, but rather purchases RTJ Apparel at discount prices and sometimes in bulk.

9. Messrs. Meadows and/or Olson explained that GFSI assigns customer types to each of its customers. Examples of GFSI customer types include "golf," "corporate," and "secondary market." Messrs. Meadows and/or Olson acknowledged that at least one secondary market customer, Stein Mart, was classified incorrectly as a golf customer in the accounting system. Messrs. Meadows and/or Olson also acknowledged that there could be other customers that are classified incorrectly.

10. Based upon my own knowledge and information obtained during our on-site visit, Stein Mart, The Golf Warehouse, and Neiman Marcus GF are secondary market customers who are classified incorrectly as golf customers in the GFSI accounting system. The

---

DECLARATION OF MR. THOMAS B. ZETLMEISL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

pricing of the RTJ Apparel sold to Stein Mart, The Golf Warehouse and Neiman Marcus GF provides evidence of their secondary market status.

11. The typical price of RTJ Apparel item number RMF103 sold to            was whereas the average price charged to other customers (excluding sales representatives) was over    . An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 2.

12. The typical price of RTJ Apparel item number RMP101 sold to            and            was    whereas the average price charged to other customers (excluding sales representatives and other secondary markets) was approximately    . An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 3.

13. The typical price of RTJ Apparel item number RMP109 sold to            was whereas the average price charged to other golf customers (excluding sales representatives and other secondary markets) was approximately    . An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 4.

14. GFSI classifies            as a secondary market customer. An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 5.

15. GFSI classifies            as a secondary market customer. An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 5.

16. GFSI classifies            as a secondary market customer. An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 5.

17. GFSI classifies            as a secondary market customer. An accurate printout of GFSI's financial data demonstrating this fact is attached to this declaration as Exhibit 5.

18. Based on the financial data provided by GFSI for the period May 1, 2005 to July 31, 2007, GFSI's net sales to secondary markets customers were at least            . This includes those sales classified in GFSI's accounting system as secondary markets sales as well as all sales to Stein Mart, The Golf Warehouse and Neiman Marcus GF which are incorrectly classified as Golf customers in GFSI's accounting system. To the extent other customers are incorrectly classified in GFSI's accounting system, there could be additional sales to secondary markets that are not reflected here. See Exhibit 6 for a detailed summary of the approximately            in net sales referred to here.

---

DECLARATION OF MR. THOMAS B. ZETLMEISL IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

19. Messrs. Meadows and/or Olson explained that RTJ Apparel sold to secondary markets could include returned products, overstocks, and/or returned sample lines from sales representatives.

20. Messrs. Meadows and/or Olson explained that:

    a. Return products could include damaged or defective products, such as color, size, stitching, decoration or labeling defects, late shipments or other customer satisfaction issues;

    b. All returned products are sent to a returns division within GFSI. The returns division sorts the returned products to determine which products are (1) returned to stock, (2) sold to secondary markets, or (3) destroyed as unsellable.

    c. Returned defective or damaged products that are deemed sellable are sold to secondary markets.

21. Based upon my understanding of GFSI's procedures for selling RTJ Apparel to secondary markets, I believe that returned defective or damaged RTJ Apparel products are sold to secondary markets with the Robert Trent Jones labels remaining on the products.

22. Messrs. Meadows and/or Olson explained that overstocks could include discontinued RTJ Apparel, last season's styles or poor performing products. GFSI's normal practice is to discount overstocks to non-secondary market customers to maximize profits, until the overstocks can no longer be sold to these customers. At this point, the overstocks are sold to secondary markets.

23. Messrs. Meadows and/or Olson explained that GFSI collects all sample lines that are returned by the sales representatives at the end of the season. It is GFSI's general practice to either sell these returned sample lines directly to secondary markets or sell the returned sample lines with other returned products and/or overstocks to secondary markets as a bulk sale.

