UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT TRENT JONES II, INC., and ROBERT TRENT JONES LICENSING GROUP, LLC,<br>    Plaintiffs,<br>  v.<br>GFSI, INC., d/b/a GEAR FOR SPORTS, INC.,<br>    Defendant. | No. 07-4913 SC<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY <u>INJUNCTION</u> |

### I. **INTRODUCTION**

Plaintiffs Robert Trent Jones II, Inc. and Robert Trent Jones Licensing Group, LLC ("Plaintiffs" or "RTJ2") brought this suit against Defendant GFSI, Inc. ("Defendant" or "GFSI") asserting claims for fraudulent misrepresentation, negligent misrepresentation, breach of contract, unfair competition in violation of the California Business & Professions Code, and numerous violations of the Lanham Act, 15 U.S.C. § 1051, et seq. See Compl., Docket No 1. Plaintiffs brought the instant motion seeking a preliminary injunction pending final resolution of the matter at trial. See Notice of Mot. & Mem. of P. & A. in Support of Pls.' Mot. for Prelim. Inj. ("Motion"), Docket No. 11. GFSI opposed the Motion, and Plaintiffs replied. See Docket Nos. 36, 39. The parties also submitted numerous declarations in support of their positions, and appeared before the Court for an evidentiary hearing on the Motion. Having considered all of the

arguments and evidence submitted, the Court DENIES Plaintiffs' Motion for the reasons set forth below.

## II. BACKGROUND

Robert Trent Jones, Jr., is a world-renowned golf course architect and Chairman of the design firm bearing his name, Robert Trent Jones II, LLC. Jones has been designing golf courses for more than forty years, and has received numerous awards and accolades for his work. Plaintiffs manage the rights to Jones's name, trademarks, and rights of publicity. GFSI designs, manufactures, and distributes sportswear and other apparel.

In 2004, Plaintiffs and GFSI entered into an agreement pursuant to which GFSI would manufacture and distribute apparel bearing Plaintiffs' trademarks ("RTJ Marks"). See Def.'s Ex. 1, Intellectual Property Licensing Agreement ("Agreement").[1] Prior to entering the relationship with GFSI, Plaintiffs had never authorized use of the RTJ Marks for use in any sort of apparel. Jones maintains that the RTJ brand is considered a premium brand, and that its name is associated with luxury goods, such as Rolex watches and Lexus automobiles. Plaintiffs claim that maintenance of the high-end status of the RTJ brand was a paramount concern when they negotiated the Agreement with GFSI.

According to Plaintiffs, three provisions of the Agreement were designed to preserve the integrity of the RTJ Marks and brand

---

[1] Unless otherwise noted, references to Defendant's Exhibits ("Def.'s Ex.") or Plaintiffs' Exhibits ("Pls.' Ex.") refer to those exhibits entered into evidence during the hearing on this Motion before the Court on January 24, 2008.

2

by limiting the channels of distribution.  Section 13 provides:

> LICENSEE warrants it will not use the Licensed Products for sales to Mass Retailers, Clubs or discount stores except as permitted by Sections (2.10) and (6) of this Agreement without prior written consent of RTJ2.

Section 2.10 provides:

> "Secondary Market(s)" means a LICENSEE customer that LICENSEE customarily sells defective, irregular, seconds or overstocks of products, such as The Paradies [sic] Shops (d/b/a PGA Tour Shop Stores), Burlington Coat Factory, Bermo Enterprises, Gabriel Brothers or the like. Defective, irregular, seconds, or overstocks cannot be sold to "Mass Retailers" such as Wal-Mart, K-Mart, Ames, Value City, Dollar General and Dollar Stores or "Clubs" such as Costco or Sam's or like stores.

Section 6.3 states, in part:

> LICENSEE shall not except as provided in this Section (6.3) sell, display, market, distribute or use for any purpose or permit any third party to sell, display, market, distribute or use for any purpose any Licensed Products or promotional and packaging material relating to the Licensed Products that are damaged, defective, seconds, or otherwise fail to meet RTJ2's specifications or quality standards or the trademark and copyright usage and notice requirements of this Agreement.  Should LICENSEE elect to sell such product to Secondary Markets, LICENSEE shall remove any and all Licensed Rights identification from the garment prior to sales, display or distribution.