24. Based on a review of the GFSI sales data we were provided, in some cases product designated for a secondary market has its style number changed in the accounting system from the typical three letter/three number identifier to a more generic description of the product. As demonstrated by invoice numbers 30012411 and 30012430 to _____, a classified secondary market customer, the style is simply RTJP to designate "Robert Trent Jones Polos." According to Messrs. Meadows and/or Olson, they cannot determine any specifics on the products sold to _____ under

these two invoices, only that the products were Robert Trent Jones polos. Attached hereto as Exhibit 7 are true and correct copies of the stated invoices.

25. Based on a review of the GFSI sales data we were provided and our discussions with Messrs. Meadows and/or Olson, GFSI's accounting system does not track within the RTJ Apparel that is sold to secondary markets whether such product is damaged or defective. When asked, Messrs. Meadows and/or Olson could not state that damaged or defective RTJ Apparel was not sold to secondary markets. In contrast, Messrs. Meadows and/or Olson stated that returned defective or damaged products that are deemed sellable are sold to secondary markets.

26. Messrs. Meadows and/or Olson explained that the product designated for secondary markets is accumulated and stored in temporary storage bins. Mr Meadows took Mr. Burgett and me to view the storage bins. The storage bins are large cardboard boxes that contained a wide variety of RTJ Apparel intermixed together. I sifted through some of the RTJ Apparel stored in the storage bins. Some of the RJT Apparel was still in its packaging. However, a significant amount of the RTJ Apparel was placed in the storage bins in disarray. The storage bins contained RTJ Apparel that had noticeable defects, such as color and label defects, and other RTJ Apparel that did not appear to have any defects. The RTJ Apparel that I viewed in the storage bins all had the Robert Trent Jones labeling still intact.

27. Messrs. Meadows and/or Olson explained that when sufficient bulk of RTJ Apparel accumulates in the temporary storage bins, GFSI sells the product to a secondary market customer for the best price it can negotiate. Messrs. Meadows and/or Olson explained that non-secondary market sales have prices that are based on system generated information. However, the secondary market pricing is based solely on the ability of GFSI to negotiate the best price for the product available.

28. Messrs. Meadows and/or Olson indicated that no documentation was kept in the ordinary course of business relating to the negotiation of sales with secondary markets. The price, the product and the condition of the product varies on a case-by-case basis.

29. Based upon my understanding of GFSI's procedures for selling RTJ Apparel to secondary markets, it is not GFSI's practice to remove the labels and/or tags from RTJ Apparel prior to selling the RTJ Apparel to secondary markets. Mr. Burgett asked Messrs. Meadows and/or Olson if the labels and/or tags were removed prior to selling the RTJ Apparel to secondary markets and Messrs. Meadows and/or Olson stated they were not aware of the labels and/or tags being removed prior to sale. We requested

GFSI's procedures for the handling of RTJ Apparel that is sold to secondary markets; however, Messrs. Meadows and/or Olson have failed to provide this information. Unless there is a label and/or tag removal step that I was not informed of, GFSI does not remove the labels and/or tags from RTJ Apparel prior to selling the product to secondary markets.

30. Based upon my interviews with Messrs. Meadows and/or Olson and my onsite review of GFSI's operations as well as the financial data provided, I conclude at least the following:

    a. Unless I was not informed of a label and/or tag removal step, damaged and defective RTJ Apparel was sold to secondary markets with the labels and tags remaining on the product.

    b. There is substantial information that management of GFSI committed to provide us at the conclusion of our second day on-site. As of the date of this declaration, that information has not been received.

    c. There was inconsistency in GFSI's calculating and lack of documentation to support GFSI's royalty payments.

    d. The accounting for sample product provided to sales representatives changed over time and was difficult to follow based on the limited information and workpapers provided.

    e. Royalties were not paid on private label sales.

    f. For sales to affiliated companies, GFSI is not paying royalties on the correct amount. It is paying at the amount invoiced to its affiliated entities instead of the amount that the end consumer pays to that affiliated entity.

    g. There is inconsistency in how customers were labeled in GFSI's accounting system. Some customers who were paying prices consistent with secondary markets customers were labeled with the 'Golf' customer type.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this 27th day of November, 2007, in St. Louis, Missouri.

Thomas B. Zetlmeisl