Def.'s Ex. 1.

Plaintiffs brought this Motion because GFSI has sold products bearing the RTJ Marks to a number of stores which Plaintiffs contend are "discount stores," as that term is used in the Agreement, thus violating Section 13, and causing immediate and irreparable harm to the RTJ brand.  The stores in question are Gabriel Brothers, Hockabee's, Steinmart, The Golf Warehouse

3

1  ("TGW"), Sym's, Neiman Marcus Last Call, T.J. Maxx, and Ross.
2  With the exception of TGW and Hockabee's, GFSI has not sold to
3  these retailers since the Fall of 2006, and, although it disputes
4  that any of these stores are "discount retailers," agreed not to
5  sell any RTJ apparel to them after Plaintiff raised the issue in
6  July 2007.  Larry Graveel, the President of GFSI, testified that
7  since this dispute began, he has made notes in the GFSI customer
8  database indicating that GFSI will no longer accept orders for RTJ
9  apparel from Hockabee's.  Graveel further testified, however, that
10 GFSI intends to continue selling RTJ apparel to TGW, and does not
11 believe that TGW is a discount store.

12    Plaintiffs also allege that GFSI is selling damaged or
13 defective goods bearing the RTJ Marks out of its warehouse during
14 "dock sale" events and at its own outlet store, in violation of
15 Section 6.3 of the Agreement.  Graveel testified that the dock
16 sales are only open to GFSI employees.  Plaintiffs' private
17 investigator, Jimmy Kidd, is not a GFSI employee, however, and
18 testified (by sworn declaration) that he was able to enter the
19 GFSI warehouse during a dock sale and purchase a number of
20 defective shirts with the RTJ Marks, which Plaintiffs also
21 provided to the Court.  See Pls.' Exs. 5, 6.

22    During the hearing on this matter, the parties attempted to
23 reach a satisfactory resolution that would not require further
24 action from the Court.  GFSI agreed that pending final disposition
25 of the law suit by agreement of the parties or by an order of the
26 Court, it would not sell any apparel bearing the RTJ Marks to
27 Gabriel Brothers, Hockabee's, Steinmart, Sym's, Neiman Marcus Last

4

Call, T.J. Maxx, or Ross. GFSI further agreed that it would monitor the dock sales to assure that it was not selling defective merchandise bearing the RTJ Marks. Despite this, the parties could not reach an agreement regarding GFSI's sales to TGW. Plaintiffs maintain that TGW is a discount store, and that sales to TGW violate the Agreement. GFSI disagrees that TGW is a discount store, and refuses to stop sales to TGW. The parties therefore submitted the issue to the Court.

### III. LEGAL STANDARD

Injunctive relief is available to the plaintiff in a trademark infringement dispute. See 15 U.S.C. § 1116. In this Circuit, a plaintiff must show "either: (1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." A&M Records v. Napster, Inc., 239 F.3d 1004, 1013 (9th Cir. 2001). These two alternatives "are not separate tests but the outer reaches of a single continuum." Regents of Univ. of Cal. v Am. Broad. Cos., Inc., 747 F.2d 511, 515 (9th Cir. 1994). "Essentially, the trial court must balance the equities in the exercise of its discretion." Int'l Jensen, Inc. v. MetroSound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993).

### IV. DISCUSSION

#### A. Success On The Merits

Success on the merits in a trademark infringement dispute requires the plaintiff to show ownership of a valid, protectible

5

mark, and that defendant's use of the mark is likely to cause consumer confusion.[2] See Charles Schwab & Co. v. Hibernia Bank, 665 F. Supp. 800, 803 (N.D. Cal. 1987).

Here, RTJ2's ownership of valid marks is not in dispute. The RTJ Marks are registered, entitling them to a presumption of validity. See Jones Decl. ¶ 15; 15 U.S.C. §§ 1057(b), 1115(a) (registration is prima facie evidence of validity and right to enforce). GFSI does not appear to contest either the ownership or validity of the RTJ Marks.

The determining factor, then, is the likelihood of consumer confusion about the source of the goods. In a traditional trademark infringement suit, the court determines the likelihood of confusion according to the eight factors established in AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). See Jada Toys, Inc. v. Mattel, Inc., 496 F.3d 974, 979 (9th Cir. 2007). In a dispute between a licensee and licensor, however, the inquiry is different. There is no need to compare RTJ2's marks or products with GFSI's – they are identical by virtue of the Agreement. See Hollywood Athletic Club v. GHAC-CityWalk, 938 F. Supp. 612, 614-15 (C.D. Cal. 1996). "Where a licensee persists in the unauthorized use of a licensor's trademark, courts have found that the continued use alone establishes a likelihood of consumer confusion." Sun Microsystems v. Microsoft Corp., 999 F. Supp. 1301, 1311 (N.D. Cal. 1998) (citing Paisa, Inc. v. N & G Auto, Inc., 928 F. Supp. 1009, 1012 n.4 (C.D. Cal. 1996); Hollywood

---

[2] Although RTJ2 has other claims in this suit, the Motion only addresses the claim for trademark infringement.

6

1 Athletic Club, 938 F. Supp. at 614-15 (C.D. Cal. 1996)).  This is
2 the core of the dispute.

3 　　　In their brief, Plaintiffs point to substantial authority
4 holding that unauthorized use of the licensor's mark by a licensee
5 necessarily causes confusion, and is therefore sufficient
6 likelihood of success on the merits to justify injunctive relief.
7 See Mot. at 19 (citing Paisa, 928 F. Supp at 1012 n.4; Hollywood
8 Athletic Club, 938 F. Supp. at 614-15; Church of Scientology Int'l
9 v. Elimira Mission of the Church of Scientology, 794 F.2d 38 (2d
10 Cir. 1986).  The matter before the Court now differs from those
11 cases in a significant way, however.  In each case RTJ2 cites, the
12 license agreement had been terminated before the licensor sought
13 injunctive relief.  See Paisa, 928 F. Supp. at 1011; Hollywood
14 Athletic Club, 938 F. Supp. at 615; Church of Scientology, 794
15 F.2d at 42.  Here, RTJ2 has not terminated the Agreement, so
16 GFSI's continued use of the RTJ2 Marks is not inherently
17 unauthorized.

18 　　　The Court therefore must determine whether, by selling RTJ
19 apparel to TGW, GFSI is breaching the Agreement.[3]  Whether GFSI is
20 in breach turns on whether TGW is a "discount store" as used in
21 the Agreement.  While arguing before the Court, Plaintiffs'
22 counsel stated, "Everybody knows what a discount store is."  Were
23 that the case, this would be much less complicated.

---

[3] The Court focuses only on the sales to TGW because, as noted above, GFSI agreed during the hearing to cease sales of RTJ apparel to Gabriel Brothers, Hockabee's, Steinmart, Sym's, Neiman Marcus Last Call, T.J. Maxx, and Ross pending the resolution of this suit, and to monitor the dock sales.

Unfortunately, the parties did not define that term in the Agreement, and now advocate different definitions. Neither definition is well-articulated.

At different points during his testimony, Graveel variously defined a discount store as containing some combination of the following attributes: it sells a broad assortment of products, is "promotionally minded," relies on Sunday circular ads, generally is of a certain (undefined) square footage, uses ads to bring in customers, profits through a high volume of low-margin sales, sells general merchandise, sells both "hard" and "soft" products, and uses weekly ads. Graveel named a number of stores, none of which is at issue here, that he considers discount stores, including Target, K-Mart, Wal-Mart, Myers, Sears, and Value City. According to Graveel, neither TGW nor any of the stores relevant to this Motion is a discount store. Graveel claimed his definition was standard in the retail apparel industry, in which he has worked for decades.[4]

Claiming no special knowledge of the apparel industry or retail marketing in general, Jones testified that a discount store is a store where goods are offered below retail store prices. He did not define "retail store," however. When asked about a number of specific stores, including Nordstrom, Bloomingdale's, Dillard's, and JC Penney, Jones was, at first, uncertain whether those stores were retail stores or discount stores. Then he

---

[4] Curiously, this is a different test for determining whether a retailer is a discount store than GFSI advanced in its brief. See Opp'n at 9-10 (citing *In re* City Stores Co., 9 B.R. 717, 720-21 (Bankr. S.D.N.Y. 1981)).

8

1  recalled that someone had told him some of the stores in question
2  were retail stores.  He said that TGW is a discount store, because
3  other RTJ2 employees, including Bill Fugasy and Tali Jones, had
4  told him that TGW is a discount store.

5  These definitions amount to "I know it when I see it," which
6  is no better a means for determining whether a store is a discount
7  store than it is for determining whether speech is obscene.
8  Compare Jacobellis v. Ohio, 378 U.S. 184, 197 (1964)(Stewart, J.,
9  concurring); with Miller v. California, 413 U.S. 15, 24 (1973).
10 The Court noted this during the hearing and asked the parties for
11 parol evidence supporting their proposed definitions.  See Consol.
12 World. Invs., Inc. v. Lido Preferred, Ltd., 11 Cal. Rptr. 2d 524,
13 526-27 (1992) ("One exception to the parol evidence rule is that
14 extrinsic evidence may be introduced to explain the meaning of
15 ambiguous contractual language.").[5]  Plaintiffs repeatedly
16 asserted that they had substantial evidence proving conclusively
17 that TGW is a discount store, including print-outs of pages from
18 the TGW website, but offered no parol evidence supporting their
19 definition.  Without a definition, the additional evidence is of
20 no help.  GFSI offered a definition from Wikipedia.com, to which
21 RTJ2 objected.  The Court sustained the objection.  The parties'
22 intent upon entering the Agreement is unclear.  Jones testified
23 that he believed the parties shared an understanding about what

---

[5] The Court follows California contract law, pursuant to the choice-of-law provision in Section 18.7 of the Agreement.  See Paracor Fin., Inc. v. Gen. Elec., 96 F.3d 1151, 1164 (9th Cir. 1996) (court applies forum states's choice-of-law rules); Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 464 (Cal. 1992) (California recognizes contractual choice-of-law provisions).

discount stores were and about limiting sales of RTJ apparel to "high-end" stores. Graveel testified that GFSI never would have entered the Agreement if the definition of "discount store" RTJ2 now advances had applied at the time.

The very limited testimony about what has transpired since the Agreement went into effect is the only available evidence of value. See Kennecott Corp. v. Union Oil Co., 242 Cal. Rptr. 403, 410 (Ct. App. 1987)(citations omitted) ("The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions."). Graveel testified that GFSI has been selling RTJ2 apparel to the stores, including TGW, that Plaintiffs now challenge since the Agreement went into effect, without objection. Jones claims that he was unaware of the extent of these sales until he received a letter describing these customers in July 2007, see Pls.' Ex. 4, and that he immediately sought to stop GFSI from making further sales. Jones himself may not have known about the prior sales, but Graveel testified that GFSI disclosed all of these sales to Tali Jones, another RTJ2 executive, during regular meetings. Further, Jones knew that RTJ2 was selling some merchandise to these stores, but not the extent of the sales. When he, apparently, thought the sales were of small quantities, Jones did not object, suggesting that Plaintiffs did not view sales to TGW and the other stores in question as per se violations of the Agreement.

On the record available, the Court cannot conclude that TGW is a discount store, as that term is used in the Agreement. Nor

10

can the Court conclude that RTJ2 is likely to provide sufficient evidence for the Court to make that determination when the case proceeds. As such, the Court rules that RTJ2 has failed to make the required showing that it is likely to succeed on the merits, which weighs against granting the requested injunctive relief.[6]

**B.   Irreparable Harm**

The above analysis compels the same conclusion with regard to irreparable harm. See Goto.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1205 n.4 (2000) ("In a trademark infringement claim, irreparable injury may be presumed from a showing of likelihood of success on the merits. This presumption effectively conflates the dual inquiries of this prong into the single question of whether the plaintiff has shown a likelihood of success on the merits.") (internal citation and quotation marks omitted). All of Plaintiffs' arguments that it is suffering, or will suffer, irreparable harm are based on its claim that GFSI is distributing RTJ apparel to discount stores without authorization. Because Plaintiffs have failed to prove the breach, however, they cannot prove the irreparable harm.

First, Plaintiffs argue that in a dispute between a licensee

---

[6] The Court does not rule that Defendant's proposed definition (or either of them) is the correct interpretation of the term "discount store" in the Agreement, as a matter of law. The record is not sufficient for such a ruling. The Court notes that Graveel's definition includes stores such as K-Mart and Wal-Mart, which are included in the grouping "Mass Retailers" in the Agreement. Graveel's definition therefore would conflate "Mass Retailer" with "discount store", making one of those terms meaningless, even though they are used distinctly in the Agreement. Before this matter concludes, the parties will have to provide the Court with adequate parol evidence to support a conclusive determination of that issue.

11

and a licensor, the presumption of irreparable harm favors the licensor even more strongly than it does in a normal trademark dispute. See Mot. at 21. Plaintiffs' authorities on this point are the same cases they relied on to support their position regarding likelihood of confusion. See id. (citing Hollywood Athletic Club, 938 F. Supp. at 615; Church of Scientology, 794 F.2d at 42). For the reasons noted above, these cases are inapplicable. It may be the case that if Plaintiffs had proven they were likely to prevail on the merits, i.e., likelihood of confusion, their position as licensors would entitle them to a favorable presumption of irreparable harm. The Court does not reach that conclusion here, however, because Plaintiffs failed in the first instance.

Beyond the presumption of irreparable harm, Plaintiffs also argue that there is an actual harm. See Mot. at 21-22. The purported actual harm, however, is still rooted in violation of the Agreement. Plaintiffs cite to Section 12.9 of the Agreement, which provides:

> LICENSEE agrees that the Licensed Rights possess special, unique, and extraordinary characteristics which make difficult the assessment of the monetary damages which RTJ2 would sustain by unauthorized use and that irreparable injury would be caused to RTJ2 by unauthorized use of the Licensed Rights. LICENSEE agrees that injunctive and other equitable relief would be appropriate in the event of a breach of this Agreement by LICENSEE, provided, however, that such remedy shall not exclude any other legal remedies otherwise available.

Def.'s Ex. 1. To trigger this provision, however, Plaintiffs would have to demonstrate a breach.

12

Plaintiffs also rely on a letter in which Graveel stated, "I continue to express my opinion that having your brand in those stores in significant quantities over time is not a good thing for your brand image and not a good thing for my profitability, so we are both negatively impacted." Pls.' Ex 4. That sales in certain markets may be bad for the RTJ brand image is not inherently the same as irreparable harm. Defendant admits that the business arrangement between the parties was not going well for either side, and in fact, sought to terminate the Agreement. See id. Nothing in Graveel's letter indicates what "significant quantities" means, or how long a period of time it would take to hurt the brand. The letter clearly does not admit irreparable harm, nor does it admit a breach of the Agreement.

Finally, Plaintiffs, again relying on the holding in Church of Scientology, argue that a licensor need not show actual harm to justify injunctive relief, as long as they can show loss of control over the brand's reputation. See Mot. at 22. If all of GFSI's sales are authorized by the Agreement, however, the Court cannot conclude that Plaintiffs are not in control of their marks or reputation. In Church of Scientology, the loss of control stemmed from a former licensee's unauthorized use of the mark. See Church of Scientology, 794 F.2d at 42. Plaintiffs did not terminate the Agreement, despite an apparent request from GFSI to do so.

Until RTJ2 either provides adequate evidence to support its interpretation of the Agreement or proves that it is suffering actual injury regardless of purported breach of the Agreement, the

13

Court cannot conclude that it is suffering an irreparable harm.

**V.   <u>CONCLUSION</u>**

Because Plaintiffs have failed to carry their burden of proving either a likelihood of success on the merits or irreparable harm, the Court need not reach the questions of the balance of hardships or the public interest.  For the reasons described above, the Court hereby DENIES Plaintiffs' Motion for Preliminary Injunction.

IT IS SO ORDERED.

February 4, 2008

_____
UNITED STATES DISTRICT JUDGE

14